IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

JEMME J. JENKINS, Individually, )
and JULIANNE GLISSON,            )
Administrator of the Estate of  )
Jimmie L. Alexander, Sr.,       )
                                 )
      Plaintiffs,                )
                                 )
v.                               )    CASE NO. CV418-099
                                 )
CORIZON HEALTH INC., a Delaware  )
Corporation; GUY AUGUSTIN,       )
M.D.; VICTORIA NEILSER, LPN.;    )
KEVIN TODD, Corporal; MARK       )
DAMBACH, LPN.; CARL MILTON,      )
Sergeant; WANDA WILLIAMS,        )
Lieutenant; DESMOND BRYANT,      )
Corporal; CHATHAM COUNTY         )
COMMISSIONERS; JOHN WILCHER,     )
Sheriff of Chatham County; and   )
JOHN DOES 1-5;                   )
                                 )
      Defendants.                )
_____ )

## O R D E R

Before the Court are Defendants Corizon Health, Inc., Guy Augustin, M.D., Mark Dambach, and Victoria Neisler ("Corizon Defendants") Motion to Exclude Testimony of Robert Blais, M.D. (Doc. 127) and Motion to Strike the Affidavit of Robert Blais, M.D. (Doc. 198). For the following reasons, Corizon Defendants' Motion to Strike the Affidavit of Robert Blais, M.D. (Doc. 198) is **DENIED IN PART** and **GRANTED IN PART** and Corizon Defendants' Motion to Exclude Testimony of Robert Blais (Doc. 127) is **DENIED IN PART** and **GRANTED IN PART.**

**BACKGROUND**

On May 22, 2016, around 8:30 p.m., Jimmie Alexander, Sr. ("Alexander"), a pretrial detainee at Chatham County Detention Center ("CCDC") began to experience pain in his right hip and leg. (Doc. 96 at ¶ 15; Doc. 145 at ¶ 15.) Alexander was evaluated by Defendant Mark Dambach, a licensed practical nurse ("LPN"), and Dambach noted that Alexander complained of sudden onset of right leg pain, that Alexander had a weak thread pedal pulse in his right foot, and that his blood pressure was elevated. (Doc. 96 at ¶¶ 17-19; Doc. 145 at ¶¶ 17-19.) Dambach informed Defendant Guy Augustin, M.D., of Alexander's symptoms and Alexander was prescribed medications to treat the pain and lower his blood pressure. (Doc. 96 at ¶¶ 26-29; Doc. 145 at ¶¶ 26-29.) However, later that evening, Alexander crawled into the middle of Unit 6D floor, vomiting on the floor at some point. (Doc. 96 at ¶¶ 38-39; Doc. 145 at ¶¶ 38-39.) Dambach responded and checked Alexander's vitals, but did not otherwise check Alexander's right leg. (Doc. 96 at ¶¶ 41-43; Doc. 145 at ¶¶ 41-43; Doc. 48 at 131.) Alexander was moved to a cell in Receiving and Discharge ("R&D") for observation during the night. (Doc. 48 at 133-34.)

Augustin arrived at CCDC the next day, May 23, at 7:30 a.m. and spoke with other medical providers at morning conference, and left CCDC around 8:30 a.m. (Doc. 96 at ¶¶ 73-75; Doc. 145 at ¶¶ 73-75.) Augustin returned later that day and examined Alexander at

approximately 3:00 p.m. on Monday, May 23, 2016. (Doc. 96 at ¶ 84; Doc. 145 at ¶ 84.) During his examination, Augustin noted the absence of a pulse on the top of the foot and that Alexander's right lower limb was cool to the touch. (Doc. 45 at 163.) Augustin ordered Alexander to be taken to the hospital. (Id. at 165-66.)

Alexander arrived at the Memorial Health University Medical Center ("Memorial") emergency room at 5:38 p.m. on May 23. (Doc. 96 at ¶ 97; Doc. 145 at ¶ 97.) It was ultimately determined by Dr. Bhandari, a vascular interventional radiologist, that surgery would be needed to address the extensive blood clot that had been found in Alexander's right leg. (Doc. 96 at ¶¶ 100-01; Doc. 145 at ¶¶ 100-01.) Dr. Avino, a vascular surgeon, began a thrombectomy on Alexander at 10:05 p.m. on May 23, 2016 and Alexander was transferred from the operating room to the post-anesthesia care unit ("PACU") for recovery at 11:52 p.m. (Doc. 96 at ¶¶ 103, 104, 106; Doc. 145 at ¶¶ 103, 104, 106). At 7:07 p.m. on May 23, prior to the thrombectomy, Alexander's potassium level was recorded at 5.1 mmol/L. (Doc. 77, Attach. 1 at 87.) At 4:37 a.m. on May 24, 2016, after surgery, Alexander's potassium level was recorded at 7.3 mmol/L. (Id. at 91.) Alexander's potassium level was reported to Dr. Moon, the chief resident working that night, and Dr. Moon and his team went to the PACU and found Alexander in cardiac arrest. (Doc. 96 at ¶¶ 113-14; Doc. 77, Attach. 1 at 12-13.) Alexander could not be revived and was declared dead by Dr. Moon

on May 24, 2016 at approximately 5:13 a.m. (Doc. 96 at ¶ 116; Doc. 90, Attach. 3 at 1.)

In their complaint, Plaintiffs pursue counts of negligence, professional negligence, wrongful death, and deliberate indifference to serious medical needs, among other things, due to the alleged inadequate medical attention Alexander received at CCDC. Both Plaintiffs and Defendants have retained experts to testify on a variety of subjects. At issue in this order is the testimony of Robert Blais, M.D. (Doc. 127.)

## STANDARD OF REVIEW

The admission of expert testimony is controlled by Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The trial judge is assigned "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597, 113 S. Ct. 2786, 2799, 125 L. Ed. 2d 469 (1993). "As the Supreme Court made abundantly clear in Daubert, Rule 702 compels district courts to perform the critical gatekeeping function

4

concerning the admissibility of expert scientific evidence." United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (internal quotation marks and citation omitted). This gatekeeping function equally applies to the admissibility of expert technical evidence. Id.; Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147-49, 119 S. Ct. 1167, 1174-75, 143 L. Ed. 2d 238 (1999). The Eleventh Circuit Court of Appeals has explained that district courts fulfill that function by engaging in a three-part inquiry, considering whether

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as to be determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific . . . expertise, to understand the evidence or to determine a fact in issue.

Frazier, 387 F.3d at 1260.

When a court considers the reliability of a particular expert's opinion, it considers, to the extent possible, (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. Quiet Tech. DC-8, Inc. v. Hurel-Dubois, UK, Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003) (citing McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1256 (11th Cir. 2002)).

These factors "do not constitute a definitive checklist or test." Kumho Tire, 526 U.S. at 150, 119 S. Ct. at 1175 (internal quotation marks and citation omitted). Rather, the applicability of these factors "depends upon the particular circumstances of the particular case at issue." Id. The same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony. Frazier, 387 F.3d at 1262.

**ANALYSIS**

I. CORIZON DEFENDANTS' MOTION TO STRIKE THE AFFIDAVIT OF ROBERT BLAIS, M.D.

Robert Blais, M.D. ("Dr. Blais") was deposed on February 13, 2019. (Doc. 79 at 1.) On June 4, 2019, Corizon Defendants moved to exclude the testimony of Dr. Blais (Doc. 127) to which Plaintiffs responded in opposition (Doc. 171). Plaintiffs attached to their response an affidavit by Dr. Blais. (Doc. 171, Attach. 2.) Corizon Defendants have now moved to strike the affidavit filed by Dr. Blais (Doc. 171, Attach. 2) on the grounds that it is untimely, contains new opinions, and is unnecessarily cumulative. (Doc. 198 at 1.) Specifically, Corizon Defendants identify Paragraph 9 of the affidavit in which "Dr. Blais states that it is his opinion that Mr. Alexander had a high grade or total occlusion beginning at the time that he began to suffer right hip and leg pain on May 22, 2016" and argue that this opinion differs from Dr. Blais's

deposition in which he could not identify when the occlusion occurred. (Doc. 198, Attach. 1 at 4.)

The Court notes that Corizon Defendants offer contradictory positions in their motion. Despite Corizon Defendants' arguments that the above opinion is a new, previously undisclosed opinion, Corizon Defendants also state that "Plaintiffs' affidavit simply parrots opinions that Dr. Blais has already rendered in his expert report and deposition testimony, and it is nothing more than an attempt to bolster testimony already given." (Id. at 5.) Nevertheless, Corizon Defendants maintain that the above opinion regarding the timing of the total occlusion is a new opinion that must be stricken. In response, Plaintiffs argue that this is not a new opinion, that the affidavit elaborates on prior opinions and cite to Dr. Blais's Rule 26 report in which he stated his opinion that Alexander's right leg likely became totally occluded during the time he was left in the observation room. (Doc. 212 at 1.)

"Affidavits from expert witnesses, which are served after the deadline for disclosing expert reports and also contain new opinions and/or restructure the original expert opinions may be stricken as untimely." Walker v. Yamaha Motor Co., No. 613CV1546ORL37GJK, 2016 WL 7325525, at *2 (M.D. Fla. Jan. 20, 2016) (citing Corwin v. Walt Disney Co., 475 F.3d 1239, 1252 (11th Cir. 2007)). See also Cochran v. Brinkman Corp., 2009 WL 4823858, at *13-15 (N.D. Ga. Dec. 9, 2009). However, "affidavits, which

merely provide further explanation, clarification or justification for opinions already contained in expert reports and that are used to combat an attack upon the expert's methodologies have been allowed." Walker, 2016 WL 7325525, at *2.

The Court finds that Dr. Blais's affidavit offers a new opinion to the extent that Dr. Blais now identifies 8:30 p.m. as the time when the total occlusion occurred. The paragraph that Corizon Defendants take issue with, paragraph nine, states that:

> Alexander began to complain of right hip and leg pain around 8:30 p.m. on May 22, 2016. It is my opinion that Alexander had a high grade or total occlusion beginning at that time and that the sudden severe pain he was reporting was likely the result of tissue injury. . . . While neither I nor anyone else can determine an exact time when Alexander's total occlusion occurred, I can state with a reasonable degree of medical certainty that Alexander's right leg tissue was likely becoming nonviable during the early morning hours of May 23rd, probably between 2:30-5:30 a.m., while he was locked in the observation cell by himself.

(Doc. 171, Attach. 2 at 4-5.)

First, the Court does not strike the paragraph in its entirety. The Court finds that Dr. Blais's opinion generally that Alexander began to suffer from the ischemic event at 8:30 p.m. is consistent with his Rule 26 report and his deposition testimony. In his Rule 26 report, Dr. Blais opined that Alexander "suffered from ischemia of his right leg, beginning in the early evening of May 22, 2016," and that "[i]t is my opinion that Mr. Alexander's right leg suffered severe injury and likely became totally occluded

during the time he was left in the observation room." (Doc. 79, Attach. 2 at 2, 4.) This is also consistent with Dr. Blais's supplemental report in which he listed his opinions and included an opinion that "Alexander had right leg ischemia beginning on night of May 22nd." (Doc. 79, Attach. 3 at 1.) The Court finds that this opinion is also consistent with Dr. Blais's deposition in which he testified that he could not say when the total obstruction occurred, but that "in all likelihood, it started at one point and the symptoms gradually progressed that at some point when he had a total obstruction, they were critical. I can't give you a timeline on that." (Doc. 79 at 52.) This opinion is consistent with Dr. Blais's opinions, stated above, that the ischemic event began on the evening on May 22 but he cannot opine on the exact time of total occlusion. Thus, Dr. Blais may testify as to when the ischemic event began, the progress of that event and the concomitant tissue death as set out in his deposition, Rule 26 report, and affidavit.

However, to the extent that Dr. Blais is now opining that the total occlusion occurred at 8:30 p.m., such opinion is new or contradictory and must be excluded. As stated above, Dr. Blais testified in his deposition that he could not give a timeline on when the total occlusion occurred but that it was likely overnight in the observation cell. (Doc. 79 at 52; Doc. 79, Attach. 2 at 2, 4.) Despite his statement that he cannot "determine an exact time

9

when Alexander's total occlusion occurred," Dr. Blais opines in his affidavit that Alexander had a high grade or total occlusion beginning at 8:30 p.m. on May 22, 2016. (Doc. 171, Attach. 2 at 4-5.) "[A] party may not rely on untimely-disclosed expert opinions contained in an affidavit." Daggett v. United States, No. 08-21026-CIV, 2010 WL 11553196, at *1 (S.D. Fla. Feb. 4, 2010) (collecting cases). See also Travelers Prop. Cas. Co. of Am. v. All-S. Subcontractors, Inc., No. CV 17-0041-WS-B, 2018 WL 1787883, at *10 (S.D. Ala. Apr. 13, 2018) ("There is ample authority for the proposition that untimely expert opinions submitted by supplemental report or affidavit are impermissible. It is equally true, however, that such affidavits are typically allowed if they do not offer new expert opinions but simply clarify or explain previously given opinions."). As stated above, Dr. Blais's affidavit is stricken only to the extent that he now specifically identifies the time of the total occlusion.

Corizon Defendants also seek to exclude Dr. Blais's affidavit on the basis that the rest of the affidavit is cumulative and simply restates the same opinions set forth in Dr. Blais's written report and deposition. (Doc. 198, Attach. 1 at 6.) The Court is not persuaded. First, Federal Rule of Evidence 403 does permit a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the

jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Corizon Defendants claim that "unnecessarily similar and cumulative expert testimony may create a risk that the jury will resolve differences in expert opinion by focusing on the quantities of each opinion rather than by giving fair consideration to the quality and credibility of each opinion." (Doc. 198, Attach. 1 at 7.) However, at this stage in the case, the parties have presented various motions for summary judgment and the concern that a jury may weigh expert opinions by the quantity of the opinions, rather than the quality, is premature. Additionally, the case cited by Corizon Defendants in support of this argument, <u>Royal Bahamian Ass'n, Inc. v. QBE Ins. Corp.</u>, No. 10-21511-CIV, 2010 WL 4225947, at *2 (S.D. Fla. Oct. 21, 2010), concerned the situation in which numerous experts testify on the same topic, not the situation here where the expert filed an affidavit on the same opinions that he stated in his Rule 26 report and deposition. Ultimately, the Court does not find that it needs to exclude Dr. Blais's affidavit as needlessly cumulative. Corizon Defendant's Motion to Strike (Doc. 198) is **GRANTED IN PART** and **DENIED IN PART**. Dr. Blais may still testify about when the ischemic event began and the progression of tissue death, to the extent permitted below, but Dr. Blais cannot offer an opinion that the total occlusion occurred at 8:30 p.m.

II.  <u>CORIZON DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF ROBERT
     BLAIS, M.D.</u>

Corizon Defendants also seek to exclude the testimony of Dr.
Blais. (Doc. 127.) According to Dr. Blais's expert report, he is
a practicing vascular surgeon in Delray Beach, Florida who has
been practicing vascular surgery since 1976. (Doc. 79, Attach. 2
at 2.) Dr. Blais offers a number of opinions in this case, however,
Corizon Defendants primarily take issue with his opinions that
Defendants Augustin, Dambach, and Neisler breached the standard of
care in their treatment of Alexander and his opinions regarding
the standard of care for licensed practical nurses and correctional
health providers. (Doc. 127, Attach. 1 at 10-11.) Plaintiffs have
responded in opposition. (Doc. 171.)

A.  <u>Dr. Blais's Standard of Care Opinion for Licensed
    Practical Nurses</u>

Corizon Defendants argue that Dr. Blais does not meet the
requirements under Georgia law to testify regarding the standard
of care applicable to licensed practical nurses ("LPNs"). (Doc.
127, Attach. 1 at 14-15.) In response, Plaintiffs generally contend
that Dr. Blais is able to provide a LPN standard of care opinion,
that the inability of Dr. Blais to opine as to the "LPN scope of
care is not surprising," because "Blais is not a lawyer," and that
if Dr. Blais is excluded, Dr. Reese must be similarly excluded.
(Doc. 171 at 16-18.)

12

The Court finds that Dr. Blais is not qualified to opine on the standard of care for LPNs. Pursuant to O.C.G.A. § 24-7-702(c)(2)(D),

> an expert who is a physician and, as a result of having, during at least three of the last five years immediately preceding the time the act or omission is alleged to have occurred, supervised, taught, or instructed nurses, nurse practitioners, certified registered nurse anesthetists, nurse midwives, physician assistants, physical therapists, occupational therapists, or medical support staff, has knowledge of the standard of care of that health care provider under the circumstances at issue shall be competent to testify as to the standard of that health care provider.

Dr. Blais testified that he did not know a lot about the training for LPNs other than what he had seen in his clinical practice, that in his clinical practice, he had minimal interaction with LPNs, and that he does not know whether LPNs are legally able to reach a nursing diagnosis. (Doc. 79 at 28, 29.) Dr. Blais testified as follows:

> Q. And in your experience, how much of your practice was spent in or acting with LPNs?
>
> A. Pretty minimal because they are at the lower end of the hierarchy for nursing. And most of my actual interaction would be with the registered nurse at the time.
>
> Q. Between 2011 and 2016, can you tell us what percentage of your professional time, either in the office or the facility setting, was spent interacting with and working with LPNs?
>
> A. Well, on the floor, they were there, and for 43 years, I've had some interaction with this particular specialty.

13

(Id. at 28.) When asked "[s]o what did the standard of care for a licensed practical nurse require [Defendant Dambach] to do that he did not do?" Dr. Blais answered that "I don't know how to answer a question in that exact form. It is too variable." (Doc. 79 at 32.) Additionally, he testified as follows:

> Q. In your experience, what do you rely on the licensed practical nurses to do?
>
> A. I'm not really sure how to answer that. Because they don't give medicines. They don't do injections. They are generally not called upon to make clinical decisions in a hospital setting. That is my only association. So I know very little about that.
>
> Q. So when you have LPNs on the floor seeing your patients, what is your understanding of what they are doing for those patients?
>
> A. They take their blood pressure, they check their pulse and almost just like a caretaker as much. It's very little actual medical delivery by the LPN and almost zero medical assessment by the LPN.

(Doc. 79 at 30.)

In his deposition, Dr. Blais stated that he had little experience working with LPNs, much less supervising them, and was not aware of their scope of practice, e.g. whether they give nursing diagnoses. Although Dr. Blais has had a long career as a doctor and was able to generally describe what LPNs do, the Court does not find this sufficient to demonstrate that for three of the five years prior to the events at issue in this case, Dr. Blais "supervised, taught, or instructed" LPNs. See Bonds v. Nesbitt, 322 Ga. App. 852, 858, 747 S.E.2d 40, 46 (Ga. Ct. App. 2013)

14

("'But a minimum level of knowledge in the area in which the opinion is to be given is insufficient; instead, an expert must be both familiar with the standard of care at issue and also demonstrate specific experience in the relevant practice area.'" (quoting Dawson v. Leder, 294 Ga. App. 717, 719, 669 S.E.2d 720 (Ga. Ct. App. 2008)); Anderson v. Mountain Mgmt. Servs., Inc., 306 Ga. App. 412, 417, 702 S.E.2d 462, 466 (Ga. Ct. App. 2010); Pendley v. S. Reg'l Health Sys., Inc., 307 Ga. App. 82, 89, 704 S.E.2d 198, 203 (Ga. Ct. App. 2010).

Finally, Plaintiffs also discuss their challenge of a different expert, Dr. Reese, and contend that "if Blais is excluded from providing testimony on the LPN standard of care, then Reese must also be excluded" as "Reese is less qualified than Blais to testify on the LPN standard of care." (Doc. 171 at 18.) This Court does not rule on Daubert motions and motions to exclude by weighing the comparative experience and qualifications of experts against one another but, instead, by examining each expert's qualifications as challenged. Accordingly, for the reasons stated above, Corizon Defendant's motion to exclude the standard of care opinions by Dr. Blais for LPNs is **GRANTED**.

B. Dr. Blais's Qualifications to Opine on the Standard of Care Applicable to Healthcare Providers in a Correctional Medicine Setting

Corizon Defendants next contend that Dr. Blais is not qualified to testify as to the standard of care applicable to

healthcare providers in a correctional setting because he does not have experience practicing medicine in a correctional setting. (Doc. 127, Attach. 1 at 15.) In response, Plaintiffs argue that Dr. Blais's lack of experience in a correctional setting is irrelevant because the community standard applies both generally and at the CCDC. (Doc. 171 at 19.)

The Court is not persuaded that Dr. Blais is unqualified to testify as to the standard of care of Defendants Augustin and Corizon purely because he has not provided medical treatment in a correctional facility. In McDowell v. Brown, 392 F.3d 1283, 1296 (11th Cir. 2004), the defendant correctional healthcare provider argued that the plaintiff's experts did "not possess the education, training, or experience that would qualify them to testify against a jail nurse." The Eleventh Circuit disagreed and, after noting that an expert's opinion stemmed from "a knowledge of medical care, not jail policies," found that "[t]he standard of care applicable to nurses is universal, and does not diminish when the setting is a jail rather than a hospital." McDowell, 392 F.3d at 1296. Additionally, a court in this district, after considering McDowell, remained "unpersuaded that correctional medicine is a medical specialty thereby requiring the exclusion of [the expert.]" Anderson v. Columbia Cty., Ga., No. CV 112-031, 2014 WL 8103792, at *10 (S.D. Ga. Mar. 31, 2014). This Court agrees with the reasoning set forth in Anderson on this point. See also Maley

16

v. Corizon Health, Inc., No. CV416-060, 2018 WL 797441, at *2 (S.D. Ga. Feb. 8, 2018). Accordingly, Corizon Defendants' motion on the ground that Dr. Blais is unqualified due to his lack of experience in correctional medicine is **DENIED**.

C. Dr. Blais's Causation Opinions

Corizon Defendants finally argue that Dr. Blais's causation opinion is a basic "earlier treatment is better" opinion that is inadmissible. (Doc. 127, Attach. 1 at 16.) Corizon Defendants contend that Dr. Blais's opinion only offers "the vague opinion that the delay was 'a cause' or 'contributed' to the outcome." (Id. at 17.) In response, Plaintiffs argue that Defendant Corizon's equation of Dr. Blais's opinion with the inadmissible "the earlier the better" opinion barred in McDowell is in error because Dr. Blais cites to medical evidence that supports a conclusion that treatment for acute ischemic leg is time sensitive and that earlier treatment is necessary to prevent tissue death. (Doc. 171 at 20.)

The Court finds that Dr. Blais's causation opinion is not an inadmissible "the earlier the better" opinion. In McDowell, the Eleventh Circuit affirmed the exclusion of three experts' opinions on the grounds that their theories were inadmissible "the earlier, the better," opinions. 392 F. 3d at 1299.

First, in McDowell, Dr. Merinkangas held the opinions that "early treatment of a patient with spinal epidural abscess reduced neurological damage," and that the four-hour delay by the Grady

defendants caused the plaintiff's injuries. 392 F.3d at 1299. He based these theories on common sense and the universal axiom that expedited treatment is preferable to delayed treatment. Id. As to the first opinion, the Eleventh Circuit agreed with the district court's exclusion because a general understanding that earlier treatment is better would be within the knowledge of jurors and has nothing to do with causation. Thus, a theory that earlier treatment is better "adds nothing absent some testimony connecting the delay to the causation or aggravation of an injury." Id. at 1300. As to the second opinion, the Eleventh Circuit also agreed that the opinion failed the Daubert analysis because the expert could not identify any empirical data, survey, study, or literature to support his theory save one study that discussed the delay that was nearly double the delay at issue in the case. Id. Thus, because the expert would have to "leap" from the study's conclusions to his own theory, the opinion was unreliable. Id. Finally, the Eleventh Circuit noted that Dr. Merinkangas "simply made a blanket statement that the delay caused the paralysis, but gave no opinion as to whether the sum of the delays compounded [the plaintiff's] injuries, or if just one delay created the damage" and, therefore, "it [was] impossible to mete out whether the initial delay at the Jail contributed to the cause at all." Id.

The Eleventh Circuit also affirmed the exclusion of Dr. Darouiche's opinion that the plaintiff would have suffered less

injury had he been treated earlier. Id. at 1301. Dr. Darouiche's theory was based on his past experience and training with spinal patients and his observation that a more rapid progression of neurological damage indicated that earlier treatment would be successful. Id. at 1300. The Eleventh Circuit noted that Dr. Darouiche "frequently explained that his causation theory lacked empirical evidence or scientific support, and he acknowledged an absence of studies which assess surgery at the four, eight, twelve, eighteen, or twenty-four hour time intervals," and instead relied upon "medical logic." Id. at 1300-01. Dr. Darouiche's opinions were excluded because they were "more of a guess than a scientific theory" and that, while Daubert permits experts to draw conclusions from existing data, there was no existing data upon which to draw. Id. at 1301. Finally, Dr. Gower's opinion that the plaintiff would have recovered faster had he received earlier treatment was properly excluded because Dr. Gower could not point to scientific studies or reports to support this theory and the facts of case did not even fit his own theory. Id.

Defendants argue that "Dr. Blais only offers the vague opinion that the delay was 'a cause' or 'contributed' to the outcome. Dr. Blais could not specify which delay contributed, how it contributed, in what quantity, or how Mr. Alexander's specific outcome after surgery would have been different." (Doc. 127, Attach. 1 at 17.) The Court disagrees. The situation in McDowell

19

is not present here. Dr. Blais provides specific support for his opinion and is able to tie the existing data to his conclusions about the delay.

First, the Court finds that Dr. Blais does state "which delay" and how that delay contributed to Alexander's outcome. Dr. Blais states in his Rule 26 report that "[t]he delay of 20.5 hours was a significant cause of the severe condition of Alexander's right leg . . . during such an extended period of time, an ischemic lower extremity will suffer severe tissue injury." (Doc. 208, Attach. 1 at 3.) He further explains that the lack of blood flow causes tissue to die thereby increasing acid and potassium that can contribute to cardiac arrest, that with a total occlusion, the time could be as short as 5-6 hours before permanent damage occurs, and cites to peer reviewed articles that discuss the progression and severity of acute limb ischemia. (Id.) Thus, unlike the experts in McDowell, Dr. Blais has not simply opined that Alexander should have been treated earlier but, through his testimony, "connect[ed] the delay to the causation or aggravation of an injury." Id. at 1300.

Further, Dr. Blais relies on and cites to peer reviewed sources that affirm that the urgency of acute limb ischemia. In "Acute Limb Ischemia," by Mark A. Creager, John A. Kaufman, and Michael S. Conte, the authors state that "[u]rgent recognition [of acute limb ischemia] with prompt revascularization is required to

preserve limb viability in most circumstances." (Doc. 171, Attach. 3 at 1.) The authors also discuss the appropriate treatments and how that relates to the stages of acute limb ischemia. (Id. at 3.) An article in the Journal of Vascular Surgery also discusses the clinical classification of acute limb ischemia and three stages or levels of severity. (Doc. 171, Attach. 4 at 2.) The article states that "rapid diagnosis of the severity of acute limb ischemia and its probable cause is an urgent matter. Time to diagnosis and successful outcome of treatment are inversely related." (Id. at 3.) Another article, written by Jamie R. Santistevan and published in Emergency Medicine Clinics of North America, states that acute limb ischemia "is a time-sensitive condition," in which a diagnosis and definitive management are necessary to "prevent loss of life or limb." (Doc. 171, Attach. 5 at 2.) Thus, unlike the experts in McDowell, who based their causation opinions on "logic" and "common knowledge," Dr. Blais's opinion—that delay in diagnosing acute limb ischemia and receiving medical treatment caused unnecessary tissue injury—is supported by these articles.

Moreover, Dr. Blais connects his causation opinion to the facts and uses the existing data to support and develop his opinion. Dr. Blais discusses when Alexander began exhibiting symptoms of acute limb ischemia, how and why tissue suffers injury due to a delay in treatment, what treatments may be provided to address acute limb ischemia, and that the severity of the acute

limb ischemia impacts the patient's prognosis. (Doc. 79, Attach. 2 at 4-5.) Thus, unlike the experts in McDowell, Dr. Blais's causation testimony is significantly more developed and supported and is not a vague "the earlier, the better" causation opinion. See Chesnut v. United States, No. 617CV00079GFVTHAI, 2019 WL 6879739, at *5 (E.D. Ky. Dec. 17, 2019) (declining to exclude an expert's causation opinion concerning an ischemic lower extremity as an improper "the earlier, the better" causation opinion under McDowell because the expert was not engaging in pure speculation but "giving his opinion, based on personal practical experience and relevant medical literature, that the condition worsens over time such that diagnosis of the condition even a day earlier can materially change the ultimate outcome."); Beltran v. NCL Corp., Ltd., No. 13-24566-CIV, 2017 WL 4270618, at *5 (S.D. Fla. Sept. 26, 2017) (distinguishing McDowell and finding that the experts' causation opinions were supported by medical literature and were connected to the existing data); Drake v. United States, No. 5:07-CV-707-VEH, 2009 WL 10703258, at *10 (N.D. Ala. Feb. 6, 2009); Presley v. City of Blackshear, No. CV507-094, 2008 WL 11417553, at *3 (S.D. Ga. Nov. 20, 2008) (distinguishing McDowell and finding that the expert's testimony was "more than simply stating that earlier treatment" because the testimony linked the alleged negligent treatment to the injury suffered). Accordingly, Corizon

Defendants' motion on this ground is **DENIED**. Dr. Blais's causation opinion is not excluded.

### CONCLUSION

For the foregoing reasons, Corizon Defendants' Motion to Strike the Affidavit of Robert Blais, M.D. (Doc. 198) is **DENIED IN PART** and **GRANTED IN PART** and Corizon Defendants' Motion to Exclude Testimony of Robert Blais (Doc. 127) is **DENIED IN PART** and **GRANTED IN PART**.

SO ORDERED this _6th_ day of August 2020.

_____
WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA