```
        IN THE UNITED STATES DISTRICT COURT FOR
           THE SOUTHERN DISTRICT OF GEORGIA
                    SAVANNAH DIVISION
```

JEMME J. JENKINS, Individually, )
and JULIANNE GLISSON,            )
Administrator of the Estate of   )
Jimmie L. Alexander, Sr.,        )
                                 )
        Plaintiffs,               )
                                 )
v.                               )   CASE NO. CV418-099
                                 )
CORIZON HEALTH INC., a Delaware  )
Corporation; GUY AUGUSTIN,       )
M.D.; VICTORIA NEILSER, LPN;     )
KEVIN TODD, Corporal; MARK       )
DAMBACH, LPN; CARL MILTON,       )
Sergeant; WANDA WILLIAMS,        )
Lieutenant; DESMOND BRYANT,      )
Corporal; CHATHAM COUNTY         )
COMMISSIONERS; JOHN WILCHER,     )
Sheriff of Chatham County; and   )
JOHN DOES 1-5;                   )
                                 )
        Defendants.               )
_____)

## O R D E R

Before the Court is Defendants Corizon Health, Inc. ("Corizon"), Guy Augustin, M.D., Mark Dambach, LPN, and Victoria Neisler, LPN's (collectively, "Corizon Defendants") Partial Motion for Summary Judgment on Wrongful Death. (Doc. 122.) For the following reasons, Corizon Defendants' motion (Doc. 122) is **DENIED**.

### BACKGROUND

This case arises out of the incarceration and subsequent death of Jimmie Alexander, Sr. ("Alexander") in 2016. (Doc. 1.) Alexander

was a pretrial detainee at Chatham County Detention Center ("CCDC"). (Doc. 86, Attach. 2.) At the time of Alexander's detention, Defendant Corizon Health, Inc. ("Corizon") provided medical services to detainees at CCDC pursuant to a contract with Chatham County. (Doc. 87, Attach. 1.) At all relevant times, Defendant Dr. Guy Augustin was the acting onsite medical director employed by Corizon. (Doc. 156 at 94.) Defendant Corizon also employed Defendant Mark Dambach, a licensed practical nurse ("LPN"), and Defendant Victoria Neisler, also an LPN. (Doc. 48 at 17-18; Doc. 52 at 33.)

On May 22, 2016, around 8:30 p.m., Alexander began to experience pain in his right hip and leg. (Doc. 96 at ¶ 15; Doc. 145 at ¶ 15.) Alexander was evaluated by Dambach and Dambach noted that Alexander complained of sudden onset of right leg pain, that Alexander had a weak thready pedal pulse in his right foot, and that his blood pressure was elevated. (Doc. 96 at ¶¶ 17-19; Doc. 145 at ¶¶ 17-19.) Dambach informed Defendant Augustin of Alexander's symptoms and Alexander was prescribed medications to treat the pain and lower his blood pressure. (Doc. 96 at ¶¶ 26-29; Doc. 145 at ¶¶ 26-29.) However, later that evening, Alexander crawled into the middle of Unit 6D floor, vomiting on the floor at some point. (Doc. 96 at ¶¶ 38-39; Doc. 145 at ¶¶ 38-39.) Dambach responded and checked Alexander's vitals, but did not otherwise check Alexander's right leg. (Doc. 96 at

2

¶¶ 41-44; Doc. 145 at ¶¶ 41-44; Doc. 48 at 131.) Alexander was moved to a cell in Receiving and Discharge ("R&D") for observation during the night. (Doc. 48 at 133-34.) Augustin arrived at CCDC the next day, May 23, at 7:30 a.m. and spoke with other medical providers at morning conference, and left CCDC around 8:30 a.m. (Doc. 96 at ¶¶ 73-75; Doc. 145 at ¶¶ 73-75.) Augustin returned later that day and examined Alexander at approximately 3:00 p.m. on Monday, May 23, 2016. (Doc. 96 at ¶ 84; Doc. 145 at ¶ 84.) During his examination, Augustin noted the absence of a pulse on the top of the foot and that Alexander's right lower limb was cool to the touch. (Doc. 45 at 163.) Augustin ordered Alexander to be taken to the hospital. (Id. at 165-66.)

Alexander arrived at the Memorial Health University Medical Center ("Memorial") emergency room at 5:38 p.m. on May 23. (Doc. 96 at ¶ 97; Doc. 145 at ¶ 97.) It was ultimately determined by Dr. Bhandari, a vascular interventional radiologist, that surgery would be needed to address the extensive blood clot that had been found in Alexander's right leg. (Doc. 96 at ¶¶ 100-01; Doc. 145 at ¶¶ 100-01.) Dr. Avino, a vascular surgeon, began a thrombectomy on Alexander at 10:05 p.m. on May 23, 2016 and Alexander was transferred from the operating room to the post-anesthesia care unit ("PACU") for recovery at 11:52 p.m. (Doc. 96 at ¶¶ 103, 104, 106; Doc. 145 at ¶¶ 103, 104, 106). At 7:07 p.m. on May 23, prior to the thrombectomy, Alexander's potassium level was recorded at

3

5.1 mmol/L. (Doc. 77, Attach. 1 at 87.) At 4:36 a.m. on May 24, 2016, after surgery, the basic metabolic panel, which includes the patient's potassium level, resulted and Alexander's potassium level was recorded at 7.3 mmol/L. (Id. at 91.) At 4:37 a.m., the high lab value was reported by lab staff. (Id.) Dr. Moon, the chief resident working that night, was informed of Alexander's potassium level and he and his team went to the PACU and found Alexander in cardiac arrest. (Doc. 96 at ¶¶ 113-14; Doc. 77, Attach. 1 at 12-13.) Alexander could not be revived and was declared dead by Dr. Moon on May 24, 2016 at approximately 5:13 a.m. (Doc. 96 at ¶ 116; Doc. 90, Attach. 3 at 1.)

Alexander's autopsy was performed by the Georgia Bureau of Investigations ("GBI") medical examiner, Dr. J. Upshaw Downs. (Doc. 96 at ¶ 117; Doc. 145 at ¶ 117.) Dr. Downs opined that Alexander's cause of death was the result of "generalized arteriosclerosis which manifests as right lower extremity ischemia, status postoperative with subsequent acute onset hyperkalemia." (Doc. 90, Attach. 3 at 8.) Dr. Downs found that Alexander's excessive potassium and released toxins during reperfusion post-surgery contributed to Alexander's cardiac arrest and death.

After his death, Alexander's son, Jemme Jenkins, brought suit in both his individual and representative capacity for the benefit of, and on behalf of, the Estate of Jimmie Lee Alexander, Sr. in

4

the State Court of Chatham County, Georgia. (Doc. 1, Attach. 1 at 2-17.) After amending his complaint to add a claim under 42 U.S.C. § 1983 for the alleged deliberate indifference to Alexander's medical needs, the action was removed to this Court. (Doc. 1 at 1-2.) Subsequently, on May 24, 2018, Plaintiff Jenkins filed a second amended complaint adding Julianne Glisson, in her capacity as Administrator for the Estate of Jimmie Lee Alexander, Sr., as plaintiff. (Doc. 15.)

Plaintiffs subsequently filed a third amended complaint. (Doc. 26, Attach. 1.) In their third amended complaint, Plaintiffs allege the following claims: (1) a professional negligence claim against Corizon Defendants, (2) a negligence claim against Corizon Defendants, (3) a negligence claim against Defendants Wilcher, Todd, Milton, Williams, and Bryant, (4) a claim against the Chatham County Commissioners alleging that they are liable for failing to correct inadequate funding to the Chatham County Sheriff's Office, (5) a claim of deliberate indifference under the Georgia Constitution against all Defendants, (6) a claim of deliberate indifference pursuant to 42 U.S.C. § 1983 against all Defendants, (7) an intentional infliction of emotional distress claim against all Defendants, (8) a claim for punitive damages against all Defendants, and (9) a claim for breach of sheriff and deputy bonds. (Id. at 11-24.) Corizon Defendants have now moved for summary judgment on Plaintiffs' claim of wrongful death. (Doc. 122 at 2.)

5

## STANDARD OF REVIEW

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (citing Fed. R. Civ. P. 56 advisory committee notes). Summary judgment is appropriate when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The substantive law governing the action determines whether an element is essential. DeLong Equip. Co. v. Wash. Mills Abrasive Co., 887 F.2d 1499, 1505 (11th Cir. 1989).

As the Supreme Court explained:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

6

Celotex, 477 U.S. at 323, 106 S. Ct. at 2553. The burden then shifts to the nonmovant to establish, by going beyond the pleadings, that there is a genuine issue as to facts material to the nonmovant's case. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The Court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmovant. Matsushita, 475 U.S. at 587-88, 106 S. Ct. at 1356. However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Id., 475 U.S. at 586, 106 S. Ct. at 1356. A mere "scintilla" of evidence, or simply conclusory allegations, will not suffice. See, e.g., Tidwell v. Carter Prods., 135 F.3d 1422, 1425 (11th Cir. 1998). Nevertheless, where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the Court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989).

**ANALYSIS**

In their motion, Corizon Defendants argue that Plaintiffs cannot prove that they were the cause-in-fact of Alexander's death because the evidence shows that it was Memorial's failure to catch and treat Alexander's high potassium post-operatively that ultimately led to Alexander's death. (Doc. 122, Attach. 1 at 12.) Corizon Defendants contend that Plaintiffs' experts cannot specify

when Alexander "passed the point of no return such that his death was a foregone conclusion." (Id.) In response, Plaintiffs argue that they have produced expert witness testimony that opines that Alexander's injury could have been avoided if Defendants had complied with the standard of care. (Doc. 188 at 13.) Plaintiffs also argue that Defendants cannot escape liability for the negligent acts as a matter of law by pointing to the later acts of Memorial. (Id. at 20-25.)

The Court finds that Corizon Defendants' motion is due to be denied.

> To recover in a medical malpractice case, a plaintiff must show not only a violation of the applicable medical standard of care but also that the purported violation or deviation from the proper standard of care is the proximate cause of the injury sustained. In other words, a plaintiff must prove that the defendants' negligence was both the cause in fact and the proximate cause of his injury.

Walker v. Giles, 276 Ga. App. 632, 638, 624 S.E.2d 191, 197 (Ga. Ct. App. 2005). Under Georgia law, causation in medical malpractice cases must be established through expert testimony. Id. "Questions regarding causation are peculiarly questions for the jury except in clear, plain, palpable and undisputed cases." Id., 276 Ga. App. at 639, 624 S.E.2d at 197. Plaintiffs, therefore, must have evidence and expert testimony that shows that had Corizon Defendants abided by the standard of care, Alexander would not

8

have died. Id. The Court finds that Plaintiffs have met this burden.

Plaintiffs' contention in this case is that Corizon Defendants were deliberately indifferent to Alexander's medical needs by failing to adequately evaluate him and failing to send him to the hospital earlier and that these failures constituted medical malpractice. (Doc. 26, Attach. 1.) With regard to the development of hyperkalemia, Plaintiffs argue that the fatal potassium level was due to the delay Alexander experienced at CCDC. This is because prolonged ischemia can cause tissue death which, in turn, produces acid and potassium. (Doc. 79, Attach. 2 at 4 (Dr. Blais); Doc. 90 at 41 (Dr. Downs); Doc. 81, Attach. 4 at 6 (Dr. Lewinstein).) When blood flow is restored to the limb through revascularization, the new blood flow in effect "washes out" the toxins and potassium to the rest of the body. (Doc. 79, Attach. 2 at 4 (Dr. Blais); Doc. 90 at 41 (Dr. Downs); Doc. 81, Attach. 4 at 6 (Dr. Lewinstein).) Potassium that is too high can contribute to cardiac arrest. (Doc. 79 at 91.)

Plaintiffs must first provide expert testimony that Corizon Defendants deviated from the standard of care. The Court finds that they have met this burden. Dr. Blais opined that Corizon Defendants' actions, including the failure to provide adequate evaluations of Alexander, fell below the standard of care and led to the delay in Alexander receiving treatment for his ischemic

9

leg. (Doc. 79, Attach. 2 at 2-4.) Dr. Blais further opines that the delay caused excessive tissue death which ultimately led to the development of hyperkalemia. (Id.)

Further, Plaintiffs have presented expert evidence connecting Corizon Defendants' deviations from the standard of care to the cause of Alexander's death. Plaintiffs have presented evidence that connects the delay in medical care Alexander experienced at CCDC to hyperkalemia and Alexander's resulting cardiac arrest. Numerous experts have testified that the development of hyperkalemia is directly related to the tissue death in an ischemic limb. When tissue dies due to lack of blood flow, the muscle creates toxins and by-products, like potassium, in the limb. Upon the restoration of blood flow, or revascularization, the toxins and by-products are released into the bloodstream. Dr. Blais, Dr. Lewinstein, and Dr. Downs all discuss this process. The Court will specifically review the experts' explanations of how delay in treating an ischemic limb can contribute to high potassium.

Dr. Lewinstein, Corizon Defendants' own expert, testified as follows:

> Q. Okay. Now, Paragraph 4. You say, quote, The morbidity of thrombectomy in the presence of prolonged ischemia relates to the presence of dead or necrotic muscle in the extremity, which becomes revascularized. End quote. Did I read that right?
> A. Yes.
> Q. So when you say "prolonged ischemia," what are you referring to?

10

```
A.   The amount of time between the onset of ischemia
     times zero and the time that you are doing
     intervention, however many hours that would be.
Q.   Okay. The longer the ischemia was prolonged the
     more dead or necrotic tissue in the extremity you
     would expect?
A.   Once you - yeah. Once you pass the point in time
     where muscles start to die, then the more
     prolongation there is the more necrotic by-products
     of the muscle there will be.
```

(Doc. 81 at 104.) He also testified that Alexander's potassium level of 5.1 and a CPK of 35,000, from Alexander's first round of lab panels, were both consistent with necrotic muscle. (Id. at 106.) Additionally, Dr. Lewinstein testified in his deposition that, if at 9:00 p.m. on May 22, Alexander had motor function and sensory function, then he could have been treated with lysis agents, which are drugs that dissolves clots. (Id. at 13; 104.)

Dr. Blais states in his Rule 26 report that "[t]he delay of 20.5 hours was a significant cause of the severe condition of Alexander's right leg . . . during such an extended period of time, an ischemic lower extremity will suffer severe tissue injury." (Doc. 79, Attach. 2 at 4.) He further explains that the lack of blood flow causes tissue to die thereby increasing acid and potassium that can contribute to cardiac arrest, that with a total occlusion, the time could be as short as 5-6 hours before permanent damage occurs, and cites to peer reviewed articles that discuss the progression and severity of acute limb ischemia. (Id.) Dr. Blais attributed Alexander's cause of death, e.g. cardiac arrest

11

due to hyperkalemia, to the amount of potassium that built up in Alexander's leg due to the delay in treatment.[1] (Id. at 5.)

Dr. Downs opined in his Rule 26 report that Alexander "died as the result of right lower extremity ischemia following . . . vascular occlusion, status post emergent revascularization" which resulted in "rhabdomyolysis which in turn directly resulted in a lethal elevation in potassium." (Doc. 90, Attach. 4 at 5.) He further opined that this situation could be compounded by reperfusion injury. (Id. at 6.) Dr. Downs found that the delay in treatment necessitated the surgery performed by Dr. Avino, with its attendant risks, and that the delay was a significant contributing cause to Alexander's death. (Id. at 8-9.)

Thus, Plaintiffs have produced expert testimony that the process by which Alexander died, hyperkalemia, is directly tied to the amount of dead tissue he had which, again, depends on the length of time ischemia existed without treatment. The Court finds that Plaintiffs have presented evidence creating a genuine issue of material fact on the issue of causation. See Knight v. Roberts,

---

[1] In his expert report, Dr. Blais attributes Alexander's death to the delay Alexander suffered at CCDC. (Doc. 79, Attach. 2 at 5.) However, in his deposition Dr. Blais stated that his prior opinion that "[t]he electrolyte imbalance originating in Alexander's right leg was most likely the cause of his death," was not "truly accurate." (Doc. 79 at 68.) He stated that it was hard to say there was just one cause but "[he] would be more likely to blame a combination of cardiac disease and hyperkalemia." (Id. at 69.)

12

316 Ga. App. 599, 605, 730 S.E.2d 78, 84 (Ga. Ct. App. 2012); Walker, 276 Ga. App. at 642, 624 S.E.2d at 199.

Additionally, the Court is not persuaded by Corizon Defendants' argument that summary judgment is appropriate because the experts cannot opine on a time in which Alexander passed the "point of no return." In MCG Health, Inc. v. Barton, 285 Ga. App. 577, 583, 647 S.E.2d 81, 87 (Ga. Ct. App. 2007), the plaintiff offered expert testimony that the following actions were deviations from the standard of care: (1) the hospital staff's act of negligently misplacing his form from the hospital's emergency communication center in which his hospital admission had already been approved, and (2) the triage nurse's act of classifying him as "non-urgent" following her examination of him. The plaintiff's medical expert opined that these actions were deviations from the standard of care and that the actions delayed Plaintiff from being seen by a physician which ultimately led to the loss of his testicle. Id., 285 Ga. App. at 583-84, 647 S.E.2d at 87. The Georgia Court of Appeals found that "[t]he fact that [the plaintiff's] medical expert could not testify as to the exact point in time at which [the plaintiff's] testicle became unsalvageable does not render his testimony mere speculation." Id. Likewise, the inability of an expert to specify the exact point in which Alexander would die without treatment, or at what point lack of treatment for the ischemic leg created hyperkalemia, is not

dispositive. Plaintiffs have cited to expert testimony that adequately demonstrates the process by which hyperkalemia develops and the causes of it: the wash-out of toxins and potassium that developed due to the dead tissue in the limb following revascularization. (See Doc. 81 at 104-105 (Dr. Lewinstein); Doc. 90 at 55-57 (Dr. Downs); Doc. 90, Attach. 4 at 7-8 (Dr. Downs).)

Finally, to the extent Corizon Defendants seek summary judgment based on their affirmative defense of intervening negligence, the Court finds that it is due to be denied. "[M]edical malpractice by one or more successive physicians does not constitute an intervening cause as a matter of law that cuts off the original physician's liability." Amu v. Barnes, 286 Ga. App. 725, 734, 650 S.E.2d 288, 295 (Ga. Ct. App. 2007), aff'd, 283 Ga. 549, 662 S.E.2d 113 (2008). See also Knight, 316 Ga. App. at 608, 730 S.E.2d at 86; MCG Health, Inc., 285 Ga. App. at 585, 647 S.E.2d at 88; Walker, 276 Ga. App. at 644, 624 S.E.2d at 201; Coleman v. Atlanta Obstetrics & Gynecology Grp., P.A., 194 Ga. App. 508, 511, 390 S.E.2d 856, 859, aff'd, 260 Ga. 569, 398 S.E.2d 16 (Ga. Ct. App. 1990). "[T]he liability of a tortfeasor whose actions started the chain of events leading to the victim's injury is superseded and cut off only if there intervened between the act and the injury a distinct, successive, **unrelated**, efficient cause of the injury." Knight, 316 Ga. App. at 608, 730 S.E.2d at 86 (emphasis added). See also Med. Ctr. of Cent. Georgia v. Landers, 274 Ga. App. 78,

14

86-87, 616 S.E.2d 808, 815 (Ga. Ct. App. 2005) ("[F]or an intervening act of a third party to become the sole proximate cause of a plaintiff's injuries, the intervening act must not have been foreseeable by defendant, must not have been triggered by defendant's act, and must have been sufficient by itself to cause the injury.").

As described above, there is sufficient evidence by which a jury could find that Memorial's failure to identify and treat Alexander's hyperkalemia post-operatively, is not a "distinct, successive, unrelated, efficient cause of the injury." Knight, 316 Ga. App. at 608, 730 S.E.2d at 86. See MCG Health, Inc., 285 Ga. App. at 585, 647 S.E.2d at 88 (affirming trial court's denial of defendant hospital's motion for summary judgment based on the defense of intervening negligence); Walker, 276 Ga. App. at 644, 624 S.E.2d at 201 (reversing trial court's grant of defendant doctor's motion for directed verdict based on intervening negligence).

## CONCLUSION

For the foregoing reasons, Corizon Defendants' Partial Motion for Summary Judgment on Wrongful Death (Doc. 122) is **DENIED**.

SO ORDERED this 22ᴺᴰ day of August 2020.

_____
WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA