IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

JEMME J. JENKINS, Individually,　)
and JULIANNE GLISSON,　　　　　　 )
Administrator of the Estate of　)
Jimmie L. Alexander, Sr.,　　　　)
　　　　　　　　　　　　　　　　　　)
　　　Plaintiffs,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　 )　CASE NO. CV418-099
　　　　　　　　　　　　　　　　　　)
CORIZON HEALTH INC., a Delaware )
Corporation; GUY AUGUSTIN, M.D.;)
VICTORIA NEILSER, LPN; KEVIN　　)
TODD, Corporal; MARK DAMBACH,　 )
LPN; CARL MILTON, Sergeant;　　　)
WANDA WILLIAMS, Lieutenant;　　　)
DESMOND BRYANT, Corporal;　　　　)
CHATHAM COUNTY COMMISSIONERS;　 )
JOHN WILCHER, Sheriff of Chatham)
County; and JOHN DOES 1-5;　　　 )
　　　　　　　　　　　　　　　　　　)
　　　Defendants.　　　　　　　　　)
_____)

## O R D E R

Before the Court is Defendants Chatham County Commissioners'
("County Defendants") Motion for Summary Judgment. (Doc. 123.) For
the following reasons, County Defendants' motion (Doc. 123) is
**GRANTED.**

### BACKGROUND

### I.　THE INCIDENT ON MAY 22-24, 2016

This case arises out of the incarceration and subsequent death
of Jimmie Alexander, Sr. ("Alexander") in 2016. (Doc. 1.) Alexander
was a pretrial detainee at Chatham County Detention Center ("CCDC").
(Doc. 86, Attach. 2.) At the time of Alexander's detention, Defendant

Corizon Health, Inc. ("Corizon") provided medical services to detainees at CCDC pursuant to a contract with Chatham County. (Doc. 87, Attach. 1.) At all relevant times, Defendant Dr. Guy Augustin was the acting onsite medical director employed by Corizon. (Doc. 156 at 94.) Defendant Corizon also employed Defendant Mark Dambach ("Dambach"), a licensed practical nurse ("LPN"), and Defendant Victoria Neisler ("Neisler"), also an LPN. (Doc. 150 at 17-18; Doc. 154 at 33.) Jimmie Alexander, Sr. ("Alexander") was booked into CCDC as a pretrial detainee on April 27, 2016. (Doc. 86, Attach. 2 at 1.) Alexander was sixty years of age at the time of his intake. (Id.) Alexander reported during the intake screening process that his medical history included hypertension, a smoking history of over twenty years, and a transient ischemic attack ("TIA") that occurred in March 2016. (Doc. 74, Attach. 9 at 5-9.)

On May 22, 2016, at approximately 8:30 p.m., Alexander began to complain about pain in his right hip and leg. (Doc. 97, Attach. 7 at 11; Doc. 49 at 137.) At approximately 8:47 p.m. on May 22, 2016, a Signal 55 was called for Alexander.[1] (Doc. 85 at 65.) Dambach responded to the call and evaluated Alexander between 9:02 p.m. and 9:13 p.m. (Doc. 150 at 105-10.) During this examination, Dambach understood Alexander's complaint to be that he began experiencing right leg pain suddenly and found that Alexander had a weak, thready

---

[1] A "Signal 55" is a code that means that an inmate needs medical attention. (Doc. 85 at 29.)

pedal pulse in his right foot. (Id. at 105-06.) Alexander reported to Dambach that the pain felt like "his leg was broken, his hip was out of the socket." (Id. at 109.) Dambach checked Alexander's vitals and noted that his blood pressure was elevated at 188 over 122. (Id. at 107.) Before leaving Alexander's cell, Dambach told Alexander that he was going to relay this information to the doctor and then be back once he received orders from the doctor and that he would bring any medications that been ordered. (Id. at 110-11.)

Dambach called Dr. Augustin after evaluating Alexander and informed Augustin of Alexander's elevated blood pressure, the reported right leg and hip pain, and Alexander's known medical history. (Doc. 150 at 111.) Augustin prescribed Clonodine 0.1 mg, for reducing blood pressure, Novasc 10 mg, for reducing blood pressure, and Naproxyn 500 mg, for the pain. (Id. at 111-112; Doc. 156 at 159-160.) Around 9:30 p.m., Alexander used a plastic chair while walking to the wing officer's desk in Unit 6D, the unit he was housed in, and was dragging his right leg. (Doc. 96 at ¶¶ 30-31; Doc. 145 at ¶¶ 30-31.) At approximately 9:45 p.m., Dambach administered the above medications to Alexander. (Doc. 150 at 118.) Dambach did not examine Alexander when he gave him the medications. (Id. at 117.) Around 11:15 p.m., Alexander used a plastic chair to travel to the restroom and at 11:30 p.m., several inmates carried Alexander back to his pod. (Doc. 96 at ¶¶ 36-37; Doc. 145 at ¶¶ 36-37.)

3

Around 11:40 p.m., Alexander crawled out into the middle of Unit 6D floor and vomited as he crawled out. (Doc. 96 at ¶¶ 38-39; Doc. 145 at ¶¶ 38-39.) At 11:39 p.m., Defendant Todd called a 10-78 code which means that the officer needs assistance, but is not in any danger. (Doc. 85 at 29, 113.) Deputies, including Sergeant Milton, arrived in Unit 6D in response to the 10-78 and the 10-78 turned into a Signal 55. (Id. at 117; Doc. 91 at 76-77.) Dambach responded to the Signal 55 and arrived in Unit 6D around 11:48 p.m. and found Alexander lying on the floor next to a small amount of vomit. (Doc. 150 at 131.) Dambach proceeded to check Alexander's vitals, but did not otherwise check Alexander's right leg. (Id.)

Dambach went to the Medical Unit and called Augustin at approximately midnight of May 22. (Id. at 133.) Augustin and Dambach agreed that Alexander should be sent to infirmary, however, the male beds in the infirmary were reportedly full. (Id. at 133-34.) Alexander was placed into a wheelchair and taken to Receiving and Discharge ("R&D") for observation during the night. (Id.; Doc. 91 at 50-51.) Dambach examined Alexander's right foot pulse before placing him in the R&D cell, but did not document that he did so. (Doc. 150 at 151-52.) Alexander was placed in R&D cell #8 at 12:21 a.m. on Monday, May 23, 2016. (Id. at 151.)

Augustin came to CCDC at 7:30 a.m. on Monday, May 23, 2016 and spoke about Alexander with other medical providers at morning conference. (Doc. 156 at 133-34.) Augustin, however, did not examine

Alexander that morning and subsequently left CCDC around 8:30 a.m. to find a dentist for himself. (Id. at 132-33.) Alexander was placed on Augustin's "sick call list" to be seen by Augustin. (Doc. 156 at 134.) Also on the morning of Monday, May 23, 2016, around 7:00 a.m., Victoria Neisler came on duty in CCDC's R&D area for the day shift, relieving Dambach. (Doc. 154 at 127.) Dambach told Niesler about Alexander's leg pain. (Doc. 150 at 176, 178; Doc. 154 at 130.) Neisler visited Alexander to check on him and saw that he was standing in the cell. (Doc. 154 at 138-140.) During that time, Neisler took Alexander's blood pressure but did not otherwise take any other vital signs or examine Alexander's right leg or foot. (Id.)

Augustin returned to CCDC later on May 23, 2016 and examined Alexander at approximately 3:00 p.m. on Monday, May 23, 2016. (Doc. 156 at 162, 196, 224.) During his examination, Augustin noted the absence of a pulse on the top of the foot and that Alexander's right lower limb was cool to the touch. (Id. at 163.) During this examination, Augustin told Alexander that he was going to the hospital because Augustin believed he had some type of vascular issue due to the coolness in his limb. (Id. at 165-66.) Alexander was placed into a wheelchair and moved to a holding room in the Medical Unit around 3:11 p.m. (Id. at 231-32.) Augustin ordered Alexander to be taken to the emergency room. (Id. at 228-29.) Alexander was to be transported by car to the hospital. (Doc. 92 at 77-78; Doc. 89 at 68.)

The CCDC watch commander, Defendant Lieutenant Williams, received the instruction to transport Alexander to the hospital at 3:16 p.m.[2] (Doc. 92 at 77, 80.) Defendant Williams testified that at roughly 3:21 p.m., she contacted Corporal Kelly-James but she did not take Alexander because she complained of not having her lunch break and her shift ending at 4:00 p.m. (Id. at 79, 89.) Defendant Williams testified that she then contacted Defendant Bryant at roughly 3:30 p.m. to transport Alexander and expected Defendant Bryant to be ready to leave with Alexander by 4:00 p.m. (Id. at 90.) Internal records show an entry dated May 23, 2016 at 3:47 p.m. with an event time of 3:16 p.m. that reads: "The doctor recommends that detainee Jimmy Alexander 6D be transported to MMC via car for an evaluation. Cpl. Kelly-James assigned to complete the detail." (Doc. 92, Attach. 2 at 19.) Thus, at the time that Defendant Williams completed the entry, 3:47 p.m., the log only reflects that Kelly-James had been contacted. Corporal Bryant, however, testified that he did not receive a call to transport Alexander until 4:40 p.m. (Doc. 88 at 17.) Defendant Bryant further testified that he and Alexander left CCDC at approximately 5:08 p.m. and arrived at Memorial Health University Medical Center ("Memorial") emergency room around 5:42 p.m. (Id. at 40.) Memorial's records show that

---

[2] Corporal Addie Bailey (née Cochran) testified that the Watch Commander, Defendant Williams, was notified at 3:18 p.m. (Doc. 89 at 68.)

Alexander arrived at 5:38 p.m. on May 23, 2016 and was admitted at 5:42 p.m. (Doc. 94, Attach. 1 at 2.)

When Alexander presented at Memorial, his right leg was cold, pulseless, insensate and without motor function. (Id. at 3, 6-7.) Memorial emergency room doctors consulted with vascular medicine doctors. (Id. at 7.) At 5:59 p.m. on May 23, Alexander had blood drawn for various lab panels. (Doc. 77, Attach. 1 at 87.) At 7:07 p.m. on May 23, 2016, Alexander's potassium levels were recorded at 5.1 mmol/L. (Id.) Dr. Bhandari, a vascular interventional radiologist, reviewed the CT angiogram of Alexander's right leg and found an extensive blood clot. (Doc. 77 at 24-27.) Dr. Bhandari determined that surgery would be needed. (Id. at 27-28.) Dr. Avino, a vascular surgeon, began a thrombectomy on Alexander at 10:05 p.m. on May 23, 2016. (Doc. 94, Attach. 1 at 28.) Anesthesia was concluded at 11:52 p.m. on May 23, 2016 and Alexander was transferred from the operating room to the post-anesthesia care unit ("PACU") to recover on May 24, 2016 at 12:00 a.m. (Id.)

Alexander had blood specimens drawn at 2:05 a.m. on May 24, 2016. (Doc. 77, Attach. 1 at 88-89.) Alexander's PACU treatment concluded at 2:30 a.m. (Id. at 28.) The various lab tests performed on Alexander resulted at different times. The CBC with differential lab resulted at 2:37 a.m., the Protime-INR lab resulted at 2:51 a.m., and the PTT lab resulted at 2:51 a.m. on May 24, 2016. (Id. at 89-90.) The basic metabolic panel, which includes a value for the

patient's potassium level, resulted at 4:36 a.m. on May 24, 2016.
(Id. at 91.) Alexander's potassium level was recorded at 7.3 mmol/L
and reported by lab staff at 4:37 a.m. (Id.) Dr. Moon, the chief
resident working that night, was informed of Alexander's potassium
level, and he and his team went to the PACU and found Alexander in
cardiac arrest. (Doc. 77, Attach. 1 at 12-13, 18.) Alexander could
not be revived and was declared dead by Dr. Moon on May 24, 2016 at
approximately 5:13 a.m. (Doc. 77, Attach. 1 at 18; Doc. 90, Attach.
3 at 1.)

Alexander's autopsy was performed by the Georgia Bureau of
Investigations ("GBI") medical examiner, Dr. J. Upshaw Downs. (Doc.
90, Attach. 3.) Dr. Downs opined that Alexander's cause of death was
the result of "generalized arteriosclerosis which manifests as right
lower extremity ischemia, status postoperative with subsequent acute
onset hyperkalemia." (Id. at 8.) Dr. Downs found that Alexander's
excessive potassium and released toxins during reperfusion post-
surgery contributed to Alexander's cardiac arrest and death.

## II.   CORIZON'S HEALTHCARE CONTRACT

In 2010, Chatham County, by and through the Board of
Commissioners of Chatham County, Georgia, entered into a contract
with Prison Health Services, Inc. for the provision of inmate
healthcare services. (Doc. 168, Attach. 5 at 2.) The contract was
annual, but had four renewals with an expiration date of February
26, 2015. (Id.) Around July 2011, Prison Health Services, Inc.'s

name changed to Corizon. (Doc. 168 at 38-39.) The annual cost under the contract for 2010 was $5,399,000.00. (Doc. 168, Attach. 5 at 26.) In 2011, Chatham County paid $5,584,224, in 2012 the amount was $5,774,088, and in 2013, the amount paid was $5,774,088. (Doc. 167 at 16-17; Doc. 167, Attach. 2 at 1.) Subsequently, Corizon and Chatham County entered into a contract on January 17, 2014 in the amount of $5,074,224. (Doc. 87, Attach. 1; Doc. 167, Attach. 2 at 1.) Linda Cramer, a designated corporate representative for Chatham County, testified that the compensation was $5,070,224 for both 2014 and 2015. (Doc. 167 at 17.)

Pursuant to the contract, Corizon had assumed all medical care, including psychiatric but with the exclusion of psychologist, for all inmates at CCDC. (Doc. 87, Attach. 1 at 14.) Corizon was to staff nurses in various parts of CCDC as follows: (1) in the Medical Unit 24 hours a day, 7 days a week, (2) in the R&D area 24 hours a day, 7 days a week, (3) each of the housing units for 8 hours, 5 days a week and (4) in the infirmary 24 hours a day, 7 days a week. (Id. at 14-15.)

In 2015, Chatham County expressed a concern about Corizon's staffing levels and felt that there should have been additional registered nurses ("RNs") in the facility at any given time. (Doc. 166 at 38-39.) By e-mail dated September 18, 2015, Scott Bowers, with Corizon, emailed Lee Smith and Micheal Kaigler at Chatham County. (Doc. 93, Attach. 9 at 3.) In that e-mail, Bowers summarized

a meeting between representatives of Corizon and Chatham County regarding care at CCDC. Specifically, Bowers mentioned that "there was a question regarding our staffing Licensed Practical Nurses (LPNs) at intake to conduct health screenings. We recognize your consultants have recommended Registered Nurses (RNs) at **intake**, and we can do that." (Id. at 4 (emphasis in original).) Bowers then states that the cost of adding an RN for 12 hours per night would be $197,172. (Id.) Bowers further stated that "when the question of staffing an RN at night was first raised, my team did not believe it to be incumbent upon Corizon Health to absorb this cost because they are confident that we have structured a sound inmate medical program . . . ." and offered to share the cost of increased nursing staff. (Id.) An increase in RN staffing was never adopted. (Doc. 93 at 110.)

At the time of Alexander's incarceration and subsequent death, Chatham County was in the process of soliciting a new inmate healthcare provider through a request for proposal ("RFP"). (Doc. 168 at 28-29.) The contract was awarded to Correct Health in July 2016. (Id. at 29.) Correct Health's contract for 2016 was in the amount of $6,973,725. (Doc. 167 at 17.)

III.   PROCEDURAL HISTORY

After his death, Alexander's son, Jemme Jenkins, brought suit in both his individual and representative capacity for the benefit of, and on behalf of, the Estate of Jimmie Lee Alexander, Sr. in the State Court of Chatham County, Georgia. (Doc. 1, Attach. 1 at 2-17.)

After amending his complaint to add a claim under 42 U.S.C. § 1983 for the alleged deliberate indifference to Alexander's medical needs, the action was removed to this Court. (Doc. 1 at 1-2.) On May 24, 2018, Plaintiff Jenkins filed a second amended complaint adding Julianne Glisson, in her capacity as Administrator for the Estate of Jimmie Lee Alexander, Sr., as plaintiff. (Doc. 15.) Plaintiffs subsequently filed a third amended complaint. (Doc. 26, Attach. 1.)

In their third amended complaint, Plaintiffs allege the following claims: (1) a professional negligence claim against Defendants Corizon, Augustin, Dambach, and Neisler (collectively, the "Corizon Defendants"), (2) a negligence claim against Corizon Defendants, (3) a negligence claim against Defendants Wilcher, Todd, Milton, Williams, and Bryant (collectively, the "Sheriff Defendants"), (4) a claim against Defendant Chatham County Commissioners alleging that they are liable for failing to correct inadequate funding to the Chatham County Sheriff's Office, (5) a claim of deliberate indifference under the Georgia Constitution against all Defendants, (6) a claim of deliberate indifference pursuant to 42 U.S.C. § 1983 against all Defendants, (7) an intentional infliction of emotional distress claim against all Defendants, (8) a claim for punitive damages against all Defendants, and (9) a claim for breach of sheriff and deputy bonds. (Id. at

11-24.) County Defendants now move for summary judgment on the claims against them. (Doc. 123.)

**STANDARD OF REVIEW**

According to Fed. R. Civ. P. 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim of defense—on which summary judgment is sought." Such a motion must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56 advisory committee notes). Summary judgment is appropriate when the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The substantive law governing the action determines whether an element is essential. DeLong Equip. Co. v. Wash. Mills Abrasive Co., 887 F.2d 1499, 1505 (11th Cir. 1989).

As the Supreme Court explained:

[A] party seeking summary judgment always bears the
initial responsibility of informing the district court of
the basis for its motion, and identifying those portions
of the pleadings, depositions, answers to interrogatories,

12

> and admissions on file, together with the affidavits, if
> any, which it believes demonstrate the absence of a genuine
> issue of material fact.

Celotex, 477 U.S. at 323, 106 S. Ct. at 2553. The burden then shifts to the nonmoving party to establish, by going beyond the pleadings, that there is a genuine issue concerning facts material to its case. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The Court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmoving party. Matsushita, 475 U.S. at 587-88, 106 S. Ct. at 1356. However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Id., 475 U.S. at 586, 106 S. Ct. at 1356. A mere "scintilla" of evidence, or simply conclusory allegations, will not suffice. See, e.g., Tidwell v. Carter Prods., 135 F.3d 1422, 1425 (11th Cir. 1998). Nevertheless, where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the Court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989).

## ANALYSIS

I.   COUNTY DEFENDANTS' IMMUNITY FROM SUIT

County Defendants first argue that all claims brought against them are barred by the doctrine of sovereign immunity. (Doc. 124 at 2-5.) Plaintiffs have brought state law claims and a federal § 1983

claim against County Defendants. The Court finds that the state law claims against County Defendants are due to be dismissed.

"In Georgia, 'sovereign immunity extends to the state and all of its departments and agencies.'" Carter v. Butts Cty., Ga., 821 F.3d 1310, 1323 (11th Cir. 2016) (quoting Ga. Const. art. I § 2, ¶ IX; Gilbert v. Richardson, 264 Ga. 744, 452 S.E.2d 476, 479 (1994)). Sovereign immunity extends to counties as well unless waived by the General Assembly. Id.; see also Presnell v. Paulding Cty., Ga., 454 F. App'x 763, 769 (11th Cir. 2011). Plaintiffs bear the burden to demonstrate that sovereign immunity has been waived. Carter, 821 F.3d at 1323.

In their response, Plaintiffs argue that a local government does not enjoy sovereign immunity from federal constitutional violations. (Doc. 186 at 5.) The Court finds these statements insufficient to demonstrate a waiver of sovereign immunity in this case. Plaintiffs have failed to identify a specific waiver of the state's sovereign immunity and focuses more generally on their ability to bring their federal § 1983 claim. Counties and sheriffs enjoy sovereign immunity for tort claims under the Georgia Constitution, including claims related to the provision of medical care in jails. Temple v. McIntosh Cty., Ga., No. 2:18-CV-91, 2019 WL 287482, at *7 (S.D. Ga. Jan. 22, 2019); Tattnall Cty. v. Armstrong, 333 Ga. App. 46, 52, 775 S.E.2d 573, 578 (Ga. Ct. App. 2015), overruled on other grounds by Rivera v. Washington, 298 Ga. 770, 784

14

S.E.2d 775 (2016). The Court, therefore, finds that County Defendants are entitled to summary judgment on Plaintiffs' state law claims. County Defendants' motion for summary judgment on this basis is **GRANTED**.

As to County Defendants' argument that Plaintiffs' § 1983 claim is also barred by sovereign immunity, the Court finds that this argument fails. First, it is not clear to this Court the exact parameters of Plaintiffs' § 1983 claims against County Defendants. In their third amended complaint, Plaintiffs allege a broad § 1983 claim against all Defendants for "exhibiting deliberate indifference to Alexander's federal constitutional rights and by denying and delaying adequate medical care to him, including emergency care when it was obviously needed." (Doc. 26, Attach. 1 at 21.) However, in count four, Plaintiffs specifically allege a claim against County Defendants for their failure to adequately fund CCDC and contend that the "failure to correct this known inadequacy was widespread, persistent and established a custom or policy that caused a constitutional violation of the rights of Alexander . . . ." (Id. at 19.) Similarly, in their response to County Defendants' motion for summary judgment, Plaintiffs focus on the alleged understaffing of CCDC as the policy by which County Defendants are liable under 42 U.S.C. § 1983. (Doc. 186 at 7.) Reviewing Plaintiffs' third amended complaint as a whole, the Court finds that Plaintiffs' pursue a § 1983 claim against County Defendants on the basis of their alleged

unconstitutional policy of understaffing by failing to adequately fund CCDC.

The Court finds that, to the extent County Defendants contend that Plaintiffs' § 1983 claim is also barred by sovereign immunity, this argument fails. Counties (and other local government entities) are "persons" within the scope of § 1983 and may be subject to liability. McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004). County Defendants argue that, pursuant to Turquitt v. Jefferson Cty., Ala., 137 F.3d 1285, 1292 (11th Cir. 1998), a county is "sovereignly immune from claims brought for causes of actions arising out of the county's jail." (Doc. 124 at 3.) While there are some circumstances in which Turquitt may bar actions against counties, the Court finds County Defendants' reading in this case too expansive.

In Turquitt, the Eleventh Circuit held that a local government "must have power in an area in order to be held liable for an official's acts in that area." 137 F.3d at 1292. The Eleventh Circuit held that the defendant county had no liability because it had no power over the administration or operation of the jail and that its authority extended only to "maintaining the jail's physical plant and providing operational funding." Id. at 1291. Therefore, the Eleventh Circuit found that, as the sheriff could not be a "policymaker" for the defendant county, the county could not be liable on the basis of the sheriff's actions. Id. at 1292. The situation presented here is not the same as the one in Turquitt. The

16

Eleventh Circuit noted in Turquitt that the complaint did not "relate to the provision of such necessities, nor does it allude to any failure on the County's part to appropriate adequate funds." 137 F.3d at 1290. As stated above, it does not appear that Plaintiffs are pursuing a § 1983 claim against County Defendants for the actions of the Sheriff Defendants, but instead contend that County Defendants were deliberately indifferent to Alexander's medical needs by failing to adequately fund and staff the jail to provide medical care. Turquitt stands for the principle that a local government may only be held liable pursuant to § 1983 for actions of those whom the local government has authority over and for injuries that it caused itself. 137 F.3d at 1290.

In Georgia, counties are charged by the General Assembly with funding the provision of medical care to inmates. Lake v. Skelton, 840 F.3d 1334, 1341 (11th Cir. 2016) (interpreting O.C.G.A. § 42-5-2 and finding that the code section imposes "two separate duties: the county must fund the provision of medical care, and the sheriff must select an appropriate provider and ensure that inmates receive care when necessary."). Therefore, Plaintiffs can maintain their § 1983 claim based on County Defendants' alleged inadequate funding. See, e.g., Marsh v. Butler Cty., Ala., 268 F.3d 1014, 1027 (11th Cir. 2001) (en banc) (finding that, as the defendant county was charged with erecting and maintaining jails under Alabama law, the plaintiffs could maintain an Eighth Amendment claim on the

contention that the failure to maintain the jail constituted deliberate indifference), abrogated on other grounds by Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); Gaines v. Choctaw Cty. Comm'n, 242 F. Supp. 2d 1153, 1163 (S.D. Ala. 2003) (discussing Turquitt and finding that the plaintiffs had stated a claim under § 1983 against the defendant county for failing to provide funding to adequately staff the medical care at the jail). Thus, the Court denies County Defendants' motion to the extent that it argues Plaintiffs' § 1983 claim is barred by sovereign immunity.

## II.  PLAINTIFFS' 42 U.S.C. § 1983 CLAIM AGAINST COUNTY DEFENDANTS FAILS

County Defendants also argue that Plaintiffs' § 1983 claim against them fails because Plaintiffs cannot prove that they were indifferent to the medical needs of Alexander either by failing to fund the Sheriff or by ignoring a warning so clear that a reasonable person would know harm was imminent. (Doc. 124 at 8.) In response, Plaintiffs argue that County Defendants failed to provide the necessary funding for a nighttime R&D nurse, knew that the additional staffing was needed, and that, without additional funding, inmates would not be receiving adequate healthcare. (Doc. 186 at 6-7.) The Court finds that Plaintiffs' § 1983 claim against County Defendants fails.

To impose § 1983 liability on a municipality, a plaintiff must show: "(1) that his constitutional rights were violated; (2) that

the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." McDowell, 392 F.3d at 1289. A municipality may be liable under § 1983 only where "the deprivation at issue was undertaken pursuant to city 'custom' or 'policy,' and not simply on the basis of respondeat superior." Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1479 (11th Cir. 1991). To prove § 1983 liability against a municipality based on custom, "a plaintiff must establish a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." Id. at 1481 (internal quotation marks and citation omitted). Thus, a longstanding and widespread practice "is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." Id. To subject Defendant Chatham County to liability under § 1983, Plaintiffs "must show that the constitutional violation occurred as a result of a county policy." Cagle v. Sutherland, 334 F.3d 980, 986 (11th Cir. 2003).

In this case, Plaintiffs argue that County Defendants' "decision not to fully fund staffing at CCDC was a policy decision." (Doc. 186 at 7.) Plaintiffs contend that "a pattern of underfunding is not necessary because the knowledge is shown by direct evidence of actual knowledge in the communications and [sic] between [County

Defendants] and Corizon. (Id. at 9.) This misstates the law and the evidence.

First, contrary to Plaintiffs' contention, Plaintiffs must show that County Defendants had a **policy** of understaffing. To demonstrate a policy or custom, "it is generally necessary to show a persistent and wide-spread practice." McDowell, 392 F.3d at 1290. Plaintiffs have failed to meet this burden. Plaintiffs do not allege other instances of underfunding inmate medical care and in fact acknowledge in their response brief that County Defendants acted on a prior request to fund two mental health professionals in April 2014. (Doc. 186 at 8.) Plaintiffs have cited to no evidence that County Defendants habitually underfunded inmate medical care or that they had a practice of denying requests for additional funds. Plaintiffs cannot rest on this single incident of County Defendants not funding an RN. See Craig v. Floyd Cty., Ga., 643 F.3d 1306, 1311 (11th Cir. 2011) (finding that § 1983 liability against municipalities cannot rely on single incident of alleged unconstitutional activity); McDowell, 392 F.3d at 1290-91 (finding that, although the plaintiff provided evidence that the jail had staffing problems, plaintiff could not produce evidence that the understaffing contributed to or exacerbated an inmate's medical condition and, therefore, there was no evidence of a widespread or persistent policy).

Second, Plaintiffs must establish that the action taken, here the failure to fund a nighttime RN at the R&D area, was " 'taken

with the requisite degree of culpability . . . with deliberate indifference to its known or obvious consequences.' " McDowell, 392 F.3d at 1283 (quoting Davis ex rel. Doe v. Dekalb County Sch. Dist., 233 F.3d 1367, 1375-76 (11th Cir. 2000)). Plaintiffs cannot rely on a generalized policy of understaffing. Id. There is no evidence that County Defendants knew that the failure to staff a nighttime RN in R&D would create a substantial risk of serious harm to the inmates at CCDC or that the "known or obvious consequence" of not staffing a nighttime RN at R&D would result in an inmate not receiving infirmary level care due to the unavailability of the infirmary. Plaintiffs seem to rely on the fact that County Defendants were the ones requesting a nighttime RN at R&D and that the "need for additional funding was obvious and had been expressly recognized by [Defendant Chatham County]." (Doc. 186 at 7.) However, contrary to Plaintiffs' assertion, there is no clear evidence of exactly why County Defendants raised the issue of staffing a nighttime RN.

In an e-mail dated September 18, 2015, Scott Bowers, with Corizon, emailed Lee Smith and Micheal Kaigler at Chatham County and stated that "there was a question regarding our staffing Licensed Practical Nurses (LPNs) at **intake** to conduct health screenings. We recognize your consultants have recommended Registered Nurses (RNs) at intake, and we can do that." (Doc. 93, Attach. 9 at 3-4.) Thus, according to this source, County Defendants wanted an RN to conduct health screenings. However, Virginia O'Neill, the corporate

representative for Defendant Corizon, testified that County Defendants wanted a nighttime RN because it was a recommendation from the accrediting body. (Doc. 110 at 107.) Neither of these statements demonstrate that County Defendants were aware that the alleged constitutional violation was a "highly predictable consequence" of their failure to fund a nighttime RN in the R&D area or that County Defendants disregarded a risk of serious harm. See McDowell, 392 F.3d at 1291 (finding that the plaintiff could not show facts that demonstrated that a member of Board believed that their budget decisions would cause an inmate not to receive timely medical care; Cagle, 334 F.3d at 988 (finding that the defendant county's decision to fund no additional nighttime watcher was not deliberately indifferent to a substantial likelihood of detainee suicide because there was no evidence to show that the county was truly aware that prisoners were likely to attempt suicide). The Court finds that County Defendants' motion for summary judgment is due to be granted.

III. <u>PUNITIVE DAMAGES</u>

Because this Court has granted summary judgment to County Defendants on all of Plaintiffs' claims against them, any derivative claims for punitive damages must be dismissed. See <u>Butler v. Georgia Dep't of Corr.</u>, No. 6:18-CV-170, 2018 WL 6729647, at *7 (S.D. Ga. Dec. 21, 2018), appeal dismissed, No. 19-10249-AA, 2019 WL 1858369 (11th Cir. Feb. 28, 2019); <u>Lewis v. Meredith Corp.</u>, 293 Ga. App.

747, 750, 667 S.E.2d 716, 719 (Ga. Ct. App. 2008) ("Under Georgia law, a plaintiff cannot recover punitive damages when the underlying tort claim fails.").

## CONCLUSION

For the foregoing reasons, County Defendants' Motion for Summary Judgment (Doc. 123) is **GRANTED**.

SO ORDERED this 27th day of August 2020.

_____
WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA