IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

JEMME J. JENKINS, Individually, )
and JULIANNE GLISSON,            )
Administrator of the Estate of  )
Jimmie L. Alexander, Sr.,       )
                                 )
       Plaintiffs,               )
                                 )
v.                               )    CASE NO. CV418-099
                                 )
CORIZON HEALTH INC., a Delaware )
Corporation; GUY AUGUSTIN,      )
M.D.; VICTORIA NEILSER, LPN;    )
KEVIN TODD, Corporal; MARK      )
DAMBACH, LPN; CARL MILTON,      )
Sergeant; WANDA WILLIAMS,       )
Lieutenant; DESMOND BRYANT,     )
Corporal; CHATHAM COUNTY        )
COMMISSIONERS; JOHN WILCHER,    )
Sheriff of Chatham County; and  )
JOHN DOES 1-5;                   )
                                 )
       Defendants.               )
_____ )

<u>**O R D E R**</u>

Before the Court is Defendant Guy Augustin, M.D.'s Motion for Partial Summary Judgment on Deliberate Indifference, Punitive Damages, and Attorneys' Fees (Doc. 118), Defendant Mark Dambach's Motion for Partial Summary Judgment on Deliberate Indifference, Punitive Damages, and Attorneys' Fees (Doc. 119), and Defendant Victoria Neisler's Motion for Partial Summary Judgment on Deliberate Indifference, Punitive Damages, and Attorneys' Fees (Doc. 120). For the following reasons, Defendant Augustin's Partial Motion for Summary Judgment (Doc. 118) is **GRANTED IN PART**

and **DENIED IN PART**, Defendant Mark Dambach's Partial Motion for Summary Judgment (Doc. 119) is **GRANTED**, and Defendant Victoria Neisler's Partial Motion for Summary Judgment (Doc. 120) is **GRANTED**.

**BACKGROUND**

I.  THE INCIDENT ON MAY 22-24, 2016

This case arises out of the incarceration and subsequent death of Jimmie Alexander, Sr. ("Alexander") in 2016. (Doc. 1.) Alexander was a pretrial detainee at Chatham County Detention Center ("CCDC"). (Doc. 86, Attach. 2.) At the time of Alexander's detention, Defendant Corizon Health, Inc. ("Corizon") provided medical services to detainees at CCDC pursuant to a contract with Chatham County. (Doc. 87, Attach. 1.) At all relevant times, Defendant Dr. Guy Augustin was the acting onsite medical director employed by Corizon. (Doc. 156 at 94.) Defendant Corizon also employed Defendant Mark Dambach ("Dambach"), a licensed practical nurse ("LPN"), and Defendant Victoria Neisler ("Neisler"), also an LPN. (Doc. 150 at 17-18; Doc. 154 at 33.) Alexander was booked into CCDC as a pretrial detainee on April 27, 2016. (Doc. 86, Attach. 2 at 1.) Alexander was sixty years of age at the time of his intake. (Id.) Alexander reported during the intake screening process that his medical history included hypertension, a smoking history of over twenty years, and a transient ischemic attack ("TIA") that occurred in March 2016. (Doc. 74, Attach. 9 at 5-9.)

On May 22, 2016, at approximately 8:30 p.m., Alexander began to complain about pain in his right hip and leg. (Doc. 97, Attach. 7 at 11; Doc. 49 at 137.) At approximately 8:47 p.m. on May 22, 2016, Defendant Todd, a Sheriff's deputy, instructed a Signal 55 to be called for Alexander.[1] (Doc. 85 at 65, 78.) Dambach responded to the call and evaluated Alexander between 9:02 p.m. and 9:13 p.m. (Doc. 150 at 105-10.) During this examination, Dambach understood Alexander's complaint to be that he began experiencing right leg pain suddenly and found that Alexander had a weak, thready pedal pulse in his right foot. (Id. at 105-06.) Alexander reported to Dambach that the pain felt like "his leg was broken, his hip was out of the socket." (Id. at 109.) Dambach checked Alexander's vitals and noted that his blood pressure was elevated at 188 over 122. (Id. at 107.) Before leaving Alexander's cell, Dambach told Alexander that he was going to relay this information to the doctor and then be back once he received orders from the doctor and that he would bring any medications that had been ordered. (Id. at 110-11.)

Dambach called Dr. Augustin after evaluating Alexander and informed Augustin of Alexander's elevated blood pressure, the reported right leg and hip pain, and Alexander's known medical history. (Id. at 111.) Augustin prescribed Clonodine 0.1 mg, for

---

[1] A "Signal 55" is a code that means that an inmate needs medical attention. (Doc. 85 at 29.)

reducing blood pressure, Novasc 10 mg, for reducing blood pressure, and Naproxyn 500 mg, for the pain. (Id. at 111-112; Doc. 156 at 159-160.) Around 9:30 p.m., Alexander used a plastic chair while walking to the wing officer's desk in Unit 6D, the unit he was housed in, and was dragging his right leg. (Doc. 96 at ¶¶ 30-31; Doc. 145 at ¶¶ 30-31.) At approximately 9:45 p.m., Dambach administered the above medications to Alexander. (Doc. 150 at 118.) Dambach did not examine Alexander when he gave him the medications. (Id. at 117.) Around 11:15 p.m., Alexander used a plastic chair to travel to the restroom and at 11:30 p.m., several inmates carried Alexander back to his pod. (Doc. 96 at ¶¶ 36-37; Doc. 145 at ¶¶ 36-37.)

Around 11:40 p.m., Alexander crawled out into the middle of Unit 6D floor and vomited as he crawled out. (Doc. 96 at ¶¶ 38-39; Doc. 145 at ¶¶ 38-39.) At 11:39 p.m., Todd called a 10-78 code which means that the officer needs assistance, but is not in any danger. (Doc. 85 at 29, 113.) Deputies, including Defendant Milton, arrived in Unit 6D in response to the 10-78 and the 10-78 turned into a Signal 55. (Id. at 117; Doc. 91 at 76-77.) Dambach responded to the Signal 55 and arrived in Unit 6D around 11:48 p.m. and found Alexander lying on the floor next to a small amount of vomit. (Doc. 150 at 131.) Dambach proceeded to check Alexander's vitals, but did not otherwise check Alexander's right leg. (Id.)

Dambach went to the Medical Unit and called Augustin at approximately midnight of May 22. (Id. at 133.) Augustin and Dambach agreed that Alexander should be sent to infirmary, however, the male beds in the infirmary were reportedly full. (Id. at 133-34.) Alexander was placed into a wheelchair and taken to Receiving and Discharge ("R&D") for observation during the night. (Id.; Doc. 91 at 50-51.) Dambach examined Alexander's right foot pulse before placing him in the R&D cell, but did not document that he did so. (Doc. 150 at 151-52.) Alexander was placed in R&D cell #8 at 12:21 a.m. on Monday, May 23, 2016. (Id. at 151.)

Augustin came to CCDC at 7:30 a.m. on Monday, May 23, 2016 and spoke about Alexander with other medical providers at the morning conference. (Doc. 156 at 133-34.) Augustin, however, did not examine Alexander that morning and subsequently left CCDC around 8:30 a.m. to find a dentist for himself. (Id. at 132-33.) Alexander was placed on Augustin's "sick call list" to be seen by Augustin. (Id. at 134.) Also on the morning of Monday, May 23, 2016, around 7:00 a.m., Victoria Neisler came on duty in CCDC's R&D area for the day shift, relieving Dambach. (Doc. 154 at 127.) Dambach told Niesler about Alexander's leg pain. (Doc. 150 at 176, 178; Doc. 154 at 130.) Neisler visited Alexander to check on him and saw that he was standing in the cell. (Doc. 154 at 138-140.) During that time, Neisler took Alexander's blood pressure but did

not otherwise take any other vital signs or examine Alexander's right leg or foot. (Id.)

Augustin returned to CCDC later on May 23, 2016 and examined Alexander at approximately 3:00 p.m. on Monday, May 23, 2016. (Doc. 156 at 162, 196, 224.) During his examination, Augustin noted the absence of a pulse on the top of the foot and that Alexander's right lower limb was cool to the touch. (Id. at 163.) During this examination, Augustin told Alexander that he was going to the hospital because Augustin believed he had some type of vascular issue due to the coolness in his limb. (Id. at 165-66.) Alexander was placed into a wheelchair and moved to a holding room in the Medical Unit around 3:11 p.m. (Id. at 231-32.) Augustin ordered Alexander to be taken to the emergency room. (Id. at 228-29.) Alexander was to be transported by car to the hospital. (Doc. 92 at 77-78; Doc. 89 at 68.)

The CCDC watch commander, Defendant Lieutenant Williams, received the instruction to transport Alexander to the hospital at 3:16 p.m.[2] (Doc. 92 at 77, 80.) Defendant Williams testified that at roughly 3:21 p.m., she contacted Corporal Kelly-James but Kelly-James did not take Alexander because she complained of not having her lunch break and her shift ending at 4:00 p.m. (Id. at 79, 89.)

---

[2] Corporal Addie Bailey (née Cochran) testified that the Watch Commander, Defendant Williams, was notified at 3:18 p.m. (Doc. 89 at 68.)

Defendant Williams testified that she then contacted Defendant Bryant at roughly 3:30 p.m. to transport Alexander and expected Defendant Bryant to be ready to leave with Alexander by 4:00 p.m. (Id. at 90.) Internal records show an entry dated May 23, 2016 at 3:47 p.m. with an event time of 3:16 p.m. that reads: "The doctor recommends that detainee Jimmy Alexander 6D be transported to MMC via car for an evaluation. Cpl. Kelly-James assigned to complete the detail." (Doc. 92, Attach. 2 at 19.) At the time that Defendant Williams completed the entry, 3:47 p.m., the log only reflects that Kelly-James had been contacted. Corporal Bryant testified that he did not receive a call to transport Alexander until 4:40 p.m. (Doc. 88 at 17.) Defendant Bryant further testified that he and Alexander left CCDC at approximately 5:08 p.m. and arrived at Memorial Health University Medical Center ("Memorial") emergency room around 5:42 p.m. (Id. at 40.) Memorial's records show that Alexander arrived at 5:38 p.m. on May 23, 2016 and was admitted at 5:42 p.m. (Doc. 94, Attach. 1 at 2.)

When Alexander presented at Memorial, his right leg was cold, pulseless, insensate and without motor function. (Id. at 3, 6-7.) Memorial emergency room doctors consulted with vascular medicine doctors. (Id. at 7.) At 5:59 p.m. on May 23, Alexander had blood drawn for various lab panels. (Doc. 77, Attach. 1 at 87.) At 7:07 p.m. on May 23, 2016, Alexander's potassium levels were recorded at 5.1 mmol/L. (Id.) Dr. Bhandari, a vascular interventional

7

radiologist, reviewed the CT angiogram of Alexander's right leg and found an extensive blood clot. (Doc. 77 at 24-27.) Dr. Bhandari determined that surgery would be needed. (Id. at 27-28.) Dr. Avino, a vascular surgeon, began a thrombectomy on Alexander at 10:05 p.m. on May 23, 2016. (Doc. 94, Attach. 1 at 28.) Anesthesia was concluded at 11:52 p.m. on May 23, 2016 and Alexander was transferred from the operating room to the post-anesthesia care unit ("PACU") to recover on May 24, 2016 at 12:00 a.m. (Id.)

Alexander had blood specimens drawn at 2:05 a.m. on May 24, 2016. (Doc. 77, Attach. 1 at 88-89.) Alexander's PACU treatment concluded at 2:30 a.m. (Id. at 28.) The various lab tests performed on Alexander resulted at different times. The CBC with differential lab resulted at 2:37 a.m., the Protime-INR lab resulted at 2:51 a.m., and the PTT lab resulted at 2:51 a.m. on May 24, 2016. (Id. at 89-90.) The basic metabolic panel, which includes a value for the patient's potassium level, resulted at 4:36 a.m. on May 24, 2016. (Id. at 91.) Alexander's potassium level was recorded at 7.3 mmol/L and reported by lab staff at 4:37 a.m. (Id.) Dr. Moon, the chief resident working that night, was informed of Alexander's potassium level, and he and his team went to the PACU and found Alexander in cardiac arrest. (Id. at 12-13, 18.) Alexander could not be revived and was declared dead by Dr. Moon on May 24, 2016 at approximately 5:13 a.m. (Id. at 18; Doc. 90, Attach. 3 at 1.)

8

Alexander's autopsy was performed by the Georgia Bureau of Investigations ("GBI") medical examiner, Dr. J. Upshaw Downs. (Doc. 90, Attach. 3.) Dr. Downs opined that Alexander's cause of death was the result of "generalized arteriosclerosis which manifests as right lower extremity ischemia, status postoperative with subsequent acute onset hyperkalemia." (Id. at 8.) Dr. Downs found that the excessive potassium and other toxins released during reperfusion post-surgery contributed to Alexander's cardiac arrest and death.

## II.  PROCEDURAL HISTORY

After his death, Alexander's son, Jemme Jenkins, brought suit in both his individual and representative capacity for the benefit of, and on behalf of, the Estate of Jimmie Lee Alexander, Sr. in the State Court of Chatham County, Georgia. (Doc. 1, Attach. 1 at 2-17.) After amending his complaint to add a claim under 42 U.S.C. § 1983 for the alleged deliberate indifference to Alexander's medical needs, the action was removed to this Court. (Doc. 1 at 1-2.) On May 24, 2018, Plaintiff Jenkins filed a second amended complaint adding Julianne Glisson, in her capacity as Administrator for the Estate of Jimmie Lee Alexander, Sr., as plaintiff. (Doc. 15.) Plaintiffs subsequently filed a third amended complaint. (Doc. 26, Attach. 1.)

In their third amended complaint, Plaintiffs allege the following claims: (1) a professional negligence claim against

Defendants Corizon, Augustin, Dambach, and Neisler (collectively, the "Corizon Defendants"), (2) a negligence claim against Corizon Defendants, (3) a negligence claim against Defendants Wilcher, Todd, Milton, Williams, and Bryant (collectively, the "Sheriff Defendants"), (4) a claim against Defendant Chatham County Commissioners alleging that they are liable for failing to correct inadequate funding to the Chatham County Sheriff's Office, (5) a claim of deliberate indifference under the Georgia Constitution against all Defendants, (6) a claim of deliberate indifference pursuant to 42 U.S.C. § 1983 against all Defendants, (7) an intentional infliction of emotional distress claim against all Defendants, (8) a claim for punitive damages against all Defendants, and (9) a claim for breach of sheriff and deputy bonds. (Id. at 11-24.)

## STANDARD OF REVIEW

According to Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim of defense—on which summary judgment is sought." Such a motion must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56 advisory committee notes).

Summary judgment is appropriate when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law governing the action determines whether an element is essential. DeLong Equip. Co. v. Wash. Mills Abrasive Co., 887 F.2d 1499, 1505 (11th Cir. 1989).

As the Supreme Court explained:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Celotex, 477 U.S. at 323. The burden then shifts to the nonmovant to establish, by going beyond the pleadings, that there is a genuine issue as to facts material to the nonmovant's case. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

The Court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmovant. Matsushita, 475 U.S. at 587-88. However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586. A mere "scintilla" of evidence, or simply conclusory allegations, will

not suffice. See, e.g., Tidwell v. Carter Prods., 135 F.3d 1422, 1425 (11th Cir. 1998). Nevertheless, where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the Court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989).

## ANALYSIS

I.  DEFENDANT AUGUSTIN'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON DELIBERATE INDIFFERENCE, PUNITIVE DAMAGES, AND ATTORNEYS' FEES

### A. Deliberate Indifference

Augustin argues that he was not deliberately indifferent to Alexander's serious medical needs. (Doc. 118, Attach. 1 at 12.) Augustin argues that (1) he did not know that Alexander had acute limb ischemia based on the calls with Dambach, (2) he reasonably believed that Alexander's complaints related to hypertension and osteoarthritis and he treated those conditions, and (3) when he did evaluate Alexander and realized there was a vascular condition, he immediately ordered Alexander to be sent to the hospital. (Id.) In response, Plaintiffs argue that there is evidence from which a jury could find that Augustin had knowledge of Alexander's serious medical need, that Augustin was deliberately indifferent to that need by failing to ensure Alexander was evaluated urgently on the night of May 22, abandoning Alexander on May 23 when he left to

find a dentist, and by failing to send Alexander to the hospital by EMS. (Doc. 190 at 13-23.)

A pre-trial detainee's right to adequate medical care arises under the due process clause of the Fourteenth Amendment. Jackson v. West, 787 F.3d 1345, 1352 (11th Cir. 2015). Plaintiffs allege that Alexander's right to medical care was violated due to Augustin's deliberate indifference to Alexander's serious medical need. To show a constitutional violation and prevail on a claim of deliberate indifference to a medical need, a pre-trial detainee must be able to show: "(1) a serious medical need; (2) the defendant's deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." Mann v. Taser Int'l Inc., 588 F.3d 1291, 1306-07 (11th Cir. 2009).

First, this Court finds for the purposes of this motion that Alexander had a serious medical need. A serious medical need is one that has "been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity of the doctor's attention." Youmans v. Gagnon, 626 F.3d 557, 558 (11th Cir. 2010). "In the alternative, a serious medical need is determined by whether a delay in treating the need worsens the condition." Mann, 588 F.3d at 1307. Here, Alexander was complaining of leg and hip pain, was vomiting, had trouble using a limb, and had a weak, thready pulse on the top of his foot. The Court is satisfied that Plaintiffs have provided at

13

least enough evidence of Alexander's medical condition to survive summary judgment. See Fields v. Corizon Health, Inc., 490 F. App'x 174, 183 (11th Cir. 2012) (noting that fractured hips, broken feet, and paralysis are serious medical needs). Additionally, Plaintiffs have provided evidence that Alexander suffered from acute limb ischemia on May 22 into May 23, 2016 while at CCDC and this is a condition that worsens due to delay.

Next, Plaintiffs must demonstrate that Augustin was deliberately indifferent to that need. The Court finds that Plaintiffs have presented enough evidence to create a jury question on this issue. To show that a defendant has been deliberately indifferent, a plaintiff must show the prison's official's "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence." Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011). "Conduct that is more than mere negligence includes: (1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all." Id. The Court reviews Plaintiffs' claims in two groupings: (1) Augustin's conduct prior to when he saw Alexander on May 23, 2016 at 3:00 p.m., and (2) Augustin's conduct in ordering Alexander to be sent to the hospital by car rather than by EMS. The Court begins with the first category.

First, Plaintiffs have presented evidence that creates a
genuine issue of material fact on Augustin's knowledge of a risk
of serious harm. Dambach testified that he informed Augustin by a
call of (1) Alexander's history of TIA and hypertension, (2)
Alexander's high blood pressure reading, (3) Alexander's pain
complaints, and (4) Alexander's weak and thready right foot pulse.
(Doc. 160 at 111-15.) During the second call with Augustin, Dambach
testified that he told Augustin that (1) Alexander had been
crawling on the floor, and (2) Alexander had vomited. (Id. at 147.)
Augustin, however, testified in his deposition that Dambach told
him in the first call that Alexander was complaining of pain "like
his hip was out of the socket," that Alexander had high blood
pressure, that Alexander mentioned somebody gave him a pill and it
was some kind of black magic thing. (Doc. 165 at 170.) Augustin
also testified that Dambach informed him that both of Alexander's
legs were warm and that Alexander was walking but having problems
moving his legs. (Id. at 135-36.) He testified that he did not
consider an ischemic leg as part of his differential diagnosis
because "the nursing staff . . . examined the leg, they didn't see
anything. The six Ps that I mentioned about, the six Ps according
to what the nurses saw wasn't there."[3] (Id. at 172.) Augustin also

---

[3] The "six Ps" that Augustin mentions is a metric used by medical
professionals to gauge whether a limb is suffering from ischemia.
The six Ps are (1) pain, (2) paresthesia, (3) pallor, which is

testified that, on the second call with Dambach, he was told Alexander had vomited once and that his blood pressure was coming down. (Id. at 174.) Augustin denies that he was ever told that Alexander was crawling. (Id. at 173-74.) Augustin also testified that he was told by Dambach that "he examined his legs. He didn't see anything wrong. Both legs were like warm. Both legs—he looked for what they call Homan signs," which are DVT signs, and that Dambach told him "both legs were warm, the guy was walking. He said [Alexander] said he's having problems moving his legs, but [Dambach] and—well, we saw him, you know walking on the camera so." (Id. at 135-36.)

In this case, taking the evidence in the light most favorable to Plaintiffs, Plaintiffs have presented evidence that Augustin was informed that (1) Alexander was complaining of extreme pain which was described as feeling like his hip was out of socket, (2) that Alexander had a weak and thready pulse in his right foot, and (3) Alexander was having trouble moving his limb and was crawling. Thus, there is evidence that Augustin was subjectively aware of a serious risk of harm to Alexander. Because Augustin contests that Dambach ever informed of Alexander crawling and the weak pulse, two of six Ps, this is a factual issue that must be resolved by the jury.

---

color of the limb, (4) poikilocytosis, which is coldness of the limb, (5) pulselessness, and (6) paralysis. (Doc. 165 at 102.)

Second, as to the disregard of that risk, Augustin testified that "[o]nce you fall into the Ps, then you have a high index of suspicion and then take the next step of sending this person out, yes, sir." (Doc. 165 at 102.) Thus, Augustin testified that he was aware that patient who was presenting with multiple "Ps" would warrant more urgent care. Again, if the jury found that Augustin was aware of the information that Dambach testified he gave him, a jury could infer that failing to send Alexander to the hospital and instead arranging for a sick call visit the following day was disregarding the risk.

Finally, Plaintiffs must establish that the conduct was more than mere negligence. In the Eleventh Circuit, " 'deliberate indifference' includes 'the delay of treatment for obviously serious conditions where it is apparent that delay would detrimentally exacerbate the medical problem, where 'the delay does seriously exacerbate the medical problem,' and where 'the delay is medically unjustified.' " Fields, 490 F. App'x at 182 (quoting Harper v. Lawrence Cnty., 592 F.3d 1227, 1235 (11th Cir. 2010)). "A prisoner must provide verif[ied] medical evidence . . . to establish the detrimental effect of delay in medical treatment." James v. Bartow Cty., Ga., 798 F. App'x 581, 585 (11th Cir. 2020) (internal quotation marks and citation omitted). The Court finds that Plaintiffs have presented sufficient evidence to survive summary judgment on whether Augustin's conduct was more

than mere negligence. As discussed above, Augustin testified that he knew that a patient presenting with multiple "P" symptoms should receive emergency care.

Numerous experts in this case have opined that delay in treating an ischemic leg causes more tissue to die which, in turn, can increase the risk of loss of limb or death. Dr. Blais, in his expert report, opined that

> During the ischemic process, irreversible damage occurs to the muscle and nerves while they are denied a blood supply by a blood clot. Dying or dead tissue produces an increase of acid and potassium that can contribute to cardiac arrest. The longer the ischemia is allowed to exist, the more tissue damage occurs, placing the patient in greater jeopardy.

(Doc. 79, Attach. 2 at 4.) Similarly, Dr. Lewinstein opined in his Rule 26 report that "[w]hen a clot occurs there is decreased blood flow to the muscles, nerves, skin and subcutaneous tissue beyond the clot. If the blockage is complete, damage to the muscles and/or nerves begins after six hours of ischemia (lack of blood flow)." (Doc. 81, Attach. 4 at 5.)

Additionally, in regards to how Alexander actually died, hyperkalemia induced cardiac arrest, Plaintiffs have cited to expert testimony that adequately demonstrates the process by which hyperkalemia develops and the causes of it: the wash-out of toxins and potassium that developed due to the dead tissue in the limb following revascularization. (See Doc. 81 at 104-105 (Dr. Lewinstein); Doc. 90 at 55-57 (Dr. Downs); Doc. 90, Attach. 4 at

7-8 (Dr. Downs).) Plaintiffs have also presented expert testimony that opines that the delay Alexander experienced at CCDC caused or contributed to Alexander's death. Dr. Blais stated in his Rule 26 report that "[t]he delay of 20.5 hours was a significant cause of the severe condition of Alexander's right leg . . . during such an extended period of time, an ischemic lower extremity will suffer severe tissue injury." (Doc. 79, Attach. 2 at 4.) Dr. Blais attributed Alexander's cause of death, e.g. cardiac arrest due to hyperkalemia, to the amount of potassium that built up in Alexander's leg due to the delay in treatment.   (Id. at 5.) Dr. Downs opined in his Rule 26 report that Alexander "died as the result of right lower extremity ischemia following . . . vascular occlusion, status post emergent revascularization" which resulted in "rhabdomyolysis which in turn directly resulted in a lethal elevation in potassium." (Doc. 90, Attach. 4 at 5.) Dr. Downs found that the delay in treatment necessitated the surgery performed by Dr. Avino, with its attendant risks, and that the delay was a significant contributing cause to Alexander's death. (Id. at 8-9.)

A jury could find from the facts that the delay was unjustified. Again, taking the facts in the light most favorable to Plaintiffs, Augustin knew that Alexander had a weak pedal pulse, trouble moving his leg and was crawling, extreme pain that had a rapid onset, had vomited, and had extremely high blood pressure

that was brought down with medication. Augustin then chose to place Alexander on sick call for the next day instead of having Alexander evaluated by the RN in the infirmary or transported for evaluation at the emergency room. When asked in his deposition why Augustin choose not to have Dambach take Alexander to be evaluated by the RN in the infirmary on the night of May 22, Augustin generally testified that Dambach was reliable but gave no reason why he choose to have Alexander only evaluated by a LPN. (Doc. 165 at 205.) Thus, although Augustin decided that Alexander needed to be placed in the infirmary under the care of a RN, he could not answer why he decided that Alexander did not need to be seen by a RN before being taken to R&D for overnight observation.

The facts also show that, the next day when Augustin arrived at CCDC, he spoke with other medical providers at a morning conference but then left to attend to his dental emergency. He did not have Alexander evaluated by the other medical providers and did not see him himself until approximately 3:00 p.m. on May 23, 2016. Augustin testified that, if he did not have a dental emergency, Alexander would have been seen earlier. (Id. at 209.) There has been no explanation as to why other medical providers at CCDC could not have seen Alexander in Augustin's absence. Augustin also testified that the nurse practitioner and the physician's assistant could determine whether the Ps were present in Alexander. (Id. at 210.) In sum, Plaintiffs have presented evidence that (1)

Augustin, if he was indeed aware of Alexander's condition in full, would have considered the six Ps and knew that urgent care was needed, (2) Augustin knew that delay could exacerbate a vascular issue, (3) the delay did, in fact, seriously exacerbate the medical condition, and (4) there has been no explanation for the delay. Accordingly, the Court finds that there exists a genuine issue of material fact on Plaintiffs' § 1983 claim of deliberate indifference against Augustin.

The Court now considers Augustin's conduct after he saw Alexander. The Court does not find that there is a genuine issue of material fact on whether Augustin was deliberately indifferent to Alexander's needs after Augustin's diagnosis. Plaintiffs argue that Augustin's failure to have Alexander emergently transported after confirming limb ischemia was grossly negligent because (1) Alexander should have been transported by EMS, and (2) Augustin saw Alexander get wheeled into a holding room and told deputies to transport Alexander by car thereby causing the deputy to believe that this was not an urgent matter. (Doc. 190 at 22.) First, Plaintiffs have not offered evidence that Augustin actually knew that Alexander was not transported until approximately 5:00 p.m. Plaintiffs argue that Augustin knew because he saw Alexander get wheeled into a holding room, but does not show that Augustin knew that Alexander was left in the room for hours. Augustin testified that he did not know there was delay in transporting Alexander

until the following day. (Doc. 165 at 234.) The Court does not find that Augustin was subjectively aware of any delay in transporting Alexander.

As to Plaintiffs' argument that Augustin was deliberately indifferent for failing to have Alexander transported by EMS, this claim fails. To show that a defendant has been deliberately indifferent, a plaintiff must show the prison official's "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence." Bingham, 654 F.3d at 1176. Plaintiffs cannot show that Augustin's decision to send Alexander by car to the hospital instead of by EMS involved a subjective knowledge of a risk of serious harm and that Augustin disregarded that risk. First, Plaintiffs have not shown how sending Alexander by car, excluding any delay experienced, involved a serious risk of harm. Augustin testified that an inmate is sent by car where the person is

> stable, you know, who is breathing okay, who is not bleeding, their vital signs are okay, O2 saturation, the oxygen saturation is fine. Anybody, you know, that falls in that category goes by car. Anybody else who needs oxygen, who needs an IV, who's bleeding, you know, who we suspect some, like a puncture wound into the lungs or into the abdomen does go by like emergency.

(Doc. 165 at 114.) Other than the purported delay Alexander experienced in being transported, Plaintiffs have not shown how transportation by a car posed a serious risk of harm to Alexander— e.g. that EMS could have rendered care that Alexander needed that

he would not have received in a car transport. Additionally, Augustin testified that, once jail staff pick up the inmate-patient, "it takes 20, 30 minutes, the maximum, once they leave the office" to get to the hospital and that if the inmate-patient has not left the facility within 15 minutes, jail staff is supposed to tell medical so that they can call an ambulance. (Id. at 115.)

Second, the evidence does not support a finding that Augustin disregarded any risk of sending Alexander by car instead of by EMS. Again, Augustin testified that if an inmate-patient has not left the facility within 15 minutes, he would then call EMS to transport the patient. He further testified that, when he did find out the following day about the delay in transporting Alexander, he asked the lieutenant "what happened" because "[u]sually there's a 15 minute—if you don't take him to the hospital we will call the EMS." (Id. at 234.) In sum, Plaintiffs have not shown that Augustin's decision to transport Alexander by car instead of EMS involved a serious risk of harm to Alexander, that Augustin was subjectively aware of that risk, and that he disregarded that risk.

Thus, as to Plaintiffs' claim of deliberate indifference based on Augustin's conduct of sending Alexander to the hospital, Augustin's motion is **GRANTED**. As to Plaintiffs' claim of deliberate indifference based on Augustin's other conduct, as described herein, Augustin's motion is **DENIED**.

B. <u>Punitive Damages</u>

Augustin argues that punitive damages are not recoverable in a wrongful death case as a matter of law and can only be recovered where the actions at issue show "willful misconduct, malice, fraud, wantonness, oppression, or [an] entire want of care." (Doc. 118, Attach. 1 at 16-17.) In response, Plaintiffs argue that (1) punitive damages are not recoverable in wrongful death claims, (2) punitive damages are recoverable in a survival action, which is what Plaintiff Glisson is maintaining, and (3) punitive damages are recoverable in a § 1983 action against private corporations and individuals. (Doc. 190 at 23.)

Because the parties agree that punitive damages are not available in the wrongful death claim, the Court will review the two other basis for punitive damages. Augustin's motion is primarily based on the argument that there is no evidence of conduct by Augustin that rises to the level of culpability necessary to sustain a punitive damages claim. As to the § 1983 claim, punitive damages may be awarded where the defendant's " 'conduct is shown to be motivated by evil motive or intent or when it involves reckless or callous indifference to the federally protected rights of others.' " <u>Hooks v. Brewer</u>, No. 18-10628, 2020 WL 3397738, at *6 (11th Cir. June 19, 2020) (quoting <u>Smith v. Wade</u>, 461 U.S. 30, 55, 103 S. Ct. 1625, 75 L.Ed.2d 632 (1983)). However, as discussed above, there is a question of fact that precludes

summary judgment on whether Augustin was deliberately indifferent to Alexander's serious medical needs. The Court similarly finds that Plaintiffs have presented evidence that could support a finding of callous or reckless indifference to Alexander's federal protected rights. See Walsh v. Jeff Davis Cty., No. CV 210-075, 2012 WL 12952564, at *19 (S.D. Ga. Mar. 29, 2012), aff'd, 489 F. App'x 389 (11th Cir. 2012).

Under O.C.G.A. § 51-12-5.1(b), punitive damages "may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." Again, because this Court finds that there is a genuine issue of material fact as to whether Augustin was deliberately indifferent to Alexander's medical needs, Plaintiffs' punitive damages claim likewise survives.

C. Attorneys' Fees

Augustin argues that he is entitled to summary judgment on Plaintiffs' claims for attorneys' fees pursuant to O.C.G.A. § 13-6-11. (Doc. 118, Attach. 1 at 18.) In response, Plaintiffs argue that they are not seeking attorneys' fees under O.C.G.A. § 13-6-11 but instead pursuant to 42 U.S.C. § 1983 through 42 U.S.C. § 1988. (Doc. 190 at 24-25.) Plaintiffs further contend that Augustin's motion is premature on this ground because

Plaintiffs' § 1983 claims against Augustin survive summary judgment and are still pending to be resolved by a jury. The Court agrees. 42 U.S.C. § 1988 allows a court to award attorneys' fees to a prevailing party in § 1983 actions. Because Plaintiffs' § 1983 claim against Augustin survives summary judgment as discussed herein, Augustin's motion for summary judgment on attorneys' fees is **DENIED**.

II. <u>DEFENDANT DAMBACH'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON DELIBERATE INDIFFERENCE, PUNITIVE DAMAGES, AND ATTORNEYS' FEES</u>

A. <u>Deliberate Indifference</u>

Dambach argues that he was not deliberately indifferent to Alexander's serious medical needs. (Doc. 119, Attach. 1 at 11.) Dambach argues that (1) there is no evidence that he knew Alexander had acute limb ischemia or a blood clot in his leg and, therefore, did not know that Alexander had a serious medical need, and (2) that he was not deliberately indifferent to Alexander's medical needs because he cared for Alexander within the scope of his practice. (<u>Id.</u> at 11-24.) In response, Plaintiffs argue that Alexander had an obviously serious medical need and that Dambach was deliberately indifferent to that need when he (1) intentionally failed to follow a complete the Nursing Encounter Tool ("NET"), (2) misrepresented Alexander's condition to Augustin, (3) ignored Alexander's right leg while Alexander was in the R&D cell, and (4)

knowingly failed to accurately report Alexander's condition to Neisler when she came on shift. (Doc. 191 at 12-21.)

A pre-trial detainee's right to adequate medical care arises under the due process clause of the Fourteenth Amendment. Jackson, 787 F.3d at 1352. Plaintiffs allege that Alexander's right to medical care was violated due to Dambach's deliberate indifference to Alexander's serious medical need. To show a constitutional violation and prevail on a claim of deliberate indifference to a medical need, a pre-trial detainee must be able to show: "(1) a serious medical need; (2) the defendant's deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." Mann, 588 F.3d at 1306-07.

First, this Court finds for the purposes of this motion that Alexander had a serious medical need. A serious medical need is one that has "been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity of the doctor's attention." Youmans, 626 F.3d at 558. "In the alternative, a serious medical need is determined by whether a delay in treating the need worsens the condition." Mann, 588 F.3d at 1307. In this case, Dambach challenges whether Alexander suffered from a serious medical need while detained at CCDC. Dambach argues that a serious medical need has not been established because (1) Alexander had not been diagnosed with a specific medical condition that constituted a

27

serious medical need, and (2) he could not make that diagnosis so he was unable to diagnose Alexander with acute limb ischemia. (Doc. 119, Attach. 1 at 12-13.)

However, the inquiry is not whether the defendant could identify what medical need is at play, but whether the need is one that a layperson could recognize as needing medical attention. Youmans, 626 F.3d at 558. Here, Alexander was complaining of leg and hip pain, was vomiting, and had trouble using a limb. The Court is satisfied that Plaintiffs have provided at least enough evidence of Alexander's medical condition to survive summary judgment. See Fields, 490 F. App'x at 183 (noting that fractured hips, broken feet, and paralysis are serious medical needs). Additionally, Plaintiffs have provided evidence that Alexander suffered from acute limb ischemia on May 22 into May 23, 2016 while at CCDC and this is a condition that worsens due to delay.

Next, Plaintiffs must demonstrate that Dambach was deliberately indifferent to that need. To show that a defendant has been deliberately indifferent, a plaintiff must show the prison official's "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence." Bingham, 654 F.3d at 1176. "Conduct that is more than mere negligence includes: (1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to

no treatment at all." Id.  Dambach argues that that he was not subjectively aware of Alexander's diagnosis of acute limb ischemia and, therefore, cannot be liable for deliberate indifference as a matter of law. (Doc. 119, Attach. 1 at 15.) Dambach also argues that he did not disregard any risks because he administered care to Alexander. (Id. at 15-19.)

As to the first factor, subjective knowledge of a risk of serious harm, the Court finds that Plaintiffs have not provided enough evidence to survive summary judgment. To show the subjective component, Plaintiffs must present evidence that Dambach was " 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and must also have drawn the inference.' " Mitchell v. McKeithen, 672 F. App'x 900, 903 (11th Cir. 2016) (quoting Burnette v. Taylor, 533 F.3d 1325, 1330 (11th Cir. 2008)). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not" is insufficient to establish a constitutional violation." Collins v. Bates, No. 17-14559-G, 2018 WL 5090845, at *5 (11th Cir. May 10, 2018). Additionally, a "complaint that a physician has been negligent in diagnosing or treating a medical condition does not state" a claim of deliberate indifference. Bingham, 654 F.3d at 1176.

Even if Dambach should have perceived Alexander's symptoms as presenting a risk of serious harm, he can only be held liable if

he did in fact perceive the risk and intentionally disregarded it. See Howell v. Evans, 922 F.2d 712, 721 (11th Cir. 1991), vacated pursuant to settlement, 931 F.2d 711 (11th Cir. 1991), and opinion reinstated sub nom. Howell v. Burden, 12 F.3d 190 (11th Cir. 1994) (stating that deliberate indifference requires not "merely the knowledge of a condition, but the knowledge of necessary treatment coupled with a refusal to treat properly or a delay in such treatment."); McElligott v. Foley, 182 F.3d 1248, 1259 (11th Cir. 1999) (distinguishing Howell on the basis that "[t]he crucial difference between this case and Howell is that here plaintiff does not allege that the defendant should have known that deterioration of plaintiff's condition was possible, but that the defendant was aware that plaintiff's condition was, in fact, deteriorating, and still did nothing to treat this deteriorating state."). See also Smith v. Franklin Cty., 762 F. App'x 885, 890 (11th Cir. 2019) (finding that officer-defendant's failure to follow jail protocols, which may have led to the officer discovering the inmate's deteriorating medical condition, could not support a finding of deliberate indifference because "proof that the defendant should have perceived the risk, but did not, is insufficient"); Mitchell, 672 F. App'x at 903 (finding that there was no evidence that the defendant nurse was subjectively aware of a risk of serious harm because no evidence indicated that the nurse was aware that the inmate was suffering from a stroke, understood

his condition, or disregarded that risk). The Court does not see any evidence that Dambach did in fact perceive a risk to Alexander and disregarded that risk. Plaintiffs have not presented evidence that Dambach, taking all facts that he knew about Alexander, drew the inference that he was suffering from acute limb ischemia, or any other condition, that required medical attention at the emergency room. Dambach, unlike Augustin, does not diagnose illnesses or medical conditions and Plaintiffs did not present evidence that Dambach was aware of, and drew the conclusion, that the combination of symptoms that Alexander had posed or presented a vascular condition. (Doc. 150 at 80.)

Moreover, Plaintiffs have failed to show that Dambach disregarded a risk by conduct that is more than mere negligence. Plaintiffs argue that there are four acts that show Dambach acted with more than mere negligence: (1) intentional failure to complete the NETs, (2) misrepresentations of Alexander's condition to Augustin, (3) failure to evaluate Alexander while he was in the R&D cell, and (4) failure to accurately report Alexander's condition to Neisler when she came on shift. (Doc. 191 at 14.) These acts, however, sound in medical malpractice, not deliberate indifference. The crux of each of these acts rest on the medical care that Dambach administered and Plaintiffs are taking issue with the adequacy of such care.

31

As to the first act, Plaintiffs contend that had Dambach used the NET on the times he evaluated Alexander, Dambach would have had a record to compare findings and the record could have led to the proper diagnosis of ischemia. (Doc. 191 at 16.) The NETS are forms that nursing staff complete after interacting with inmate-patients. (Doc. 111 at 32; Doc. 160, Attach. 5 at 23.) Dambach testified that a NET was normally completed when the staff would interact with a patient that medication was going to be administered to. (Doc. 165 at 28.) Neisler testified in her deposition that NETS were usually completed in connection to a signal or code called for an inmate. (Doc. 164 at 65-67.) Plaintiffs argue that, if Dambach had used the appropriate NET, Alexander's symptoms would have been identified more clearly and Alexander could have been diagnosed sooner. However, failing to diagnose a medical condition does not directly equate to deliberate indifference. Bingham, 654 F.3d at 1176. Additionally, Plaintiffs have not presented evidence that Dambach's failure to use the NETs was anything more than negligence. See Smith, 762 F. App'x at 890-91 (noting that the nurse's failure to use the jail protocols established that, at best, the nurse was negligent and that the inmate's deteriorating condition 'should have been discovered,' but these things are insufficient to establish deliberate indifference).

As to the second act, Plaintiffs argue that, according to Augustin's testimony, Dambach failed to report key findings about Alexander's condition which, if he had reported them, would have led to a diagnosis of ischemia. (Doc. 191 at 19.) Taking Plaintiffs' facts as true, that Dambach failed to accurately report Alexander's condition to Augustin, Plaintiffs still have not shown that this conduct rises above negligence or medical malpractice. Plaintiffs argue that Dambach's focus on the "voodoo and black magic" that Alexander reported to him creates a question of fact on whether Dambach intentionally minimized Alexander's pain complaints. (Id.) The Court disagrees. The record is clear that Dambach called Augustin twice to discuss Alexander's condition and described in detail the pain that Alexander was suffering from and the high blood pressure. Augustin testified that he was told that Alexander complained of pain like "his right hip feels it's like out of socket." (Doc. 165 at 134, 170.) It is true that Dambach informed Augustin that Alexander mentioned that someone was "trying to hurt him and then gave him a pill, some black magic thing." (Id. at 170.) The record, however, does not show that Dambach deliberately ignored Alexander's pain, refused to relay the complaints of pain to Augustin, or failed to give him pain medication once it was prescribed by Augustin. Thus, Plaintiffs have not shown that Dambach's failure to accurately report his

evaluation   findings   rises   above   negligence,   or   medical
malpractice, to the level of deliberate indifference.

The third act Plaintiffs focus on is the care Dambach provided
to Alexander while he was in the R&D cell. Plaintiffs contend that
Damach failed to establish a plan of care for Alexander and failed
to assess Alexander's right leg. (Doc. 191 at 20.) This, however,
is a quintessential claim contesting the adequacy of the type of
medical care provided.

The record does not show that Dambach placed Alexander in the
R&D cell and ignored him for the rest of the time. At approximately
12:20 a.m. on May 23, Dambach checked Alexander's finger pulse and
oxygen level. (Doc. 160 at 150.) He also testified that he checked
Alexander's pedal pulse again. (Id. at 152.) Dambach left the R&D
cell around 12:24 a.m. (Id.) He came back and looked in on
Alexander at approximately 1:24 a.m., 2:00 a.m., 2:40 a.m., 4:09
a.m., 4:23 a.m., 4:38 a.m., 5:51 a.m., and 6:01 a.m. (Id. at 154-
67.) Dambach gave Alexander his morning medications at
approximately 7:46 a.m. (Id. at 173.) In sum, Plaintiffs fault
Dambach for failing to evaluate Alexander more thoroughly,
however, this fails to rise beyond an accusation of malpractice.
See Smith, 762 F. App'x at 890 (finding that the defendant nurse's
"failure to monitor the inmate or recheck his blood pressure for
the next several hours, even if required by jail protocols, was at
most negligent."); Kruse v. Williams, 592 F. App'x 848, 859 (11th

Cir. 2014) (noting that "[w]hile the nurse's diagnoses and quality of care may have been subpar, . . . they did not rise beyond a colorable claim of medical practice to deliberate indifference.").

Finally, Plaintiffs claim Dambach's failure to accurately report Alexander's complaints and condition to Neisler when she came on shift was an act of more than mere negligence. (Doc. 191 at 22.) The Court disagrees. Similar to Dambach's conduct in relaying information to Augustin, Plaintiffs have not shown how Dambach's actions were more than negligence or medical malpractice. Dambach testified that he told Neisler that Alexander had two signals called on him, that he was in R&D because the infirmary was full, that Augustin wanted to see him that morning, that he was complaining of leg pain, and that he mentioned a voodoo spell. (Doc. 160 at 176.) Neisler testified that Damach told her that Alexander had been complaining of leg pain and that Alexander was concerned someone had poisoned him. (Doc. 164 at 130.) Neisler also confirmed in her testimony that Dambach told her that Alexander was to be seen by Augustin that morning. (Id. at 141.) Ultimately, Dambach responded to each Signal 55 call and evaluated Alexander's medical needs, called the doctor, Augustin, gave Alexander the prescribed medications, periodically checked on Alexander throughout the night, and informed Neisler that Alexander was to be seen by Augustin.  These facts do not support

a finding that Dambach was deliberately indifferent to Alexander's medical needs.

B. Punitive Damages and Attorneys' Fees

Dambach also moves for summary judgment on Plaintiffs' claims for punitive damages and attorneys' fees. (Doc. 119, Attach. 1 at 20-22.) In response, Plaintiffs argue that they can be awarded punitive damages on the survival action brought under state law by Plaintiff Glisson and pursuant to their 42 U.S.C. § 1983 action.

First, the Court finds that, because Dambach is entitled to summary judgment on Plaintiffs' § 1983 action against him, their predicate claim for punitive damages fails. Additionally, based on the foregoing, the Court finds that summary judgment on Plaintiffs' state law punitive damages claim is also due to be granted. Pursuant to O.C.G.A. § 51-12-5.1(b), punitive damages may be awarded where "the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." Plaintiffs contend that the same facts that establish the issue of punitive damages in the state survival action also establish a question of fact in the federal claims. However, for the reasons outlined above, the Court does not find that there is a genuine issue of material fact as to whether Dambach was deliberately indifferent.

As to attorneys' fees, Plaintiffs state they are not pursuing a claim for attorneys' fees under O.C.G.A. § 13-6-11 but instead only seek attorneys' fees pursuant to 42 U.S.C. § 1988. (Doc. 191 at 23-24.) 42 U.S.C. § 1988 allows a court to award attorneys' fees to a prevailing party in § 1983 actions. However, because the Court finds that Dambach is entitled to summary judgment on Plaintiffs' § 1983 claim against him, Dambach's motion for summary judgment on attorneys' fees is due to be granted as well.

III. <u>DEFENDANT NEISLER'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON DELIBERATE INDIFFERENCE, PUNITIVE DAMAGES, AND ATTORNEYS' FEES</u>

A. <u>Deliberate Indifference</u>

Neisler argues that she was not deliberately indifferent to Alexander's serious medical needs and is entitled to summary judgment on Plaintiffs' claims against her. (Doc. 120.) Neisler claims that (1) there is no evidence that she knew Alexander had acute limb ischemia or a blood clot in his leg and, therefore, did not know that Alexander had a serious medical need, and (2) she did not disregard any risk to Alexander because she cared for him within the scope of her practice. (Doc. 120, Attach. 1 at 7-13.)

In response, Plaintiffs argue that questions of fact remain on Neisler's knowledge of Alexander's serious medical needs. Plaintiffs contend that Neisler "gained knowledge of Alexander's medical needs through several sources," including Alexander's history of a recent TIA and his age, Dambach's treatment notes

37

from the prior night which included Alexander's high blood pressure and his leg pain, and was told by Dambach directly that Alexander had high blood pressure due to his leg pain and had vomited. (Doc. 192 at 10-11.) Plaintiffs also argue that there is evidence of Neisler's deliberate indifference. (Id. at 11-15.)

First, for the reasons stated above, the Court finds that Alexander had an objective serious medical need. Next, Plaintiffs must demonstrate that Neisler was deliberately indifferent to that need. The Court finds that Plaintiffs have not done so. To show that a defendant has been deliberately indifferent, a plaintiff must show a prison official's "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence." Bingham, 654 F.3d at 1176. "Conduct that is more than mere negligence includes: (1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all." Id.

Neisler argues that that she was not subjectively aware of Alexander's diagnosis of acute limb ischemia and, therefore, could not have perceived the subjective risks to Alexander. (Doc. 120, Attach. 1 at 10.) The Court agrees that Plaintiffs have not provided enough evidence to survive summary judgment on Neisler's subjective knowledge. To show the subjective component, Plaintiffs must present evidence that Neisler was " 'aware of facts from which

the inference could be drawn that a substantial risk of serious harm exist[ed], and must also have drawn the inference.' " Mitchell, 672 F. App'x at 903 (quoting Burnette, 533 F.3d at 1330). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not" is insufficient to establish a constitutional violation." Collins v. Bates, No. 17-14559-G, 2018 WL 5090845, at *5 (11th Cir. May 10, 2018). Additionally, a "complaint that a physician has been negligent in diagnosing or treating a medical condition does not state" a claim of deliberate indifference. Bingham, 654 F.3d at 1176.

Plaintiffs state in their response brief that Neisler "was unaware of any diagnosis for Alexander's problems." (Doc. 192 at 3.) Thus, by this admission, Neisler was not subjectively aware of a risk of serious harm to Alexander. Additionally, the evidence shows that she was informed that by Dambach that Alexander had two signals called on him, that he was in R&D because the infirmary was full, that Augustin wanted to see him that morning, that he was complaining of leg pain, and that he mentioned a voodoo spell. (Doc. 160 at 176.) Neisler testified that Damach told her that Alexander had been complaining of leg pain and that Alexander was concerned someone had poisoned him. (Doc. 164 at 130.) Neisler also confirmed in her testimony that Dambach told her that Alexander was to be seen by Augustin that morning. (Id. at 141.) Thus, taking the facts in the light most favorable to Plaintiffs,

Neisler knew that Alexander had complained of leg pain, that be had high blood pressure the night before that came down with medication, and that he was in R&D for observation until Augustin could see him. None of these facts support a finding that Neisler was subjectively aware of a risk of serious harm existed.

Further, Plaintiffs' arguments center a contention that Neisler should have evaluated Alexander and should have realized he was suffering from acute ischemic limb. (Doc. 192 at 3.) However, this is insufficient to support a deliberate indifference claim. Smith, 762 F. App'x at 890 (finding that officer-defendant's failure to follow jail protocols, which may have led to the officer discovering the inmate's deteriorating medical condition, could not support a finding of deliberate indifference because "proof that the defendant should have perceived the risk, but did not, is insufficient"); Mitchell, 672 F. App'x at 903 (finding that there was no evidence that the defendant nurse was subjectively aware of a risk of serious harm because no evidence indicated that the nurse was aware that the inmate was suffering from a stroke, understood his condition, or disregarded that risk). Plaintiffs have not presented evidence that Neisler, taking all facts that she knew about Alexander, drew the inference that he was suffering from acute limb ischemia, or any other condition, that required medical attention and then intentionally ignored that risk by failing to

40

render medical care. Accordingly, Neisler is entitled to summary judgment on Plaintiffs' § 1983 claim against her.

B. Punitive Damages and Attorneys' Fees

Neisler also moves for summary judgment on Plaintiffs' claims for punitive damages and attorneys' fees. (Doc. 119, Attach. 1 at 20-22.) In response, Plaintiffs argue that they can be awarded punitive damages on the survival action brought under state law by Plaintiff Glisson and pursuant to their 42 U.S.C. § 1983 action. First, the Court finds that, because Neisler is entitled to summary judgment on Plaintiffs' § 1983 action against her, the predicate claim for punitive damages fails.

Additionally, based on the foregoing, the Court finds that summary judgment on Plaintiffs' state law punitive damages claim is also due to be granted. Pursuant to O.C.G.A. § 51-12-5.1(b), punitive damages may be awarded where "the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." Plaintiffs contend that the same facts that establish the issue of punitive damages in the state survival action also establish a question of fact in the federal claims. However, for the reasons outlined above, the Court does not find that there is a genuine issue of material fact as to whether Neisler was deliberately indifferent.

As to attorneys' fees, Plaintiffs state they are not pursuing a claim for attorneys' fees under O.C.G.A. § 13-6-11 but instead only seek attorneys' fees pursuant to 42 U.S.C. § 1988. (Doc. 191 at 23-24.) 42 U.S.C. § 1988 allows a court to award attorneys' fees to a prevailing party in § 1983 actions. However, because the Court finds that Neisler is entitled to summary judgment on Plaintiffs' § 1983 claim against her, Neisler's motion for summary judgment on attorneys' fees is due to be granted as well.

CONCLUSION

For the foregoing reasons, Defendant Augustin's Partial Motion for Summary Judgment (Doc. 118) is **GRANTED IN PART** and **DENIED IN PART**, Defendant Mark Dambach's Partial Motion for Summary Judgment (Doc. 119) is **GRANTED**, and Defendant Victoria Neisler's Partial Motion for Summary Judgment (Doc. 120) is **GRANTED**.

SO ORDERED this *3rd* day of September 2020.

WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA