IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

JEMME J. JENKINS, Individually, )
and JULIANNE GLISSON,            )
Administrator of the Estate of   )
Jimmie L. Alexander, Sr.,        )
                                 )
        Plaintiffs,              )
                                 )
v.                               )    CASE NO. CV418-099
                                 )
CORIZON HEALTH INC., a Delaware  )
Corporation; GUY AUGUSTIN,       )
M.D.; VICTORIA NEILSER, LPN;     )
KEVIN TODD, Corporal; MARK       )
DAMBACH, LPN; CARL MILTON,       )
Sergeant; WANDA WILLIAMS,        )
Lieutenant; DESMOND BRYANT,      )
Corporal; CHATHAM COUNTY         )
COMMISSIONERS; JOHN WILCHER,     )
Sheriff of Chatham County; and   )
JOHN DOES 1-5;                   )
                                 )
        Defendants.              )
_____)

## O R D E R

Before the Court is Defendants Sheriff John Wilcher, Cpl. Kevin Todd, Sgt. Carl Milton, Lt. Wanda Williams, Cpl. Desmond Bryant, and John Does 1-5's ("Sheriff Defendants") Motion for Summary Judgment. (Doc. 105.) For the following reasons, the Sheriff Defendants' motion (Doc. 105) is **GRANTED IN PART** and **DENIED IN PART.**

**BACKGROUND**

## I.   THE INCIDENT ON MAY 22-24, 2016

This case arises out of the incarceration and subsequent death of Jimmie Alexander, Sr. ("Alexander") in 2016. (Doc. 1.) Alexander was a pretrial detainee at Chatham County Detention Center ("CCDC"). (Doc. 86, Attach. 2.) At the time of Alexander's detention, Defendant Corizon Health, Inc. ("Corizon") provided medical services to detainees at CCDC pursuant to a contract with Chatham County. (Doc. 87, Attach. 1.) At all relevant times, Defendant Dr. Guy Augustin was the acting onsite medical director employed by Corizon. (Doc. 156 at 94.) Defendant Corizon also employed Defendant Mark Dambach ("Dambach"), a licensed practical nurse ("LPN"), and Defendant Victoria Neisler ("Neisler"), also an LPN. (Doc. 150 at 17-18; Doc. 154 at 33.) Alexander was booked into CCDC as a pretrial detainee on April 27, 2016. (Doc. 86, Attach. 2 at 1.) Alexander was sixty years of age at the time of his intake. (Id.) Alexander reported during the intake screening process that his medical history included hypertension, a smoking history of over twenty years, and a transient ischemic attack ("TIA") that occurred in March 2016. (Doc. 74, Attach. 9 at 5-9.)

On May 22, 2016, at approximately 8:30 p.m., Alexander began to complain about pain in his right hip and leg. (Doc. 97, Attach. 7 at 11; Doc. 49 at 137.) At approximately 8:47 p.m. on May 22, 2016, Defendant Todd, a Sheriff's deputy, instructed a Signal 55

to be called for Alexander.[1] (Doc. 85 at 65, 78.) Dambach responded to the call and evaluated Alexander between 9:02 p.m. and 9:13 p.m. (Doc. 150 at 105-10.) During this examination, Dambach understood Alexander's complaint to be that he began experiencing right leg pain suddenly and found that Alexander had a weak, thready pedal pulse in his right foot. (Id. at 105-06.) Alexander reported to Dambach that the pain felt like "his leg was broken, his hip was out of the socket." (Id. at 109.) Dambach checked Alexander's vitals and noted that his blood pressure was elevated at 188 over 122. (Id. at 107.) Before leaving Alexander's cell, Dambach told Alexander that he was going to relay this information to the doctor and then be back once he received orders from the doctor and that he would bring any medications that had been ordered. (Id. at 110-11.)

Dambach called Dr. Augustin after evaluating Alexander and informed Augustin of Alexander's elevated blood pressure, the reported right leg and hip pain, and Alexander's known medical history. (Id. at 111.) Augustin prescribed Clonodine 0.1 mg, for reducing blood pressure, Novasc 10 mg, for reducing blood pressure, and Naproxyn 500 mg, for the pain. (Id. at 111-112; Doc. 156 at 159-160.) Around 9:30 p.m., Alexander used a plastic chair while walking to the wing officer's desk in Unit 6D, the unit he was

---

[1] A "Signal 55" is a code that means that an inmate needs medical attention. (Doc. 85 at 29.)

housed in, and was dragging his right leg. (Doc. 96 at ¶¶ 30-31; Doc. 145 at ¶¶ 30-31.) At approximately 9:45 p.m., Dambach administered the above medications to Alexander. (Doc. 150 at 118.) Dambach did not examine Alexander when he gave him the medications. (Id. at 117.) Around 11:15 p.m., Alexander used a plastic chair to travel to the restroom and at 11:30 p.m., several inmates carried Alexander back to his pod. (Doc. 96 at ¶¶ 36-37; Doc. 145 at ¶¶ 36-37.)

Around 11:40 p.m., Alexander crawled out into the middle of Unit 6D floor and vomited as he crawled out. (Doc. 96 at ¶¶ 38-39; Doc. 145 at ¶¶ 38-39.) At 11:39 p.m., Defendant Todd called a 10-78 code which means that the officer needs assistance, but is not in any danger. (Doc. 85 at 29, 113.) Deputies, including Sergeant Milton, arrived in Unit 6D in response to the 10-78 and the 10-78 turned into a Signal 55. (Id. at 117; Doc. 91 at 76-77.) Dambach responded to the Signal 55 and arrived in Unit 6D around 11:48 p.m. and found Alexander lying on the floor next to a small amount of vomit. (Doc. 150 at 131.) Dambach proceeded to check Alexander's vitals, but did not otherwise check Alexander's right leg. (Id.)

Dambach went to the Medical Unit and called Augustin at approximately midnight of May 22. (Id. at 133.) Augustin and Dambach agreed that Alexander should be sent to infirmary, however, the male beds in the infirmary were reportedly full. (Id. at 133-

4

34.) Alexander was placed into a wheelchair and taken to Receiving and Discharge ("R&D") for observation during the night. (Id.; Doc. 91 at 50-51.) Dambach examined Alexander's right foot pulse before placing him in the R&D cell, but did not document that he did so. (Doc. 150 at 151-52.) Alexander was placed in R&D cell #8 at 12:21 a.m. on Monday, May 23, 2016. (Id. at 151.)

Augustin came to CCDC at 7:30 a.m. on Monday, May 23, 2016 and spoke about Alexander with other medical providers at morning conference. (Doc. 156 at 133-34.) Augustin, however, did not examine Alexander that morning and subsequently left CCDC around 8:30 a.m. to find a dentist for himself. (Id. at 132-33.) Alexander was placed on Augustin's "sick call list" to be seen by Augustin. (Id. at 134.) Also on the morning of Monday, May 23, 2016, around 7:00 a.m., Victoria Neisler came on duty in CCDC's R&D area for the day shift, relieving Dambach. (Doc. 154 at 127.) Dambach told Niesler about Alexander's leg pain. (Doc. 150 at 176, 178; Doc. 154 at 130.) Neisler visited Alexander to check on him and saw that he was standing in the cell. (Doc. 154 at 138-140.) During that time, Neisler took Alexander's blood pressure but did not otherwise take any other vital signs or examine Alexander's right leg or foot. (Id.)

Augustin returned to CCDC later on May 23, 2016 and examined Alexander at approximately 3:00 p.m. on Monday, May 23, 2016. (Doc. 156 at 162, 196, 224.) During his examination, Augustin noted the

absence of a pulse on the top of the foot and that Alexander's right lower limb was cool to the touch. (Id. at 163.) During this examination, Augustin told Alexander that he was going to the hospital because Augustin believed he had some type of vascular issue due to the coolness in his limb. (Id. at 165-66.) Alexander was placed into a wheelchair and moved to a holding room in the Medical Unit around 3:11 p.m. (Id. at 231-32.) Augustin ordered Alexander to be taken to the emergency room. (Id. at 228-29.) Alexander was to be transported by car to the hospital. (Doc. 92 at 77-78; Doc. 89 at 68.)

The CCDC watch commander, Defendant Lieutenant Williams, received the instruction to transport Alexander to the hospital at 3:16 p.m.[2]  (Doc. 92 at 77, 80.) Defendant Williams testified that at roughly 3:21 p.m., she contacted Corporal Kelly-James but Kelly-James did not take Alexander because she complained of not having her lunch break and her shift ending at 4:00 p.m. (Id. at 79, 89.) Defendant Williams testified that she then contacted Defendant Bryant at roughly 3:30 p.m. to transport Alexander and expected Defendant Bryant to be ready to leave with Alexander by 4:00 p.m. (Id. at 90.) Internal records show an entry dated May 23, 2016 at 3:47 p.m. with an event time of 3:16 p.m. that reads: "The doctor

---

[2] Corporal Addie Bailey (née Cochran) testified that the Watch Commander, Defendant Williams, was notified at 3:18 p.m. (Doc. 89 at 68.)

recommends that detainee Jimmy Alexander 6D be transported to MMC via car for an evaluation. Cpl. Kelly-James assigned to complete the detail." (Doc. 92, Attach. 2 at 19.) At the time that Defendant Williams completed the entry, 3:47 p.m., the log only reflects that Kelly-James had been contacted. Corporal Bryant testified that he did not receive a call to transport Alexander until 4:40 p.m. (Doc. 88 at 17.) Defendant Bryant further testified that he and Alexander left CCDC at approximately 5:08 p.m. and arrived at Memorial Health University Medical Center ("Memorial") emergency room around 5:42 p.m. (Id. at 40.) Memorial's records show that Alexander arrived at 5:38 p.m. on May 23, 2016 and was admitted at 5:42 p.m. (Doc. 94, Attach. 1 at 2.)

When Alexander presented at Memorial, his right leg was cold, pulseless, insensate and without motor function. (Id. at 3, 6-7.) Memorial emergency room doctors consulted with vascular medicine doctors. (Id. at 7.) At 5:59 p.m. on May 23, Alexander had blood drawn for various lab panels. (Doc. 77, Attach. 1 at 87.) At 7:07 p.m. on May 23, 2016, Alexander's potassium levels were recorded at 5.1 mmol/L. (Id.) Dr. Bhandari, a vascular interventional radiologist, reviewed the CT angiogram of Alexander's right leg and found an extensive blood clot. (Doc. 77 at 24-27.) Dr. Bhandari determined that surgery would be needed. (Id. at 27-28.) Dr. Avino, a vascular surgeon, began a thrombectomy on Alexander at 10:05 p.m. on May 23, 2016. (Doc. 94, Attach. 1 at 28.) Anesthesia was

concluded at 11:52 p.m. on May 23, 2016 and Alexander was transferred from the operating room to the post-anesthesia care unit ("PACU") to recover on May 24, 2016 at 12:00 a.m. (Id.)

Alexander had blood specimens drawn at 2:05 a.m. on May 24, 2016. (Doc. 77, Attach. 1 at 88-89.) Alexander's PACU treatment concluded at 2:30 a.m. (Id. at 28.) The various lab tests performed on Alexander resulted at different times. The CBC with differential lab resulted at 2:37 a.m., the Protime-INR lab resulted at 2:51 a.m., and the PTT lab resulted at 2:51 a.m. on May 24, 2016. (Id. at 89-90.) The basic metabolic panel, which includes a value for the patient's potassium level, resulted at 4:36 a.m. on May 24, 2016. (Id. at 91.) Alexander's potassium level was recorded at 7.3 mmol/L and reported by lab staff at 4:37 a.m. (Id.) Dr. Moon, the chief resident working that night, was informed of Alexander's potassium level, and he and his team went to the PACU and found Alexander in cardiac arrest. (Id. at 12-13, 18.) Alexander could not be revived and was declared dead by Dr. Moon on May 24, 2016 at approximately 5:13 a.m. (Id. at 18; Doc. 90, Attach. 3 at 1.)

Alexander's autopsy was performed by the Georgia Bureau of Investigations ("GBI") medical examiner, Dr. J. Upshaw Downs. (Doc. 90, Attach. 3.) Dr. Downs opined that Alexander's cause of death was the result of "generalized arteriosclerosis which manifests as right lower extremity ischemia, status postoperative with subsequent acute onset hyperkalemia." (Id. at 8.) Dr. Downs

8

found that the excessive potassium and other toxins released during reperfusion post-surgery contributed to Alexander's cardiac arrest and death.

## II.   CORIZON'S HEALTHCARE CONTRACT

In 2010, Chatham County, by and through the Board of Commissioners of Chatham County, Georgia, entered into a contract with Prison Health Services, Inc. for the provision of inmate healthcare services. (Doc. 168, Attach. 5 at 2.) The contract was annual, but had four renewals with an expiration date of February 26, 2015. (Id.) Around July 2011, Prison Health Services, Inc.'s name changed to Corizon. (Doc. 168 at 38-39.) The annual cost under the contract for 2010 was $5,399,000.00. (Doc. 168, Attach. 5 at 26.) In 2011, Chatham County paid $5,584,224, in 2012 the amount was $5,774,088, and in 2013, the amount paid was $5,774,088. (Doc. 167 at 16-17; Doc. 167, Attach. 2 at 1.) Subsequently, Corizon and Chatham County entered into a contract on January 17, 2014 in the amount of $5,074,224. (Doc. 87, Attach. 1; Doc. 167, Attach. 2 at 1.) Linda Cramer, a designated corporate representative for Chatham County, testified that the compensation was $5,070,224 for both 2014 and 2015. (Doc. 167 at 17.)

Pursuant to the contract, Corizon had assumed all medical care, including psychiatric but with the exclusion of psychologist, for all inmates at CCDC. (Doc. 87, Attach. 1 at 14.) Corizon was to staff nurses in various parts of CCDC as follows:

(1) in the Medical Unit 24 hours a day, 7 days a week, (2) in the R&D area 24 hours a day, 7 days a week, (3) each of the housing units for 8 hours, 5 days a week and (4) in the infirmary 24 hours a day, 7 days a week. (Id. at 14-15.)

In 2015, Chatham County expressed a concern about Corizon's staffing levels and felt that there should have been additional registered nurses ("RNs") in the facility at any given time. (Doc. 166 at 38-39.) By e-mail dated September 18, 2015, Scott Bowers, with Corizon, emailed Lee Smith and Micheal Kaigler at Chatham County. (Doc. 93, Attach. 9 at 3.) In that e-mail, Bowers summarized a meeting between representatives of Corizon and Chatham County regarding care at CCDC. Specifically, Bowers mentioned that "there was a question regarding our staffing Licensed Practical Nurses (LPNs) at intake to conduct health screenings. We recognize your consultants have recommended Registered Nurses (RNs) at **intake**, and we can do that." (Id. at 4 (emphasis in original).) Bowers then states that the cost of adding an RN for 12 hours per night would be $197,172. (Id.) Bowers further stated that "when the question of staffing an RN at night was first raised, my team did not believe it to be incumbent upon Corizon Health to absorb this cost because they are confident that we have structured a sound inmate medical program . . . ." and offered to share the cost of increased nursing staff. (Id.) An increase in RN staffing was never adopted. (Doc. 93 at 110.)

10

At the time of Alexander's incarceration and subsequent death, Chatham County was in the process of soliciting a new inmate healthcare provider through a request for proposal ("RFP"). (Doc. 168 at 28-29.) The contract was awarded to Correct Health in July 2016. (Id. at 29.) Correct Health's contract for 2016 was in the amount of $6,973,725. (Doc. 167 at 17.)

## III.   PROCEDURAL HISTORY

After his death, Alexander's son, Jemme Jenkins, brought suit in both his individual and representative capacity for the benefit of, and on behalf of, the Estate of Jimmie Lee Alexander, Sr. in the State Court of Chatham County, Georgia. (Doc. 1, Attach. 1 at 2-17.) After amending his complaint to add a claim under 42 U.S.C. § 1983 for the alleged deliberate indifference to Alexander's medical needs, the action was removed to this Court. (Doc. 1 at 1-2.) On May 24, 2018, Plaintiff Jenkins filed a second amended complaint adding Julianne Glisson, in her capacity as Administrator for the Estate of Jimmie Lee Alexander, Sr., as plaintiff. (Doc. 15.) Plaintiffs subsequently filed a third amended complaint. (Doc. 26, Attach. 1.)

In their third amended complaint, Plaintiffs allege the following claims: (1) a professional negligence claim against Defendants Corizon, Augustin, Dambach, and Neisler (collectively, the "Corizon Defendants"), (2) a negligence claim against Corizon Defendants, (3) a negligence claim against Defendants Wilcher,

11

Todd, Milton, Williams, and Bryant (collectively, the "Sheriff Defendants"), (4) a claim against Defendant Chatham County Commissioners alleging that they are liable for failing to correct inadequate funding to the Chatham County Sheriff's Office, (5) a claim of deliberate indifference under the Georgia Constitution against all Defendants, (6) a claim of deliberate indifference pursuant to 42 U.S.C. § 1983 against all Defendants, (7) an intentional infliction of emotional distress claim against all Defendants, (8) a claim for punitive damages against all Defendants, and (9) a claim for breach of sheriff and deputy bonds. (Id. at 11-24.)

## STANDARD OF REVIEW

According to Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim of defense—on which summary judgment is sought." Such a motion must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56 advisory committee notes).

Summary judgment is appropriate when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law governing the action determines whether an element is essential. DeLong Equip. Co. v. Wash. Mills Abrasive Co., 887 F.2d 1499, 1505 (11th Cir. 1989).

As the Supreme Court explained:

> [A] party seeking summary judgment always bears the
> initial responsibility of informing the district court
> of the basis for its motion, and identifying those
> portions of the pleadings, depositions, answers to
> interrogatories, and admissions on file, together with
> the affidavits, if any, which it believes demonstrate
> the absence of a genuine issue of material fact.

Celotex, 477 U.S. at 323. The burden then shifts to the nonmovant to establish, by going beyond the pleadings, that there is a genuine issue as to facts material to the nonmovant's case. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

The Court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmovant. Matsushita, 475 U.S. at 587-88. However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586. A mere "scintilla" of evidence, or simply conclusory allegations, will not suffice. See, e.g., Tidwell v. Carter Prods., 135 F.3d 1422, 1425 (11th Cir. 1998). Nevertheless, where a reasonable fact finder

13

may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the Court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989).

**ANALYSIS**

I.  CLAIMS AGAINST SHERIFF DEFENDANTS IN THEIR OFFICIAL CAPACITIES

In their complaint, Plaintiffs allege the following claims against Sheriff Defendants: (1) a negligence claim under state law, (2) a deliberate indifference claim brought pursuant to the Georgia Constitution, (3) a claim for deliberate indifference pursuant to 42 U.S.C. § 1983, (4) a claim for intentional infliction of emotional distress, and (5) a claim for punitive damages. (Doc. 15 at 13-17.) Plaintiffs brought their claims against the Sheriff Defendants in both their official and individual capacities. (Id. at 3-4.)

A. Sheriff Defendants' Immunity From Suit

Sheriff Defendants move for summary judgment on the claims against them due to their sovereign immunity. "In Georgia, 'sovereign immunity extends to the state and all of its departments and agencies.' " Carter v. Butts Cty., Ga., 821 F.3d 1310, 1323 (11th Cir. 2016) (quoting Ga. Const. art. I § 2, ¶ IX; Gilbert v. Richardson, 264 Ga. 744, 452 S.E.2d 476, 479 (1994)). Sovereign immunity extends to sheriffs and counties as well unless waived by

14

the General Assembly. Id.  Thus, a defendant who is sued in his official capacity is entitled to the benefit of the sovereign immunity defense, and the plaintiff bears the burden to demonstrate that sovereign immunity has been waived. Id.

In their response, Plaintiffs argue that the state does not enjoy sovereign immunity from federal constitutional violations, that a "sheriff, individually, does not have immunity to violate the Georgia Constitution," and that sovereign immunity only applies to claims brought against individuals in their official capacity and does not apply to 42 U.S.C. § 1983 claims. (Doc. 184 at 8-9.) The Court finds these statements insufficient to demonstrate a waiver of the State's sovereign immunity in this case. First, Plaintiffs acknowledge that sovereign immunity applies to claims against state officials in their official capacity. Second, Plaintiffs have failed to identify a specific waiver of the state's sovereign immunity and focuses more generally on their ability to bring their federal § 1983 claim. Counties and sheriffs enjoy sovereign immunity for tort claims under the Georgia Constitution, including claims related to the provision of medical care in jails. Temple v. McIntosh Cty., Ga., No. 2:18-CV-91, 2019 WL 287482, at *7 (S.D. Ga. Jan. 22, 2019); Tattnall Cty. v. Armstrong, 333 Ga. App. 46, 52, 775 S.E.2d 573, 578 (Ga. Ct. App. 2015), overruled by Rivera v. Washington, 298 Ga. 770, 784 S.E.2d 775 (2016). The Court, therefore, finds that the Sheriff Defendants

are entitled to sovereign immunity against Plaintiffs' state law claims in their official capacities. See Temple, 2019 WL 287482, at *7.[3] As a result, Sheriff Defendants' motion regarding Plaintiffs' claims against Sheriff Defendants in their official capacities is **GRANTED**.

B. Sheriff Defendants' Eleventh Amendment Immunity

Sheriff Defendants also argue that they are protected from suit by the Eleventh Amendment. (Doc. 105 at 4.) As noted above, Plaintiffs generally argue that sovereign immunity only applies to claims brought against individuals in their official capacity and does not apply to 42 U.S.C. § 1983 claims. (Doc. 184 at 8-9.) The Court finds that the claims against the Sheriff Defendants in their official capacities are due to be dismissed.

"A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity or Congress has abrogated the state's immunity." Melton v. Abston, 841 F.3d 1207, 1233 (11th Cir. 2016). See also Temple v. McIntosh

---

[3] The fact that this Court finds the Sheriff Defendants to be acting as arms of the state under the Eleventh Amendment analysis below does not require a different result here. See Nichols v. Prather, 286 Ga. App. 889, 892, 650 S.E.2d 380, 384 (Ga. Ct. App. 2007) (noting that a sheriff's department and sheriff's deputies may be state actors for the purposes of § 1983 liability and still be county actors for other purposes). See also Temple, 2019 WL 287482, at *7; Muckle v. Robinson, No. 2:12-CV-0061-RWS, 2013 WL 251113, at *5 (N.D. Ga. Jan. 23, 2013); McDaniel v. Yearwood, No. 2:11-CV-00165-RWS, 2012 WL 526078, at *12 (N.D. Ga. Feb. 16, 2012).

Cty., Ga., No. 2:18-CV-91, 2019 WL 287482, at *3 (S.D. Ga. Jan. 22, 2019). "The State of Georgia has not waived its Eleventh Amendment immunity and therefore has not consented to be sued in this Court." Green v. Waystack, No. 5:18-CV-00042-TES, 2018 WL 3097019, at *5 (M.D. Ga. June 22, 2018) (citing O.C.G.A. § 50-21-23(b)). Congress has not abrogated Eleventh Amendment immunity in § 1983 cases. Brown v. Fla. Dep't of Revenue Office of Child Support Enf't, 697 F. App'x 692, 692-93 (11th Cir. 2017); Stephens v. Ga. Dep't of Transp., 134 F. App'x 320, 324 (11th Cir. 2005) ("Congress has not abrogated immunity for claims brought pursuant to § 1983 . . . .").

Thus, the question here is whether the Sheriff Defendants are considered a state official acting as an arm of the state so as to be protected by Eleventh Amendment immunity. Courts in the Eleventh Circuit, when determining whether an official is acting as an arm of the state, consider the following four factors: "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." Lake v. Skelton, 840 F.3d 1334, 1337 (11th Cir. 2016) (quoting Manders v. Lee, 338 F.3d 1304, 1309 (11th Cir. 2003) (en banc)). In Lake, the Eleventh Circuit found that a Georgia sheriff was entitled to Eleventh Amendment immunity for claims related to the provision of food to inmates in county jails. 840 F.3d at 1342-43. Numerous

courts, upon considering <u>Lake</u>, have found that sheriffs in Georgia act as an arm of the state when providing medical care to an inmate in a county jail. <u>Johnson v. Columbus Consol. Gov't</u>, No. 4:19-CV-119 (CDL), 2020 WL 3472919, at *2 (M.D. Ga. June 25, 2020); <u>Mizelle v. Wellpath LLC</u>, No. CV 119-198, 2020 WL 3972339, at *2 (S.D. Ga. July 14, 2020); <u>Brooks v. Wilkinson Cty., Ga.</u>, 393 F. Supp. 3d 1147, 1160 (M.D. Ga. 2019); <u>Johnson v. Piper</u>, No. 2:14-CV-00173-RWS, 2017 WL 11493975, at *3 (N.D. Ga. Nov. 16, 2017). This Court is persuaded by the analysis conducted in these cases and finds, pursuant to <u>Lake</u>, 840 F.3d at 1342, that the State of Georgia controls medical care in county jails. Accordingly, the claims against Sheriff Defendants in their official capacity are barred by the Eleventh Amendment. As a result, Sheriff Defendants' motion on this basis is **GRANTED.**

II.   <u>CLAIMS AGAINST DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES</u>

   A. <u>Defendants Todd, Milton, Williams, Bryant, and John Does 1-5's Official Immunity</u>

Sheriff Defendants also contend that Plaintiffs' claims of negligence against Sheriff Defendants are similarly barred by the state doctrine of official immunity. (Doc. 106 at 6.) In this case, Plaintiffs claim that the Sheriff Defendants "failed to fulfill their ministerial duties with reasonable care" and were specifically negligent due to their

> (1)   Failure to have Alexander observed, evaluated and treated promptly by a medical care facility that

was adequately trained and equipped to diagnose and treat a vascular emergency;

(2) Failure to adequately and properly train persons attending to Alexander on the condition necessary for emergency transport of a prisoner;

(3) Failure to have adequate infirmary services to or maintain the infirmary adequately so that it could properly provide emergency medical care for prisoners;

(4) Failure to have adequate medical staff for evaluation and treatment of Alexander or in lieu of such services, transport to a hospital or comparable medical facility;

(5) Failure to have adequate procedures in place to educate, treat and timely transport sick severely ill prisoners for emergency care.

(Doc. 26, Attach. 1 at 18.) Plaintiffs allege in their complaint that these negligent acts were both ministerial duties and acts committed with malice. (Id.)

Under Georgia law, a public officer or employee may be personally liable only for ministerial acts negligently performed or discretionary acts performed with malice or an intent to injure. Cameron v. Lang, 274 Ga. 122, 123, 549 S.E.2d 341, 344 (2001); Williams v. Pauley, 331 Ga. App. 129, 130, 768 S.E.2d 546, 547 (Ga. Ct. App. 2015). Actual malice requires "a deliberate intention to do an unlawful act." Adams v. Hazelwood, 271 Ga. 414, 414, 520 S.E.2d 896, 898 (1999). Actual malice cannot be implied from the circumstances, but must be alleged by the plaintiff and supported by evidence in the record. See Watkins v. Latif, 323 Ga. App. 306, 311, 744 S.E.2d 860, 863 (Ga. Ct. App. 2013).

Sheriff Defendants argue that the complained of negligent acts were committed in the execution of Sheriff Defendants' discretionary duty. Plaintiffs, however, seem to generally contend that these acts were ministerial. Plaintiffs argue that "[i]f ministerial duties did not exist for essential aspects of providing adequate medical care, . . . then the absence of policies, supervision and training on what to do in these expected recurring circumstances that were likely significant for fulfilling constitutional duties, supports a claim for deliberate indifference." (Doc. 184 at 9.) The Court finds that the negligent acts alleged are discretionary acts and Sheriff Defendants enjoy official immunity against Plaintiff's claims.

"Under Georgia law, a 'ministerial act' is 'commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty.' " Davis v. Brown, No. 1:16-CV-00735, 2019 WL 1206431, at *10 (N.D. Ga. Mar. 14, 2019) (quoting Grammens v. Dollar, 287 Ga. 618, 619, 697 S.E.2d 775, 777 (2010)). Discretionary acts, meanwhile, "calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." Grammens, 287 Ga. at 619, 697 S.E.2d at 777 (internal quotation marks and citation omitted). "Where there is an established policy requiring an official to take

specified action in a specified situation, the policy creates a ministerial duty on the part of the official to perform the specified task." Id., 287 Ga. at 620, 697 S.E.2d at 777. "Under Georgia law, '[t]he provision of adequate medical attention . . . is a ministerial act by the sheriff . . . and is not subject to . . . official immunity. In contrast, the determination of what medical treatment to provide is an act of discretion subject to official immunity.' " Anderson v. Columbia Cty., Ga., No. CV 112-031, 2014 WL 8103792, at *16 (S.D. Ga. Mar. 31, 2014) (quoting Graham v. Cobb Cty., 316 Ga. App. 738, 742-43, 730 S.E.2d 439, 443 (Ga. Ct. App. 2012)).

In this case, Alexander did receive medical care – jail staff called Defendant Dambach to evaluate Alexander twice, the medical staff provided Alexander with medications, and the medical staff placed Alexander into R&D for observation. Thus, Plaintiffs' contentions are based on what medical care Alexander should have been given. The negligent acts alleged by Plaintiffs in their complaint focus on the inadequate care received by Alexander. Because Plaintiffs are contesting the medical care provided, the Court finds that, absent a showing of willfulness, malice, or corruption, the conduct at issue are a discretionary acts for which Sheriff Defendants are entitled to official immunity. See Davis, 2019 WL 1206431, at *10; Anderson, 2014 WL 8103792, at *16.

21

Moreover, in their broad argument that Sheriff Defendants' actions are ministerial, Plaintiffs do not identify the policy that set out the specific acts that they contend Sheriff Defendants performed negligently or failed to perform. In absence of evidence showing this Court what specific policy required the actions that were not taken in this case, the Court finds that the complained of actions, including the failure to act, are discretionary acts. Further, Plaintiff has offered no argument that Sheriff Defendants performed the actions with actual malice. The Court finds Sheriff Defendants' are entitled to summary judgment on Plaintiffs' claims of negligence against them on the basis of official immunity. Accordingly, the Court **GRANTS** the Sheriff Defendants' motion.

## B. Deliberate Indifference Against Defendants Todd, Milton, Williams, and Bryant

The Sheriff Defendants move for summary judgment on Plaintiffs' § 1983 claims against Defendants Todd, Milton, Williams, and Bryant. (Doc. 105 at 1.) The Court will evaluate each Defendant in turn.

### 1. Defendant Todd

In response to Sheriff Defendants' motion, Plaintiffs argue that questions of fact exist on Defendant Todd's liability. (Doc. 184 at 17.) Plaintiffs contend that Defendant Todd was deliberately indifferent to Alexander's medical need because he (1) could monitor the video cameras of Alexander from 8:30 p.m. until

22

midnight on May 22 and saw Alexander in distress, and (2) told Alexander to return to bed when Alexander was laying in the floor and called a signal 10-78 rather than a signal 55. (Id. at 17-20.)

A pre-trial detainee's right to adequate medical care arises under the due process clause of the Fourteenth Amendment. Jackson v. West, 787 F.3d 1345, 1352 (11th Cir. 2015). Plaintiffs allege that Alexander's right to medical care was violated due to Defendant's deliberate indifference to Alexander's serious medical need. To show a constitutional violation and prevail on a claim of deliberate indifference to a medical need, a pre-trial detainee must be able to show: "(1) a serious medical need; (2) the defendant's deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." Mann v. Taser Int'l Inc., 588 F.3d 1291, 1306-07 (11th Cir. 2009).

First, this Court finds for the purposes of this motion that Alexander had a serious medical need. A serious medical need is one that has "been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity of the doctor's attention." Youmans v. Gagnon, 626 F.3d 557, 558 (11th Cir. 2010). In this case, Sheriff Defendants challenge whether Alexander suffered from a serious medical need while detained at CCDC. Plaintiffs have provided evidence that Alexander likely suffered from acute limb ischemia on May 22 into May 23, 2016 while at CCDC. Sheriff Defendants argue

that a serious medical need has not been established because Sheriff Defendants would be unable to diagnose acute limb ischemia. However, the inquiry is not whether the defendant could identify what medical need is at play, but whether the need is one that a layperson could recognize as needing medical attention. Youmans, 626 F.3d at 558. Here, Alexander was complaining of leg and hip pain, was vomiting, and had trouble using a limb. The Court is satisfied that Plaintiffs have provided at least enough evidence of Alexander's medical condition to survive summary judgment. See Fields v. Corizon Health, Inc., 490 F. App'x 174, 183 (11th Cir. 2012) (noting that fractured hips, broken feet, and paralysis are serious medical needs).

Next, Plaintiffs must demonstrate that Defendant Todd was deliberately indifferent to that need. The Court finds that Plaintiffs have not done so. To show that a defendant has been deliberately indifferent, a plaintiff must show a prison official's "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence." Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011). "Conduct that is more than mere negligence includes: (1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all." Id.

The Court finds that Plaintiffs have not shown that Defendant Todd had subjective knowledge of a risk of serious harm and that he disregarded that risk. Both interactions that Plaintiffs focus on culminated in a Signal 55 being called for medical attention. Defendant Dambach did in fact respond to both of those calls. Further, the Court does not find the act of Defendant Todd calling a Signal 10-78 instead of immediately calling a Signal 55 sufficient to establish deliberate indifference. Plaintiffs focus on the "delay" but the record shows that at approximately 11:39 p.m. Defendant Todd called a 10-78 to "keep other inmates under control while we got Mr. Alexander further medical assistance." (Doc. 85 at 113-14.) Then, a Signal 55 was called and Defendant Dambach arrived at approximately 11:48 p.m. (Doc. 150 at 131.) Thus, the evidence shows that Defendant Todd did not ignore Alexander's medical need but instead had the CCDC's medical staff attend to Alexander. "A medical treatment claim [will] not lie against non-medical personnel unless they were personally involved in the denial of treatment or deliberately interfered with prison doctors' treatment. Prison officials are entitled to rely on the opinions, judgment and expertise of a prison medical staff to determine a medically necessary and appropriate cause of treatment for an inmate." Jackson v. Perry, No. 5:17-CV-11, 2017 WL 3138553, at *4 (S.D. Ga. July 24, 2017), report and recommendation adopted, No. 5:17-CV-11, 2017 WL 4853725 (S.D. Ga. Oct. 26, 2017).

Accordingly, the Court finds that Defendant Todd is entitled to summary judgment on Plaintiffs' § 1983 claim against him. Sheriff Defendants' motion on this ground is **GRANTED**.

### 2. Defendant Milton

In response to Sheriff Defendants' motion, Plaintiffs argue that questions of fact exist on Defendant Milton's liability. (Doc. 184 at 20.) Plaintiffs contend that Defendant Milton, according to Defendant Todd, had the ability to override medical personnel and send an inmate to the emergency room via EMS but that Milton's training "taught him that he could not override Medical and call EMS." (Id. at 21.) Plaintiffs also contend that Milton checked on Alexander twice during the night but did not let Alexander see him for fear that Alexander would again request to go to the hospital and that Milton allowed Alexander to be placed into R&D rather than the infirmary. (Id. at 21–22.)

As stated above, Plaintiffs must show " '(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence.' " Johnson, 741 F. App'x at 700 (quoting Goebert v. Lee Cty., 510 F.3d 1312, 1327 (11th Cir. 2007)). Defendants argue that Plaintiffs have not shown that the Sheriff Defendants had a subjective knowledge that Alexander needed hospital treatment and that Defendant Milton testified that he saw no reason to question the medical staff. (Doc. 106 at 23.) The Court agrees. Similar to Defendant Todd, the

evidence shows that Defendant Milton assisted in the 10-78 signal which then became a signal 55. Additionally, Defendant Milton suggested to Defendant Dambach that Alexander should be taken to the infirmary, checked on Alexander twice throughout the night, and instructed the officer working in that area to monitor Alexander closely. (Doc. 91 at 80-81.) Defendant Milton did not ignore Alexander's need for medical attention.

Further, Defendant Milton testified that:

> I had to depend on Medical's expertise because that was their profession. And as I stated earlier, I was told by IA that I was not medical certified. So I left it up to them to make the decision. Had I had seen something that I felt would have required medical -- him being transported out, I would have done so and at the same time, contacted my off-duty captain of Security, which we have to contact throughout the night on a regular basis. But I didn't physically see the injury that he claimed he had.

(Id. at 83.) Thus, while Plaintiffs' contentions that Defendant Milton believed he had to rely on the medical personnel's decisions is accurate, he also stated that he saw no reason to depart from those decisions because he could not see an injury or other reason to transport Alexander and had he seen it, he would have had him transported. Thus, Plaintiffs' have failed to show that Defendant Milton had a subjective knowledge of a risk of serious harm and that he disregarded that risk. See Stone v. Hendry, 785 F. App'x 763, 769 (11th Cir. 2019). Accordingly, the Court finds that Defendant Milton is entitled to summary judgment on Plaintiffs'

§ 1983 claim against him. Sheriff Defendants' motion on this ground is **GRANTED**.

### 3. Defendants Williams and Bryant

In response to Sheriff Defendants' motion, Plaintiffs argue that questions of fact exist on Defendant Williams and Defendant Bryant's liability. (Doc. 184 at 22-23.) As will made be clear shortly, the allegations against these Defendants should be considered together due to the discrepancy in timing. Plaintiffs argue that questions of fact exist as to Defendant Williams' liability because she "had knowledge of Alexander's serious medical need and delayed treatment for a nonmedical reason." (Doc. 184 at 23.) Specifically, Defendant Williams delayed finding someone to transport Alexander which led to further delay in Alexander receiving treatment. Plaintiffs contend that questions of fact preclude summary judgment on Defendant Bryant's liability because a question of fact remains as to whether Defendant Bryant delayed transporting Alexander after being notified of Alexander's serious medical need and the order to transport Alexander to the emergency room. (Id. at 24-25.)

The Court first reviews the facts regarding Alexander's transport. Defendant Williams testified that medical made the call on whether to send the inmate to the emergency room via EMS or by patrol car. (Doc. 92 at 27.) Defendant Williams also testified that it takes approximately 30-45 minutes to get the inmate-patient

to the sally port from when the Watch Commander receives notice of a medical transport. (Id. at 33.)  Two hours is an abnormally long time to get the inmate to the sally port. (Id. at 33-34.) At approximately 3:16 p.m. on May 23, Defendant Williams was notified that Dr. Augustin recommended Alexander be transported to Memorial by car for evaluation. (Doc. 92 at 77.) Defendant Williams testified that at roughly 3:21 p.m., Defendant Williams contacted Corporal Kelly-James but Kelly-James did not take Alexander because she complained of not having her lunch break and her shift ending at 4:00 p.m. (Id. at 79, 89.) Defendant Williams testified that she then contacted Defendant Bryant at roughly 3:30 p.m. to transport Alexander and expected Alexander to be at the sally port to leave CCDC around 4:00 p.m. (Id. at 90.) However, internal records show an entry dated May 23, 2016 and entered at 3:47 p.m. with an event time of 3:16 p.m. (Doc. 92, Attach. 2 at 19.) The entry reads as follows: "The doctor recommends that detainee Jimmy Alexander 6D be transported to MMC via car for an evaluation. Cpl. Kelly-James assigned to complete the detail." (Id.) Thus, at the time that Defendant Williams completed the entry, 3:47 p.m., the log only reflects that Kelly-James had been contacted.

Defendant Bryant, however, testified that he was not contacted by Defendant Williams until 4:40 p.m. (Doc. 88 at 17.) Defendant Williams testified Alexander and Defendant Bryant did not leave CCDC until approximately 4:25 p.m. (Doc. 92 at 78-79),

29

but Defendant Bryant testified that they left at 5:08 p.m. (Doc. 88 at 40.) Defendant Bryant and Alexander arrived at Memorial at approximately 5:42 p.m. (Id.)

To show a constitutional violation and prevail on a claim of deliberate indifference to a medical need, a pre-trial detainee must be able to show: "(1) a serious medical need; (2) the defendant's deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." Mann, 588 F.3d at 1306-07 (11th Cir. 2009). In regards to the second prong, to demonstrate that a defendant has been deliberately indifferent, a plaintiff must show " '(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence.' " Johnson, 741 F. App'x at 700 (quoting Goebert, 510 F.3d at 1327).

The Court again finds that Alexander had a serious medical need. The Court also finds that both Defendant Bryant and Williams had subjective knowledge of a risk of serious harm. Defendants were informed and aware that Dr. Augustin had ordered Alexander to be taken to the emergency room. Defendant Williams noted in her statement of incident that Corporal Cochran notified her that medical recommended that Alexander be transported by car for evaluation at Memorial and specifically noted that she was told the issue was "possible paralysis to the right side and elevated blood pressure." (Doc. 92, Attach. 3 at 1.)

As to the second prong, the Court finds that Plaintiffs have presented enough evidence to survive summary judgment. "Even where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999). "[C]ase law has established that both long and short delays can be inexcusable, depending on the medical need and the reason for the delay." Alsobrook v. Alvarado, 477 F. App'x 710, 713 (11th Cir. 2012). "If unexplained, protracted delay in the treatment of a serious medical risk can constitute deliberate indifference." Colardo-Keen v. Rockdale Cty., Ga., 775 F. App'x 555, 569 (11th Cir. 2019).

Here, Plaintiffs argue that Defendants Bryant and Williams were deliberately indifferent to Alexander's serious medical need by delaying his transportation to the emergency room. Dr. Augustin ordered Alexander to be sent to the emergency room at approximately 3:10 p.m. on May 23 (Doc. 45 at 229), however, Alexander did not leave CCDC until approximately 5:08 p.m. (Doc. 88 at 16, 40.) Defendant Williams and Defendant Bryant offer conflicting stories of who is responsible for the delay in transporting Alexander. If Defendant Williams is to be believed, then she promptly notified

31

Defendant Bryant to transport Alexander at approximately 3:30 p.m. yet he did not leave CCDC until 5:08 p.m. However, if Defendant Bryant is to be believed, he was not notified until 4:40 p.m. and he left with Alexander at 5:08 p.m., within the 30-45 minute window for transporting inmates to the emergency room. There is a question of material fact of who caused the delay in transporting Alexander that cannot be resolved on summary judgment.[4]

Regardless of who caused the delay, this Court finds that Plaintiffs have sufficiently shown deliberate indifference to survive summary judgment. Alexander was not transported to the emergency room until approximately two and a half hours after Dr. Augustin issued the order for him to be transported "immediately." As stated above, delay in rendering medical care can constitute deliberate indifference. Compare Colardo-Keen, 775 F. App'x at 568 (finding that a jury could reasonably infer that a defendant nurse subjectively disregarded the risk of serious harm to an inmate when she knew the necessary treatment ordered but delayed implementing it for five hours without explanation); Brown v. Hughes, 894 F.2d 1533, 1538 (11th Cir. 1990) (finding that an unexplained delay of hours for treatment to an inmate with a broken foot precluded summary judgment on the question of deliberate

---

[4] The Court notes that there appears to be no records of the times Defendant Williams contacted Kelly-James and Defendant Bryant. (See Doc. 92 at 90; Doc. 88 at 22.)

indifference) with Nam Dang by & through Vina Dang v. Sheriff, Seminole Cty. Fla., 871 F.3d 1272, 1283 (11th Cir. 2017) (finding no constitutional violation where a doctor, after examining the inmate, immediately directed the inmate to be transported to the emergency room and there was only about a 15-minute delay in the inmate's transport); James v. Agee, No. 1:16-CV-01381-ELR, 2018 WL 8263068, at *4 (N.D. Ga. Sept. 28, 2018), aff'd sub nom. James v. Bartow Cty., Ga., 798 F. App'x 581 (11th Cir. 2020) (finding a 12-minute time frame of medical assistance is not a constitutional violation where the nurse was notified of the inmate's medical need at 11:36 p.m. and an ambulance arrived at the jail at 11:48 p.m.). Sheriff Defendants have not argued or shown any justification for the delay.

Finally, as numerous experts in this case have opined, delay in treating an ischemic leg can cause tissue damage and appropriate medical intervention is necessary to save the life and, hopefully, the limb of the patient. (See Doc. 81, Attach. 4 at 5; Doc. 79, Attach. 2 at 4.) Thus, the Court finds that Defendants Bryant and Williams are not entitled to summary judgment on the § 1983 claims against them in the individual capacities. Sheriff Defendants' motion on this ground is **DENIED**.

### C. Deliberate Indifference Against Defendant Wilcher

Sheriff Defendants argue that Defendant Wilcher was not deliberately indifferent to the medical needs of Alexander and

that summary judgment should be granted to Defendant Wilcher. (Doc. 106 at 8.) It appears that Plaintiffs do not base Defendant Wilcher's liability on any actions he took, or failed to take, on May 22 and May 23, 2016 directly related to Alexander but on his responsibility to adequately supervise and train his subordinates to provide adequate medical care. (Doc. 184 at 10.) In order to establish that a defendant committed a constitutional violation in his supervisory capacity, a plaintiff must show that the defendant instituted a "custom or policy [that] result[s] in deliberate indifference to constitutional rights or . . . directed [his] subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." Goebert, 510 F.3d at 1331 (internal quotation marks and citation omitted).

The core of Plaintiffs' claims against Defendant Wilcher concerns his alleged failure to implement policies and procedures regarding the provision of medical care at CCDC when he became the sheriff. Plaintiffs identity three areas in which Defendant Wilcher's failure to create policies and/or train his officers supports a finding of deliberate indifference: (1) the duty to timely transport prisoners to the hospital when in need of emergency care; (2) the duty to provide infirmary level care outside of the infirmary setting when the infirmary was unavailable; and (3) understaffing the medical personnel,

34

specifically the lack of a nightshift RN in the R&D area. (Doc. 184 at 16.) Plaintiffs' claims, however, fail.

"Liability can be predicated on a failure to train or supervise theory 'where a municipality's failure to train its employees in a relevant respect evidences a deliberate indifference to the rights of its inhabitants such that the failure to train can properly be thought of as a city policy or custom . . . .' " Kraus v. Martin Cty. Sheriff's Off., No. 2:16-CV-14476, 2017 WL 6384009, at *7 (S.D. Fla. Sept. 26, 2017), aff'd, 753 F. App'x 668 (11th Cir. 2018) (quoting Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489-90 (11th Cir. 1997)). In turn, to establish "deliberate indifference" to the rights of its inhabitants, the "plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998).

> A municipality might be on notice of a need to train or supervise in a particular area if 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need' or if the employees of the municipality 'in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers.'

Denham v. Corizon Health, Inc., 675 F. App'x 935, 942 (11th Cir. 2017) (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 390, 109 S. Ct. 1197, 1205, 103 L. Ed. 2d 412 (1989)). See also Mingo v. City of Mobile, Ala., 592 F. App'x 793, 799-800 (11th Cir. 2014) ("Deliberate indifference can be established in two ways: by showing a widespread pattern of similar constitutional violations by untrained employees or by showing that the need for training was so obvious that a municipality's failure to train its employees would result in a constitutional violation.").

Plaintiffs have presented no evidence that Sheriff Wilcher was aware of a history of abuse or other incidents like the ones at issue here that demonstrated a need to provide training to his staff. See Williams v. Limestone Cty., Ala., 198 F. App'x 893, 897 (11th Cir. 2006) (finding that the facts were insufficient to establish the sheriff's liability for a failure to train the jail staff where the plaintiff failed to provide evidence of a history or pattern of jail personnel's deliberate indifference to inmates' serious medical needs and because the need for additional or difference medical training was not obvious); McDowell v. Brown, 392 F.3d 1283, 1290 (11th Cir. 2004) (finding that the plaintiff failed to establish that the facility "consistently failed to transport non-emergency cases to the hospital and, therefore, the isolated incident "does not demonstrate evidence of the county's persistent or widespread policy.").

Plaintiffs seem to recognize this point and argue "[t]he need to establish effective policies and to train subordinates to provide required medical care was well established," and that liability can attach based on a single incident if the need to train and supervise is "so obvious" that the failure to do so demonstrates deliberate indifference. (Doc. 184 at 11.) Thus, Plaintiffs rely on the second possible way to show deliberate indifference: that the need for training in the area in question is "so obvious" that failure to train in that area constitutes deliberate indifference. Plaintiffs have failed to produce sufficient evidence to prove that it was obvious that Defendant Wilcher should have provided "more or different" training. The Court will consider each of Plaintiffs' grounds.

Plaintiffs contend that Defendant Wilcher was deliberately indifferent by failing to promulgate policies regarding the transportation of inmates to the hospital and failing to train his officers. This claim fails. Plaintiffs focus on the lack of written policies by Defendant Wilcher on medical care and the transportation of inmates to the hospital. (Doc. 184 at 11.) The lack of written policy is not dispositive, Belcher v. City of Foley, Ala., 30 F.3d 1390, 1397 (11th Cir. 1994), and evidence shows that there was a policy in place on transporting inmates to the hospital. Although Sheriff Wilcher may not have memorialized his policy in writing in May 2016, Defendant Williams testified

that the policy for transporting an inmate who needs further medical treatment is to (1) find out who the inmate is and how they need to be transported, either by EMS or by car, (2) pull a hard card, which is the information on the inmate, to determine things like the escape risk and whether the inmate is a federal inmate, (3) locate a deputy who is POST-certified to make the transport, and (4) inform the captain of security, or the on-call captain. (Doc. 92 at 26.) Defendant Williams further testified that the process begins when medical contacts the Watch Commander informing them of the need for further medical treatment. (Id.) Defendant Milton similarly testified that there was a policy for emergency transport. (Doc. 91 at 44-45.) Defendant Bryant testified that there was a written policy in transporting prisoners and that he was trained on this policy. (Doc. 88 at 19-20.)

Second, Plaintiffs have not established that it was obvious that the officers needed more or different training. See Denham, 675 F. App'x at 942 (finding that providing medical training is not analogous to the Supreme Court's hypothetical in Canton of providing use of force training where officers are provided firearms because the officers did not perform medical functions and, to the extent the officer performed emergency medical care, training was provided on that). As in Denham, CCDC and Defendant Wilcher had a policy in place for transporting inmates to the hospital.

The Court now reviews the second area that Plaintiffs identified: Defendant Wilcher's failure to create policies on the provision of infirmary level care outside of the infirmary setting when the infirmary was unavailable. Plaintiffs argue that "[s]ince no one was trained on how to provide infirmary level care outside of the infirmary, the likelihood that an inmate would receive inadequate medical care was a certainty. Since the infirmary was constantly full, the need to provide a policy and training on how to provide the necessary medical care was obvious." (Doc. 184 at 13.) This claim also fails.

First, Plaintiffs have provided no evidence to support their claim that Defendant Wilcher knew that the infirmary was constantly full or that patients needing to be in the infirmary were placed elsewhere because of infirmary capacity. The Court cannot find that Defendant Wilcher's need to train on this issue was "obvious" where there is no evidence in the record that this was a recurrent issue or that he was personally aware of it. Gold, 151 F.3d at 1350 ("The plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action."). Second, there is no indication that Defendant Wilcher had notice that his policies, training procedures, or supervision were so inadequate as to "likely to result in the violation of a constitutional right." Denham, 675 F.

App'x at 942. Per the contract with Defendant Corizon, Defendant
Corizon was "responsible for all medical care, including
psychiatric but with the exclusion of psychologist, for all inmates
of the Detention Center" and was to provide "full staffing" to
include nursing coverage for the R&D area 24 hours a day, 7 days
a week. (Doc. 93, Attach. 15-16.) The Court does not see any
evidence in the record that Defendant Wilcher was aware that
Defendant Corizon was sending inmate patients to R&D area for
observation when the infirmary was full **and** that this practice
would likely result in the violation of a constitutional right.
See O'Kelley v. Craig, 781 F. App'x 888, 899 (11th Cir. 2019),
cert. denied, 206 L. Ed. 2d 713 (Apr. 6, 2020) ("Plaintiffs needed
to show that the Sheriff 'knew of a need to train and/or supervise
in a particular area and . . . made a deliberate choice not to
take any action.' (quoting Gold, 151 F.3d at 1350-51)); Williams,
198 F. App'x at 897. Finally, the Court again notes that the
Eleventh Circuit has been hesitant to find that the need for more
or different training is "so obvious" without prior constitutional
violations. See Denham, 675 F. App'x at 942 (noting that the
Supreme Court "has never determined that the need for 'more or
different' training was obvious. It has 'only given a hypothetical
example. . . .' ").

Finally, the Court evaluates Plaintiffs' third area of policy
that constitutes deliberate indifference: the lack of a night shift

40

RN in the R&D area. Plaintiffs argue that Defendant Wilcher "knew that Corizon was understaffed and that the needed RN for R&D was not on duty during the night shift." (Doc. 184 at 16.) Plaintiffs cite to Defendant Wilcher's deposition for support for Wilcher's apparent knowledge, however, the deposition filed is Defendant Wilcher's deposition in another case, <u>Ajibade v. Wilcher</u>, No. 4:16-CV-82 (S.D. Ga. 2019). (<u>See</u> Doc. 131.) Plaintiffs have not presented any evidence that Defendant Wilcher had a policy or practice of understaffing CCDC or that he was aware that Corizon was understaffing CCDC. Moreover, there is no indication that Defendant Wilcher had notice that his policies, training procedures, or supervision regarding medical personnel staffing in the R&D area were so inadequate as to "likely to result in the violation of a constitutional right." Thus, the Court finds that Defendant Wilcher is entitled to summary judgment on the § 1983 claim against him. Sheriff Defendants' motion on this ground is **GRANTED.**

D. <u>Intentional Infliction of Emotional Distress Against Defendants Todd and Bryant</u>

Sheriff Defendants move for summary judgment on the claims of intentional infliction of emotional distress. Sheriff Defendants argue that Plaintiffs have failed to state a claim against any of the defendants. (Doc. 106 at 29.) The Court agrees.

In Georgia, the tort of intentional infliction of emotional distress is comprised of the following elements: "(1) [t]he conduct must be intentional or reckless; (2) [t]he conduct must be extreme and outrageous; (3) [t]here must be a causal connection between the wrongful conduct and the emotional distress; and (4) [t]he emotional distress must be severe." Jarrard v. United Parcel Serv., Inc., 242 Ga. App. 58, 59, 529 S.E.2d 144, 146 (Ga. Ct. App. 2000) (internal quotation marks and citation omitted). Under Georgia law, "extreme or outrageous conduct [is] conduct 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " Fortson v. Carlson, 618 F. App'x 601, 609 (11th Cir. 2015) (quoting Yarbrough v. SAS Sys., Inc., 204 Ga. App. 428, 429, 419 S.E.2d 507, 509 (Ga. Ct. App. 1992)). The Court will evaluate each Defendant's conduct in turn.

### 1. Defendant Todd

Plaintiffs claim that Defendant Todd intentionally inflicted emotional distress on Alexander by calling a signal 10-78 for officer assistance instead of a signal 55 for medical help which delayed the medical care Alexander sought. (Doc. 184 at 20.) The Court finds that Sheriff Defendants' motion as to the intentional infliction of emotional distress claim asserted against Defendant Todd must be granted. Plaintiffs have not shown how the Defendant Todd's act of calling a signal 10-78 instead of a signal 55 is one

that is " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " Carlson, 618 F. App'x at 609 (quoting Yarbrough, 204 Ga. App. at 429, 419 S.E.2d at 509). The Court finds that Defendant Todd is entitled to summary judgment on Plaintiffs' intentional infliction of emotional distress claim against him. Sheriff Defendants' motion on this ground is **GRANTED**.

    2. Defendant Bryant

    Plaintiffs claim that Defendant Bryant intentionally inflicted emotional distress on Alexander when he joked at the hospital about cutting Alexander's leg off with a chainsaw. (Doc. 184 at 25.) The Court finds that Sheriff Defendants' motion as to the intentional infliction of emotional distress claim asserted against Defendant Bryant is also due to be granted. While a comment by Defendant Bryant about cutting Alexander's leg off with a chainsaw when Alexander was being advised by his doctor that he would likely be facing amputation is insensitive and rude, the Court does not find that this comment rises to level necessary to sustain a claim for intentional infliction of emotional distress. As stated, the inquiry requires the conduct to go beyond "all possible bounds of decency." The Court does not find that to be the case here. See Thornton v. Jackson, 998 F. Supp. 2d 1365, 1382 (N.D. Ga. 2014); Northside Hosp., Inc. v. Ruotanen, 246 Ga. App.

433, 435, 541 S.E.2d 66, 69 (Ga. Ct. App. 2000) (finding that comments to the plaintiff concerning the release of her father's body to her to be rude and insensitive in light of the plaintiff's recent loss but insufficient to sustain a claim for intentional infliction of emotional distress). The Court finds that Defendant Bryant is entitled to summary judgment on the intentional infliction of emotional distress claim asserted against him. Sheriff Defendants' motion on this ground is **GRANTED**.

III. <u>PUNITIVE DAMAGES</u>

Finally, Sheriff Defendants argue that Plaintiffs' punitive damages claim fails because all underlying tort claims against the Sheriff Defendants must be dismissed. (Doc. 106 at 30.) Because this Court has granted summary judgment to Defendants Todd, Milton, and Wilcher on all of Plaintiffs' claims against them, any derivative claims for punitive damages must be dismissed. <u>See</u> <u>Butler v. Ga. Dep't of Corr.</u>, No. 6:18-CV-170, 2018 WL 6729647, at *7 (S.D. Ga. Dec. 21, 2018), appeal dismissed, No. 19-10249-AA, 2019 WL 1858369 (11th Cir. Feb. 28, 2019); <u>Lewis v. Meredith Corp.</u>, 293 Ga. App. 747, 750, 667 S.E.2d 716, 719 (Ga. Ct. App. 2008) ("Under Georgia law, a plaintiff cannot recover punitive damages when the underlying tort claim fails."). As a result, Sheriff Defendants' motion seeking summary judgment on Plaintiffs' punitive damages claim against Defendants Todd, Milton, and Wilcher is **GRANTED**. However, because a genuine dispute of material

44

fact remains on Plaintiffs' § 1983 claims against Defendants Bryant and Williams in their individual capacities, the Court **DENIES** Sheriff Defendants' motion to the extent it seeks summary judgment on the punitive damages asserted against these Defendants.

## CONCLUSION

For the foregoing reasons, Sheriff Defendants' Motion for Summary Judgment (Doc. 105) is **GRANTED IN PART** and **DENIED IN PART**. Plaintiffs' § 1983 and punitive damages claims against Defendants Bryant and Williams remain.

SO ORDERED this _10th_ day of September 2020.

WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA