IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

JEMME J. JENKINS, Individually, )
and JULIANNE GLISSON,            )
Administrator of the Estate of   )
Jimmie L. Alexander, Sr.,        )
                                 )
     Plaintiffs,                 )
                                 )
v.                               )   CASE NO. CV418-099
                                 )
CORIZON HEALTH INC., a Delaware )
Corporation; GUY AUGUSTIN,       )
M.D.; VICTORIA NEILSER, LPN;     )
KEVIN TODD, Corporal; MARK       )
DAMBACH, LPN; CARL MILTON,       )
Sergeant; WANDA WILLIAMS,        )
Lieutenant; DESMOND BRYANT,      )
Corporal; CHATHAM COUNTY         )
COMMISSIONERS; JOHN WILCHER,     )
Sheriff of Chatham County; and   )
JOHN DOES 1-5;                   )
                                 )
     Defendants.                 )
_____)

## O R D E R

Before the Court is Defendant Corizon Health Inc.'s
("Corizon") Partial Motion for Summary Judgment on Deliberate
Indifference, Punitive Damages, and Attorneys' Fees. (Doc. 117.)
For the following reasons, Defendant Corizon's motion is **GRANTED**.

### BACKGROUND

I.   THE INCIDENT ON MAY 22-24, 2016

This case arises out of the incarceration and subsequent death
of Jimmie Alexander, Sr. ("Alexander") in 2016. (Doc. 1.) Alexander
was a pretrial detainee at Chatham County Detention Center

("CCDC"). (Doc. 86, Attach. 2.) At the time of Alexander's detention, Defendant Corizon Health, Inc. ("Corizon") provided medical services to detainees at CCDC pursuant to a contract with Chatham County. (Doc. 87, Attach. 1.) At all relevant times, Defendant Dr. Guy Augustin was the acting onsite medical director employed by Corizon. (Doc. 156 at 94.) Corizon also employed Defendant Mark Dambach ("Dambach"), a licensed practical nurse ("LPN"), and Defendant Victoria Neisler ("Neisler"), also an LPN. (Doc. 150 at 17-18; Doc. 154 at 33.) Jimmie Alexander, Sr. ("Alexander") was booked into CCDC as a pretrial detainee on April 27, 2016. (Doc. 86, Attach. 2 at 1.) Alexander was sixty years of age at the time of his intake. (Id.) Alexander reported during the intake screening process that his medical history included hypertension, a smoking history of over twenty years, and a transient ischemic attack ("TIA") that occurred in March 2016. (Doc. 74, Attach. 9 at 5-9.)

On May 22, 2016, at approximately 8:30 p.m., Alexander began to complain about pain in his right hip and leg. (Doc. 97, Attach. 7 at 11; Doc. 49 at 137.) At approximately 8:47 p.m. on May 22, 2016, Defendant Todd, a Sheriff's deputy, instructed a Signal 55 to be called for Alexander.[1] (Doc. 85 at 65, 78.) Dambach responded to the call and evaluated Alexander between 9:02 p.m. and 9:13

---

[1] A "Signal 55" is a code that means that an inmate needs medical attention. (Doc. 85 at 29.)

p.m. (Doc. 150 at 105-10.) During this examination, Dambach understood Alexander's complaint to be that he began experiencing right leg pain suddenly and found that Alexander had a weak, thready pedal pulse in his right foot. (Id. at 105-06.) Alexander reported to Dambach that the pain felt like "his leg was broken, his hip was out of the socket." (Id. at 109.) Dambach checked Alexander's vitals and noted that his blood pressure was elevated at 188 over 122. (Id. at 107.) Before leaving Alexander's cell, Dambach told Alexander that he was going to relay this information to the doctor and then be back once he received orders from the doctor and that he would bring any medications that been ordered. (Id. at 110-11.)

Dambach called Dr. Augustin after evaluating Alexander and informed Augustin of Alexander's elevated blood pressure, the reported right leg and hip pain, and Alexander's known medical history. (Doc. 150 at 111.) Augustin prescribed Clonodine 0.1 mg, for reducing blood pressure, Novasc 10 mg, for reducing blood pressure, and Naproxyn 500 mg, for the pain. (Id. at 111-112; Doc. 156 at 159-160.) Around 9:30 p.m., Alexander used a plastic chair while walking to the wing officer's desk in Unit 6D, the unit he was housed in, and was dragging his right leg. (Doc. 96 at ¶¶ 30-31; Doc. 145 at ¶¶ 30-31.) At approximately 9:45 p.m., Dambach administered the above medications to Alexander. (Doc. 150 at 118.) Dambach did not examine Alexander when he gave him the medications.

(Id. at 117.) Around 11:15 p.m., Alexander used a plastic chair to travel to the restroom and at 11:30 p.m., several inmates carried Alexander back to his pod. (Doc. 96 at ¶¶ 36-37; Doc. 145 at ¶¶ 36-37.)

Around 11:40 p.m., Alexander crawled out into the middle of Unit 6D floor and vomited as he crawled out. (Doc. 96 at ¶¶ 38-39; Doc. 145 at ¶¶ 38-39.) At 11:39 p.m., Defendant Todd called a 10-78 code which means that the officer needs assistance, but is not in any danger. (Doc. 85 at 29, 113.) Deputies, including Sergeant Milton, arrived in Unit 6D in response to the 10-78 and the 10-78 turned into a Signal 55. (Id. at 117; Doc. 91 at 76-77.) Dambach responded to the Signal 55 and arrived in Unit 6D around 11:48 p.m. and found Alexander lying on the floor next to a small amount of vomit. (Doc. 150 at 131.) Dambach proceeded to check Alexander's vitals, but did not otherwise check Alexander's right leg. (Id.)

Dambach went to the Medical Unit and called Augustin at approximately midnight of May 22. (Id. at 133.) Augustin and Dambach agreed that Alexander should be sent to infirmary, however, the male beds in the infirmary were reportedly full. (Id. at 133-34.) Alexander was placed into a wheelchair and taken to Receiving and Discharge ("R&D") for observation during the night. (Id.; Doc. 91 at 50-51.) Dambach examined Alexander's right foot pulse before placing him in the R&D cell, but did not document that he did so.

(Doc. 150 at 151-52.) Alexander was placed in R&D cell #8 at 12:21 a.m. on Monday, May 23, 2016. (Id. at 151.)

Augustin came to CCDC at 7:30 a.m. on Monday, May 23, 2016 and spoke about Alexander with other medical providers at the morning conference. (Doc. 156 at 133-34.) Augustin, however, did not examine Alexander that morning and subsequently left CCDC around 8:30 a.m. to find a dentist for himself. (Id. at 132-33.) Alexander was placed on Augustin's "sick call list" to be seen by Augustin. (Doc. 156 at 134.) Also on the morning of Monday, May 23, 2016, around 7:00 a.m., Victoria Neisler came on duty in CCDC's R&D area for the day shift, relieving Dambach. (Doc. 154 at 127.) Dambach told Niesler about Alexander's leg pain. (Doc. 150 at 176, 178; Doc. 154 at 130.) Neisler visited Alexander to check on him and saw that he was standing in the cell. (Doc. 154 at 138-140.) During that time, Neisler took Alexander's blood pressure but did not otherwise take any other vital signs or examine Alexander's right leg or foot. (Id.)

Augustin returned to CCDC later on May 23, 2016 and examined Alexander at approximately 3:00 p.m. on Monday, May 23, 2016. (Doc. 156 at 162, 196, 224.) During his examination, Augustin noted the absence of a pulse on the top of the foot and that Alexander's right lower limb was cool to the touch. (Id. at 163.) During this examination, Augustin told Alexander that he was going to the hospital because Augustin believed he had some type of vascular

5

issue due to the coolness in his limb. (Id. at 165-66.) Alexander was placed into a wheelchair and moved to a holding room in the Medical Unit around 3:11 p.m. (Id. at 231-32.) Augustin ordered Alexander to be taken to the emergency room. (Id. at 228-29.) Alexander was to be transported by car to the hospital. (Doc. 92 at 77-78; Doc. 89 at 68.)

The CCDC watch commander, Defendant Lieutenant Williams, received the instruction to transport Alexander to the hospital at 3:16 p.m.[2] (Doc. 92 at 77, 80.) Defendant Williams testified that at roughly 3:21 p.m., she contacted Corporal Kelly-James but Kelly-James did not take Alexander because she complained of not having her lunch break and her shift ending at 4:00 p.m. (Id. at 79, 89.) Defendant Williams testified that she then contacted Defendant Bryant at roughly 3:30 p.m. to transport Alexander and expected Defendant Bryant to be ready to leave with Alexander by 4:00 p.m. (Id. at 90.) Internal records show an entry dated May 23, 2016 at 3:47 p.m. with an event time of 3:16 p.m. that reads: "The doctor recommends that detainee Jimmy Alexander 6D be transported to MMC via car for an evaluation. Cpl. Kelly-James assigned to complete the detail." (Doc. 92, Attach. 2 at 19.) At the time that Defendant Williams completed the entry, 3:47 p.m., the log only reflects

---

[2] Corporal Addie Bailey (née Cochran) testified that the Watch Commander, Defendant Williams, was notified at 3:18 p.m. (Doc. 89 at 68.)

that Kelly-James had been contacted. Defendant Bryant testified that he did not receive a call to transport Alexander until 4:40 p.m. (Doc. 88 at 17.) Defendant Bryant further testified that he and Alexander left CCDC at approximately 5:08 p.m. and arrived at Memorial Health University Medical Center ("Memorial") emergency room around 5:42 p.m. (Id. at 40.) Memorial's records show that Alexander arrived at 5:38 p.m. on May 23, 2016 and was admitted at 5:42 p.m. (Doc. 94, Attach. 1 at 2.)

When Alexander presented at Memorial, his right leg was cold, pulseless, insensate and without motor function. (Id. at 3, 6-7.) Memorial emergency room doctors consulted with vascular medicine doctors. (Id. at 7.) At 5:59 p.m. on May 23, Alexander had blood drawn for various lab panels. (Doc. 77, Attach. 1 at 87.) At 7:07 p.m. on May 23, 2016, Alexander's potassium levels were recorded at 5.1 mmol/L. (Id.) Dr. Bhandari, a vascular interventional radiologist, reviewed the CT angiogram of Alexander's right leg and found an extensive blood clot. (Doc. 77 at 24-27.) Dr. Bhandari determined that surgery would be needed. (Id. at 27-28.) Dr. Avino, a vascular surgeon, began a thrombectomy on Alexander at 10:05 p.m. on May 23, 2016. (Doc. 94, Attach. 1 at 28.) Anesthesia was concluded at 11:52 p.m. on May 23, 2016 and Alexander was transferred from the operating room to the post-anesthesia care unit ("PACU") to recover on May 24, 2016 at 12:00 a.m. (Id.)

Alexander had blood specimens drawn at 2:05 a.m. on May 24, 2016. (Doc. 77, Attach. 1 at 88-89.) Alexander's PACU treatment concluded at 2:30 a.m. (Id. at 28.) The various lab tests performed on Alexander resulted at different times. The CBC with differential lab resulted at 2:37 a.m., the Protime-INR lab resulted at 2:51 a.m., and the PTT lab resulted at 2:51 a.m. on May 24, 2016. (Id. at 89-90.) The basic metabolic panel, which includes a value for the patient's potassium level, resulted at 4:36 a.m. on May 24, 2016. (Id. at 91.) Alexander's potassium level was recorded at 7.3 mmol/L and reported by lab staff at 4:37 a.m. (Id.) Dr. Moon, the chief resident working that night, was informed of Alexander's potassium level, and he and his team went to the PACU and found Alexander in cardiac arrest. (Doc. 77, Attach. 1 at 12-13, 18.) Alexander could not be revived and was declared dead by Dr. Moon on May 24, 2016 at approximately 5:13 a.m. (Doc. 77, Attach. 1 at 18; Doc. 90, Attach. 3 at 1.)

Alexander's autopsy was performed by the Georgia Bureau of Investigations ("GBI") medical examiner, Dr. J. Upshaw Downs. (Doc. 90, Attach. 3.) Dr. Downs opined that Alexander's cause of death was the result of "generalized arteriosclerosis which manifests as right lower extremity ischemia, status postoperative with subsequent acute onset hyperkalemia." (Id. at 8.) Dr. Downs found that the excessive potassium and other toxins released during

8

reperfusion post-surgery contributed to Alexander's cardiac arrest and death.

II.   <u>CORIZON'S HEALTHCARE CONTRACT</u>

In 2010, Chatham County, by and through the Board of Commissioners of Chatham County, Georgia, entered into a contract with Prison Health Services, Inc. for the provision of inmate healthcare services. (Doc. 168, Attach. 5 at 2.) The contract was annual, but had four renewals with an expiration date of February 26, 2015. (<u>Id.</u>) Around July 2011, Prison Health Services, Inc.'s name changed to Corizon. (Doc. 168 at 38-39.) The annual cost under the contract for 2010 was $5,399,000.00. (Doc. 168, Attach. 5 at 26.) In 2011, Chatham County paid $5,584,224, in 2012 the amount paid was $5,774,088, and in 2013, the amount paid was $5,774,088. (Doc. 167 at 16-17; Doc. 167, Attach. 2 at 1.) Subsequently, Corizon and Chatham County entered into a contract on January 17, 2014 in the amount of $5,074,224. (Doc. 87, Attach. 1; Doc. 167, Attach. 2 at 1.) Linda Cramer, a designated corporate representative for Chatham County, testified that the compensation was $5,070,224 for both 2014 and 2015. (Doc. 167 at 17.)

Pursuant to the contract, Corizon had assumed all medical care, including psychiatric but with the exclusion of psychologist, for all inmates at CCDC. (Doc. 87, Attach. 1 at 14.) Corizon was to staff nurses in various parts of CCDC as follows: (1) in the Medical Unit 24 hours a day, 7 days a week, (2) in the

R&D area 24 hours a day, 7 days a week, (3) each of the housing units for 8 hours, 5 days a week and (4) in the infirmary 24 hours a day, 7 days a week. (Id. at 14-15.)

In 2015, Chatham County expressed a concern about Corizon's staffing levels and felt that there should have been additional registered nurses ("RNs") in the facility at any given time. (Doc. 166 at 38-39.) By e-mail dated September 18, 2015, Scott Bowers, with Corizon, emailed Lee Smith and Micheal Kaigler at Chatham County. (Doc. 93, Attach. 9 at 3.) In that e-mail, Bowers summarized a meeting between representatives of Corizon and Chatham County regarding care at CCDC. Specifically, Bowers mentioned that "there was a question regarding our staffing Licensed Practical Nurses (LPNs) at intake to conduct health screenings. We recognize your consultants have recommended Registered Nurses (RNs) at **intake**, and we can do that." (Id. at 4 (emphasis in original).) Bowers then states that the cost of adding an RN for 12 hours per night would be $197,172. (Id.) Bowers further stated that "when the question of staffing an RN at night was first raised, my team did not believe it to be incumbent upon Corizon Health to absorb this cost because they are confident that we have structured a sound inmate medical program . . . ." and offered to share the cost of increased nursing staff. (Id.) An increase in RN staffing was never adopted. (Doc. 93 at 110.)

At the time of Alexander's incarceration and subsequent
death, Chatham County was in the process of soliciting a new inmate
healthcare provider through a request for proposal ("RFP"). (Doc.
168 at 28-29.) The contract was awarded to Correct Health in July
2016. (Id. at 29.) Correct Health's contract for 2016 was in the
amount of $6,973,725. (Doc. 167 at 17.)

III.  PROCEDURAL HISTORY

After his death, Alexander's son, Jemme Jenkins, brought suit
in both his individual and representative capacity for the benefit
of, and on behalf of, the Estate of Jimmie Lee Alexander, Sr. in
the State Court of Chatham County, Georgia. (Doc. 1, Attach. 1 at
2-17.) After amending his complaint to add a claim under 42 U.S.C.
§ 1983 for the alleged deliberate indifference to Alexander's
medical needs, the action was removed to this Court. (Doc. 1 at
1-2.) On May 24, 2018, Plaintiff Jenkins filed a second amended
complaint adding Julianne Glisson, in her capacity as
Administrator for the Estate of Jimmie Lee Alexander, Sr., as
plaintiff. (Doc. 15.) Plaintiffs subsequently filed a third
amended complaint. (Doc. 26, Attach. 1.)

In their third amended complaint, Plaintiffs allege the
following claims: (1) a professional negligence claim against
Defendants Corizon, Augustin, Dambach, and Neisler (collectively,
the "Corizon Defendants"), (2) a negligence claim against Corizon
Defendants, (3) a negligence claim against Defendants Wilcher,

Todd, Milton, Williams, and Bryant, (4) a claim against Defendant Chatham County Commissioners alleging that they are liable for failing to correct inadequate funding to the Chatham County Sheriff's Office, (5) a claim of deliberate indifference under the Georgia Constitution against all Defendants, (6) a claim of deliberate indifference pursuant to 42 U.S.C. § 1983 against all Defendants, (7) an intentional infliction of emotional distress claim against all Defendants, (8) a claim for punitive damages against all Defendants, and (9) a claim for breach of sheriff and deputy bonds. (Id. at 11-24.)

## STANDARD OF REVIEW

According to Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim of defense—on which summary judgment is sought." Such a motion must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56 advisory committee notes).

Summary judgment is appropriate when the nonmovant "fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The substantive law governing the action determines whether an element is essential. DeLong Equip. Co. v. Wash. Mills Abrasive Co., 887 F.2d 1499, 1505 (11th Cir. 1989).

> As the Supreme Court explained:
>
> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Celotex, 477 U.S. at 323, 106 S. Ct. at 2553. The burden then shifts to the nonmovant to establish, by going beyond the pleadings, that there is a genuine issue as to facts material to the nonmovant's case. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

The Court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmovant. Matsushita, 475 U.S. at 587-88, 106 S. Ct. at 1356. However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Id., 475 U.S. at 586, 106 S. Ct. at 1356. A mere "scintilla" of evidence, or simply conclusory allegations, will not suffice. See, e.g., Tidwell v. Carter Prods., 135 F.3d 1422, 1425 (11th Cir. 1998).

Nevertheless, where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the Court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989).

**ANALYSIS**

I.  DELIBERATE INDIFFERENCE

In its motion, Corizon argues that it is entitled to summary judgment on Plaintiffs' claim of deliberate indifference against it because (1) there is no evidence that any Corizon employee violated Alexander's constitutional rights or that Corizon itself violated Alexander's constitutional rights, and (2) Plaintiffs have not presented evidence supporting a custom or policy that constituted deliberate indifference. (Doc. 117, Attach. 1 at 11-12.) In response, Plaintiffs argue that a question of fact exists as to Corizon's deliberate indifference and contends that (1) Corizon had no policy or training on the provision of infirmary level observation care outside of the infirmary, (2) Corizon failed to train Neisler on how to develop a plan of care, and (3) Corizon understaffed the R&D area of CCDC and this staffing decision was based on a policy on avoiding costs. (Doc. 194 at 15-23.)

To impose § 1983 liability on a municipality, a plaintiff must show: "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted

14

deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004). A municipality may be liable under § 1983 only where "the deprivation at issue was undertaken pursuant to city 'custom' or 'policy,' and not simply on the basis of respondeat superior." Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1479 (11th Cir. 1991). To prove § 1983 liability against a municipality based on custom, "a plaintiff must establish a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." Id. at 1481 (internal quotation marks and citation omitted). Because Chatham County contracted its provision of inmate medical care out to Corizon, Corizon can be held liable like a municipality under § 1983. Denham v. Corizon Health, Inc., 675 F. App'x 935, 940 (11th Cir. 2017); Fields v. Corizon Health, Inc., 490 F. App'x 174, 181 (11th Cir. 2012). Corizon cannot be liable merely because of the conduct of its employees. Denham, 675 F. App'x at 940 (citing McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004)).

First, Plaintiffs argue that Corizon had a policy of placing patients needing infirmary level care in R&D until a bed became available in the infirmary. (Doc. 194 at 17–18.) Plaintiffs argue that this policy "creat[ed] recurrent situations when patients would likely be denied timely and adequate medical care." (Id. at

15

17.) Even presupposing that the failure to provide infirmary level care outside of the infirmary is a constitutional violation and there is evidence to support such a violation in this case, Plaintiffs have still failed to show that Corizon had a policy or custom. Other than this instant case with Alexander, Plaintiffs have not cited to any evidence in which an inmate-patient was placed in R&D instead of infirmary and did not receive constitutionally adequate care. While Plaintiffs cite to deposition testimony that the infirmary was often full, there is no evidence that those inmates were denied timely and adequate medical care. See Denham, 675 F. App'x at 944 (finding that plaintiff failed to establish Corizon had a policy of deliberate indifference because her claim rested only on her experiences and noting that a single incident of unconstitutional activity is insufficient to impose liability under § 1983); Craig v. Floyd Cty., Ga., 643 F.3d 1306, 1311 (11th Cir. 2011). Moreover, because Plaintiffs have failed to identify a pattern of similar constitutional violations, they have not established that Corizon knew of a need for more or different training related to the provision of infirmary level medical care. See Denham, 675 F. App'x at 942.

Second, Plaintiffs' contend that Corizon's failure to train Neisler on how to develop a plan of care constitutes deliberate indifference. (Doc. 194 at 18-19.) Plaintiffs' claim on this ground

fails for the same reason previously discussed: Plaintiffs have presented no evidence that Corizon had a policy or custom of failing to teach its medical staff and employees how to create a plan of care for a patient. Again, even if this Court found that not developing a plan of care rose to the level of deliberate indifference, Plaintiffs have not shown how this was a widespread practice or a policy of Corizon's.[3] Plaintiffs have only pointed to this one act of Neisler which is insufficient to impose liability. See Craig, 643 F.3d at 1312. Moreover, as to the failure to train claim,

> [a] municipality might be on notice of a need to train or supervise in a particular area if 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need' or if the employees of the municipality 'in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers.'

Denham, 675 F. App'x at 942 (quoting City of Canton v. Harris, 489 U.S. at 378, 390, 390 n.10, 109 S. Ct. 1197, 1205, 103 L. Ed. 2d 412). Again, "[b]ecause [Plaintiffs] failed to identify a pattern of similar constitutional violations, [they] also ha[ve] not established that [Corizon employees] so often violate

---

[3] This Court has granted summary judgment to Defendant Neisler and does not find any of her conduct to have violated Alexander's constitutional rights. (See Doc. 235.)

constitutional rights that the need for further [plan of care] training must have been plainly obvious to [Corizon] policymakers." Id.  Plaintiffs have also failed to show how Corizon's inadequacy in training LPNs and nursing staff on developing plans of care was "so likely to result in the violation of constitutional rights" as to warrant different or more training. Denham, 675 F. App'x at 942.

Finally, Plaintiffs' argue that Corizon understaffed CCDC and the understaffing was based on a policy decision to avoid costs. (Doc. 194 at 20.) First, Plaintiffs have not shown that the failure to staff a nightshift RN in R&D was constitutionally deficient. Plaintiffs essentially argue that the medical staff in R&D, LPNs, are not good enough and that the failure to have a higher level of nurse is deliberate indifference. Plaintiffs, however, cite to no authority that having an LPN instead of an RN constitutes deliberate indifference or otherwise violates an inmate's constitutional rights. See Grochowski v. Clayton Cty., Ga. through Turner, 961 F.3d 1311, 1321-22 (11th Cir. 2020) (finding that the plaintiffs failed to show how the jail's staffing fell below a constitutional minima); Free v. Granger, 887 F.2d 1552, 1556 (11th Cir. 1989) ("It is not sufficient, however, to point to the absence of a medical doctor, or of a round-the-clock nurse, and decry the staffing policy as unconstitutional.").

18

Additionally, Plaintiffs cannot "rely on a generalized policy of understaffing," but must show that Corizon's action was " 'taken with the requisite degree of culpability . . . with deliberate indifference to its known or obvious consequences.' " Trammell v. Paxton, 322 F. App'x 907, 911 (11th Cir. 2009) (quoting McDowell, 392 F.3d at 1291). Plaintiffs have failed to demonstrate another occasion on which the lack of a nightshift RN in R&D contributed to or exacerbated an inmate's medical condition. See McDowell, 392 F.3d at 1290-91 (finding that the plaintiff failed to present evidence of another occasion in which the jail's understaffing, and resulting inability to transport, contributed to or exacerbated an inmate's medical condition and, therefore, there was no evidence of a policy of understaffing at the jail). Thus, the Court finds that Plaintiffs cannot show that Corizon's decision not to staff a nightshift RN was done with deliberate indifference to Alexander's constitutional rights.

Ultimately, Plaintiffs rely on Alexander's experience at CCDC. However, "an isolated incident is insufficient" to impose liability on Corizon. McDowell, 392 F.3d at 1290. Thus, Corizon's motion for summary judgment is **GRANTED.**

## II.   PUNITIVE DAMAGES AND ATTORNEYS' FEES

Corizon also moves for summary judgment on Plaintiffs' claims for punitive damages and attorneys' fees. (Doc. 117, Attach. 1 at 20-21.) Corizon argues that there is no evidence to support the

recovery of punitive damages as a matter of law because no Corizon committed a tort with the requisite degree of culpability to support a punitive damages award and because there is no culpable conduct by Corizon itself. (Id. at 21.) In response, Plaintiffs argue that evidence supports a jury question on punitive damages on Plaintiffs' § 1983 claim because Plaintiffs "ha[ve] shown that Corizon had knowledge of its deficiencies and did nothing to correct them, allowing patients to be placed at risk for constitutionally deprivation [sic] of medical care." (Doc. 194 at 23.) Plaintiffs also argue that there is a jury question on punitive damages in their survival action because they do not need to show a policy decision as the basis for punitive damages and punitive damages can be supported with claims of corporate negligence. (Id.)

First, because the Court finds that Corizon is entitled to summary judgment on Plaintiffs' § 1983 claim against it, Corizon's motion for summary judgment on Plaintiffs' derivate claim for punitive damages is due to be granted as well. The Court finds that Corizon is also entitled to summary judgment on Plaintiffs' claim for punitive damages in the survival action. Pursuant to O.C.G.A. § 51-12-5.1(b), punitive damages may be awarded where "the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences."

Plaintiffs, in response to Corizon's motion for summary judgment, do not argue that Corizon's conduct demonstrates "willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences," but instead argues that its punitive damages claim can be based upon "corporate negligence, including failure to train," and cites a Georgia Court of Appeals decision from 2019. (Doc. 194 at 24.) The Georgia Court of Appeals reconsidered the opinion Plaintiffs cite to and ultimately found that, because the plaintiffs' substantive claims were subject to summary judgment, their derivative claims for punitive damages likewise failed. Oconee Fed. Sav. & Loan Ass'n v. Brown, 351 Ga. App. 561, 576, 831 S.E.2d 222, 234 (2019), cert. dismissed (Mar. 13, 2020). In absence of any argument that Corizon's conduct showed "willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences" or authority supporting Plaintiffs' claim that punitive damages may lie for corporate negligence, Corizon's motion for summary judgment on punitive damage is due to be granted.

As to attorneys' fees, Plaintiffs state they are not pursuing a claim for attorneys' fees under O.C.G.A. § 13-6-11 but instead only seek attorneys' fees pursuant to 42 U.S.C. § 1988. (Doc. 194 at 23-24.) 42 U.S.C. § 1988 allows a court to award attorneys'

fees to a prevailing party in § 1983 actions. However, because the Court finds that Corizon is entitled to summary judgment on Plaintiffs' § 1983 claim against it, Corizon's motion for summary judgment on attorneys' fees is due to be granted as well. Corizon's motion for summary judgment on Plaintiffs' claims for punitive damages and attorneys' fees is **GRANTED**.

CONCLUSION

For the foregoing reasons, Defendant Corizon's Partial Motion for Summary Judgment on Deliberate Indifference, Punitive Damages, and Attorneys' Fees (Doc. 117) is **GRANTED**.

SO ORDERED this 10th day of September 2020.

_____
WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA